FILED
US DISTRICT COURT
WESTERN DISTRICT
OF ARKANSAS

Sep 4, 2019

OFFICE OF THE CLERK

**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

| | |
|---|---|
| NORTHPORT HEALTH SERVICES OF ARKANSAS, LLC d/b/a SPRINGDALE HEALTH AND REHABILITATION CENTER; NWA NURSING CENTER, LLC d/b/a THE MAPLES, | PLAINTIFFS |
| v.   No. **19-5168** | |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ALEX M. AZAR II, in his official capacity as Secretary of the United States Department of Health and Human Services; CENTERS FOR MEDICARE & MEDICAID SERVICES, SEEMA VERMA, in her official capacity as the Administrator of the Centers for Medicare & Medicaid Services | DEFENDANTS |

**COMPLAINT**

Northport Health Services of Arkansas, LLC d/b/a Springdale Health and Rehabilitation Center ("Springdale") and NWA Nursing Center, LLC d/b/a the Maples ("The Maples") (collectively, "Plaintiffs") bring this complaint for declaratory and injunctive relief against Defendants United States Department of Health and Human Services ("HHS"); Alex M. Azar II, in his official capacity as Secretary of HHS; the Centers for Medicare & Medicaid Services ("CMS"); and Seema Verma, in her official capacity as Administrator of CMS (collectively, "Defendants").  In support thereof, Plaintiffs state the following:

**NATURE OF THE ACTION**

1.     Plaintiffs file this action to vindicate their rights under federal law, including the Federal Arbitration Act ("FAA"), 9 U.S.C. §§1-16, to enter into arbitration agreements.  The Supreme Court has repeatedly upheld and enforced those rights and has pointedly rejected a federal agency's attempt to defeat the FAA's "liberal federal policy favoring arbitration agreements,"

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U. S. 1, 24 (1983), through strategic use of regulatory authority, *see Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612 (2018) (rejecting National Labor Relations Board's attempt to nullify arbitration agreements).  Simply put, because of the FAA, arbitration cannot be treated as a second-class form of dispute resolution.  *See, e.g.*, *Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1424 (2017) (applying *DIRECTV, Inc. v. Imburgia*, 136 S. Ct. 463, 465 (2015), which in turn applied *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006)).  Nonetheless, despite this statutory law and precedent, Defendants have spent the past several years trying to weaken arbitration in the context of long-term care facilities, such as nursing homes.

2.      In 2016, Defendants promulgated a rule prohibiting Medicare-participating skilled nursing facilities ("SNFs") and Medicaid-participating nursing facilities ("NFs") from entering into pre-dispute arbitration agreements with residents at their facilities, even if the agreements would be beneficial to their residents.  *See* Ex. 1 (Medicare and Medicaid Programs; Reform of Requirements for Long-Term Care Facilities, 81 Fed. Reg. 68,688 (October 4, 2016) (the "Original Arbitration Rule")).  The Original Arbitration Rule was challenged in federal court and promptly enjoined as fundamentally inconsistent with the FAA.  *See Am. Health Care Ass'n v. Burwell*, 217 F. Supp. 3d 921 (N.D. Miss. 2016).  In particular, the Northern District of Mississippi barred Defendants' enforcement of the rule because, among other failings, Defendants were purporting to use their "authority in an unprecedented manner to enact a Rule which raises serious concerns under both the FAA and under general separation of powers principles."  *Id.* at 944.

3.      Defendants did not appeal that injunction.  Instead, they opted to open another round of notice-and-comment rulemaking to amend the Original Arbitration Rule.  The CMS Administrator signed the amended rule on February 13, 2019, and the final rule was received in

the Office of the Federal Register on July 10, 2019.  Defendants then issued the Amended Arbitration Rule on July 19, 2019.  *See* Ex. 2 (Medicare and Medicaid Programs; Revision of Requirements for Long-Term Care Facilities; Arbitration Agreements, 84 Fed. Reg. 34,718 (July 19, 2019) (the "Amended Arbitration Rule")).  Unless preliminarily enjoined by this Court, the Amended Arbitration Rule will go into effect on September 16, 2019.

4.     As explained in greater detail below, the Amended Arbitration Rule is just as unlawful as the Original Arbitration Rule.  Indeed, the differences between the rules are more cosmetic than material.  For instance, the Amended Arbitration Rule still prevents long-term care facilities from requiring agreement to arbitrate as a condition for admission, even though such agreements benefit both facilities and residents.  Because the government has long taken the view that existing residents cannot be forced to enter arbitration agreements, the "new" Rule still effectively prevents long-term care facilities from insisting on pre-dispute arbitration agreements.  At the same time, the Amended Arbitration Rule imposes new requirements—such as a 30-day rescission right—that apply only to arbitration, not to other contractual terms.

5.     Those and other aspects of the Amended Arbitration Rule continue to violate the FAA, which does not tolerate rules that single out arbitration agreements for specially disfavored treatment.  *See, e.g.*, *Kindred Nursing*, 137 S. Ct. at 1425 ("Because that rule singles out arbitration agreements for disfavored treatment, we hold that it violates the FAA.").  Indeed, the only material legal developments since the Original Arbitration Rule was invalidated are the Supreme Court's *Kindred Nursing* and *Epic* decisions, which underscored that federal agencies' administrative preferences cannot trump the FAA and that the FAA applies with full force in the context of long-term care facilities.  The Amended Arbitration Rule also exceeds Defendants' authority under both the Medicare Act and Medicaid Act, neither of which empowers Defendants to regulate alternative

dispute resolution.  To the contrary, Congress has repeatedly refused to grant Defendants the power to regulate arbitration agreements.  But even if Defendants had such authority, despite Congress' failure to delegate it, the Amended Arbitration Rule would still be unlawful.  The Amended Arbitration Rule unreasonably deprives this important industry and the countless residents it serves of many of the benefits of arbitration, including lower costs, lower prices, and enhanced care, and also marks the reversal of the government's prior pro-arbitration policy without justification.

6.      Accordingly, Plaintiffs respectfully request that the Court enter a declaratory judgment that the Amended Arbitration Rule is unlawful, stay the effective date of the rule, and preliminarily and permanently enjoin Defendants from enforcing it.  As the district court recognized when it enjoined the Original Arbitration Rule, Defendants are engaged in what is essentially a rearguard action against the FAA and the Supreme Court's decisions upholding that statute's pro-arbitration mandate.  The Court thus has "a duty to ensure that defendants are not seeking to exercise power that is properly reserved for Congress."  *Am. Health Care Ass'n*, 217 F. Supp. 3d at 939.

## PARTIES

7.      Plaintiff Northport Health Services of Arkansas, LLC d/b/a Springdale Health and Rehabilitation Center is an Arkansas company located in Springdale, Arkansas.  Its address is 102 North Gutensohn Road, Springdale, AR 72762.  Springdale is a 140-bed skilled nursing facility that participates in the Medicare and Medicaid programs.  Springdale is party to a Medicare provider agreement with CMS that authorizes Springdale to be paid by Medicare for care and services delivered to beneficiaries of the Medicare program. Springdale also is party to a separate Medicaid provider agreement with The Arkansas Department of Human Services that authorizes Springdale to be paid by Arkansas Medicaid for care and services delivered to beneficiaries of the State of Arkansas's Medicaid program.

8.      Springdale requires prospective residents to assent to an agreement to arbitrate as a condition for admission—*i.e.*, it will generally not enter into a contractual relationship with a potential resident (or that potential resident's legal representative) absent an agreement to arbitrate any disputes that may arise.  Springdale does this because it believes that arbitration is a superior form of dispute resolution, in that it is equally fair to all parties but also is simpler and less expensive.  A uniform dispute-resolution policy, moreover, allows Springdale to achieve economies of scale, which results in lower costs and greater efficiency.  If allowed to do so, Springdale would continue to require entering into an arbitration agreement as a condition for admission.

9.      Springdale does not categorically give its residents 30-days to rescind their contracts and would continue that practice if the law did not require otherwise.  A *per se* right to rescission increases costs and administrative burdens and results in less predictable relationships. Springdale also instructs its admission staff to provide the same explanation of the arbitration provision to each prospective resident and his or her family and would continue that practice if the law did not require otherwise.  Springdale does not have a retention period for arbitration decisions, and would continue that practice if the law did not require retention for a longer period.  If Springdale were to lose federal reimbursement through the Medicare and Medicaid programs, it would become insolvent and be forced to close.

10.     NWA Nursing Center, LLC d/b/a The Maples is an Arkansas company with its headquarters in Springdale, Arkansas.  Its address is 6456 Lynchs Prairie Cove, Springdale, AR 72762.  The Maples is party to a Medicare provider agreement with CMS that authorizes The Maples to be paid by Medicare for care and services delivered to beneficiaries of the Medicare program. The Maples also is party to a separate Medicaid provider agreement with the Arkansas

Department of Human Services that authorizes The Maples to be paid by Arkansas Medicaid for care and services delivered to beneficiaries of the State of Arkansas's Medicaid program.

11.     The Maples is a 140-bed skilled nursing facility that participates in the Medicare and Medicaid programs.  The Maples enters into arbitration agreements with its residents because it believes that arbitration is a superior form of dispute resolution, in that it is equally fair to all parties but also is simpler and less expensive.

12.     The Maples does not categorically give its residents 30-days to rescind their contracts and would continue that practice if the law did not require otherwise.  A *per se* right to rescission increases costs and administrative burdens and results in less predictable relationships. This facility also instructs its admission staff to provide the same explanation of the arbitration provision to each prospective resident and his or her family and would continue that practice if the law did not require otherwise.  The Maples does not have a retention policy for arbitration decisions and would continue that practice if the law did not require otherwise.  If The Maples were to lose federal reimbursement through the Medicare and Medicaid programs, it too would become insolvent and be forced to close.

13.     Defendant United States Department of Health and Human Services is a federal cabinet-level department tasked by Congress with administering various healthcare-related statutes.  It is headquartered at 200 Independence Ave., S.W., Washington, DC 20201.

14.     Defendant Alex M. Azar II is the Secretary of Health and Human Services.  He maintains offices at 200 Independence Ave., S.W., Washington, DC 20201.  Although the Secretary has delegated many responsibilities to CMS, he retains legal responsibility for the Amended Arbitration Rule, which he formally approved.  Secretary Azar is sued in his official capacity.

15.     Defendant Centers for Medicare & Medicaid Services is an agency within the Department of Health and Human Services that administers the Medicare program and oversees the states' operation and administration of each states' Medicaid program.  It is headquartered at 7500 Security Boulevard, Baltimore, MD 21244.

16.     Defendant Seema Verma is the Administrator of Centers for Medicare & Medicaid Services.  She maintains offices at 7500 Security Boulevard, Baltimore, MD 21244. Administrator Verma is sued here in her official capacity.  Administrator Verma also formally approved the Amended Arbitration Rule.

## JURISDICTION AND VENUE

17.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §1331.  This action arises under, among other federal statutes, the Administrative Procedure Act ("APA"), 5 U.S.C. §§702, 705, 706, and the Declaratory Judgment Act, 28 U.S.C. §§2201-02.  The All Writs Act, 28 U.S.C. §1651, moreover, further grants this Court authority to, among other things, enter preliminary relief to preserve the status quo pending its review of the merits of plaintiffs' claims.

18.     Alternatively, if the Court determines that any legal claims asserted here arise under the Medicare Act within the meaning of 42 U.S.C. §§405(h) and 1395ii, the Court has subject-matter jurisdiction over those claims under 42 U.S.C. §405(g) because they have been presented to the Secretary and because exhaustion of administrative remedies following enforcement of the Amended Arbitration Rule would be futile.

19.     Plaintiffs have standing because each "has been or will in fact be perceptibly harmed by the challenged agency action."  *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 688 (1973).  The Amended Arbitration Rule purports to make unlawful business practices relating to alternative dispute resolution that Plaintiffs now engage in and would continue to engage in but for the Amended Arbitration Rule.  As explained in the

attached declarations, Plaintiffs seek judicial relief here to allow them to continue such business practices.  *See* Ex. 3 (Decl. of Claude E. Lee, Springdale); Ex. 4 (Decl. of John McPherson, The Maples).

20.     Venue is proper in this district pursuant to 28 U.S.C. §1391(e) because Plaintiffs reside in this district, and a substantial part of the events giving rise to this action occurred in this district.  No real property is involved in the action.

## FACTUAL ALLEGATIONS

## THE FEDERAL ARBITRATION ACT

21.     The Federal Arbitration Act ("FAA") "reflects an emphatic federal policy in favor of arbitral dispute resolution."  *Marmet Health Care Ctr., Inc. v. Brown*, 565 U.S. 530, 533 (2012) (per curiam) (quoting *KPMG LLP v. Cocchi*, 565 U.S. 18, 21 (2011) (per curiam)) (in turn quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985)).  Congress enacted the FAA because it concluded that arbitration is often a faster, simpler, and less expensive form of dispute resolution than other mechanisms.

22.     Section 2 of the FAA states that a "written provision in … a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, … shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. §2.  Thus, if an arbitration agreement is the product of "fraud" or is "unconscionab[le]"—which are well-recognized grounds for invalidating "'contracts generally'"—Section 2 permits courts to "invalidate" the agreement. *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996) (quoting *Perry v. Thomas*, 482 U.S. 483, 493 n.9 (1987)).  Otherwise, Section 2 directs that "arbitration agreements" be "'rigorously enforce[d]' … according to their terms."  *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013) (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985)).  Accordingly,

8

federal courts routinely reject efforts to nullify arbitration, especially where arbitration has been singled out for less favorable treatment.  In short, under the FAA, a jurisdiction cannot "target arbitration either by name or by more subtle methods."  *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1418 (2019); *see also Kindred Nursing*, 137 S. Ct. at 1426 ("The FAA thus preempts any state rule discriminating on its face against arbitration … And not only that: The Act also displaces any rule that covertly accomplishes the same objective by disfavoring contracts that (oh so coincidentally) have the defining features of arbitration agreements.").

23.    Applying the longstanding presumption against implied repeals of statutes, *see, e.g.*, *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018); *Morton v. Mancari*, 417 U.S. 535, 551 (1974), the Supreme Court has explained that the FAA's mandate that arbitration agreements be "enforce[d] … according to their terms" can be displaced only by a "'contrary congressional command'" in another federal statute. *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012) (quoting *Shearson/Am. Express Inc. v. McMahon*, 482 U.S. 220, 226 (1987)).  If another statute is "silent" on the question of arbitration, the FAA controls.  *Id.* at 104.  That is consistent with the general rule that "[a] party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing a clearly expressed congressional intention that such a result should follow.  The intention must be clear and manifest." *Epic*, 138 S. Ct. at 1624 (citations and quotations omitted).  A federal agency exercising delegated authority thus cannot displace the FAA's pro-arbitration mandate unless Congress has clearly authorized the agency to do so.  *Id.* at 1629.

24.    That rule is reinforced by the reality that "when Congress wants to mandate particular dispute resolution procedures it knows exactly how to do so. … Congress has likewise shown that it knows how to override the Arbitration Act when it wishes." *Id.* at 1626 (collecting

examples).  When it wishes to vest federal agencies with the authority to regulate or prohibit the use of arbitration agreements in certain industries, Congress uses unambiguous statutory language. For example, Section 1028 of the Dodd-Frank Wall Street Reform and Consumer Protection Act provides that, if certain conditions are met, the Consumer Financial Protection Bureau "may prohibit or impose conditions or limitations on the use of an agreement between a covered person and a consumer for a consumer financial product or service providing for arbitration of any future dispute between the parties."  12 U.S.C. §5518(b); *see also, e.g.*, 15 U.S.C. §78o(o) (authorizing the Securities and Exchange Commission to, "by rule, … prohibit, or impose conditions or limitations on the use of, agreements that require customers or clients of any broker, dealer, or municipal securities dealer to arbitrate any future dispute between them"); Department of Defense Appropriations Act, 2010, Pub. L. No. 111-118, §8116(a), 123 Stat. 3409, 3454-55 (2009) (prohibiting expenditure of funds unless certain government contractors and subcontractors agree not to use or enforce particular arbitration agreements).

25.     Congress's judgment that arbitration merits robust protection is supported by empirical data.  Arbitration repeatedly has been shown to be fair to all sides and to be a preferable alternative to court proceedings.  For example, a 2015 survey of parties and attorneys who participated in arbitrations under the Kaiser Foundation Health Plan's arbitration system—which covers more than 7 million members in California—showed that 90% of the respondents who went through arbitrations that year reported that the arbitration system was as good or better than the state court system.  *See* Annual Report of the Office of the Indep. Adm'r of the Kaiser Found. Health Plan, Inc. Mandatory Arbitration Sys. for Disputes with Health Plan Members Jan. 1, 2015 – Dec. 31, 2015 at 53-54, *available at* http://www.oia-kaiserarb.com/pdfs/2015-Annual-Report.pdf.  It is no mystery why arbitration is so useful.  Arbitrations generally take only a matter

of months to resolve, instead of the years consumed in court. *Compare* United States Dist. Courts—Nat'l Judicial Caseload Profile (2018), https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0930.2018.pdf (as of Sept. 2018, the average civil lawsuit took 27.3 months to reach trial), *with* Consumer Fin. Prot. Bureau, Arbitration Study: Report to Congress, pursuant to Dodd-Frank Wall St. Reform & Consumer Prot. Act §1028(a) (Mar. 2015), at section 5, page 73, http://files.consumerfinance.gov/f/201503_cfpb_arbitration-study-report-to-congress-2015.pdf (consumer arbitrations through AAA are resolved within 180 days).

26.    Arbitration is also procedurally simpler, which reduces the burdens on the parties, both monetary and otherwise. Indeed, arbitration's simplified procedures often allow individuals to proceed without a lawyer. This aspect of arbitration is particularly beneficial to those with smaller claims, such as a billing dispute. It may not be cost effective to pay a lawyer on an hourly, or even a flat-fee, basis to resolve such a dispute. And many lawyers will be unwilling—because of the small stakes and individualized facts—to take such a case on a contingency-fee basis. Yet the complexities of judicial litigation sometimes make pursuit of these claims on a *pro se* basis effectively impossible. Thus, absent arbitration, many individuals could not seek relief at all.

27.    Arbitration is especially valuable when it is agreed upon before a dispute arises. As one commentator has explained, post-dispute arbitration agreements "amount to nothing but a beguiling mirage" because once a dispute has arisen, the parties' emotional investment in the case—and their lawyers' self-interest—almost always prevents them from agreeing to arbitration. Theodore J. St. Antoine, *Mandatory Arbitration: Why It's Better than It Looks*, 41 U. Mich. J.L. Reform 783, 790 (2008). Pre-dispute arbitration agreements thus create greater predictability for everyone, resulting in lower costs.

11

**LONG-TERM CARE FACILITIES AND THE MEDICARE AND MEDICAID ACTS**

28.     Many individuals in the United States, especially those who are elderly or disabled, require long-term care.  The nation thus has a robust marketplace of long-term health facilities that serve those individuals to improve their health and wellbeing.  The quality of care provided by these facilities has increased in recent decades—notably, during the same time period that long-term care facilities have routinely used arbitration agreements.  *See, e.g.*, *Fairness in Nursing Home Arbitration Act of 2008: Hearing Before the Subcomm. On Commercial & Admin. Law of the H. Comm. on the Judiciary*, 110th Cong. 33 (2008) (citing CMS data to demonstrate the increasing quality of care at SNFs and NFs since the early 2000s in terms of staffing levels, pain levels, and the number of quality-of-care citations issued).

29.     Congress has enacted legislation to help pay for the costs of long-term care facilities.

30.     The Medicare Act, 42 U.S.C. §§1395 to 1395*lll*, establishes a federally funded and federally administered health insurance program that pays for medical care provided to individuals 65 years of age and older and certain disabled individuals in SNFs.  For example, the Medicare Act covers post-hospitalization care provided in a SNF for up to 100 days during an individual's "spell of illness."  42 U.S.C. §1395d(a)(2)(A).  A nursing facility that wishes to care for Medicare beneficiaries and be paid by Medicare for such care and services must enter a contract, called a provider agreement, with CMS agreeing to comply with the payment and operating standards established by CMS.

31.     The Medicaid Act, 42 U.S.C. §§1396 to 1396w-5, establishes a program separate and distinct from Medicare "for the purpose of enabling each State, as far as practicable under the conditions in such State to furnish (1) medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient

to meet the costs of necessary medical services, and (2) rehabilitation and other services to help such families and individuals attain or retain capability for self-care….". 42 U.S.C. §1396. Medicaid is jointly funded by the states and the federal government. To qualify for federal funds, states must submit a state plan to the Secretary detailing, among other things, how the state will administer its program and the scope of covered persons and services of the state's Medicaid program. 42 U.S.C. §§1396 and 1396a. A state Medicaid plan must cover NF services. *See id.* §§1396a(a)(10)(A), 1396d(a)(4)(A). A nursing facility that wishes to care for Medicaid beneficiaries and be paid by the state Medicaid program for such care and services must enter a contract, called a provider agreement, with the state Medicaid program agreeing to comply with federal and state payment and operating standards.

32. The Medicare and Medicaid Acts impose similar requirements on SNFs and NFs. The Medicare Act defines a "skilled nursing facility" as an institution that, among other things, "is primarily engaged in providing to residents … skilled nursing care and related services for residents who require medical or nursing care, or … rehabilitation services for the rehabilitation of injured, disabled, or sick persons." 42 U.S.C. §1395i-3(a)(1). The Medicaid Act uses identical language in defining a "nursing facility," while adding that such an institution may also be primarily engaged in providing "health-related care and services to individuals who because of their mental or physical condition require care and services (above the level of room and board) which can be made available to them only through institutional facilities." *Id.* §1396r(a)(1)(C).

33. The Medicare and Medicaid Acts impose several categories of requirements on SNFs and NFs, including requirements related to the provision of services, 42 U.S.C. §§1395i-3(b) (SNFs), 1396r(b) (NFs), as well as resident rights, *id.* §§139(c) (SNFs), 1396r(c) (NFs). The Medicare and Medicaid Acts also impose similar requirements on SNFs and NFs "relating to

13

administration and other matters." *Id.* §§1395i-3(d) (SNFs), 1396r(d) (NFs).  For instance, a SNF or NF must be "administered in a manner that enables it to use its resources effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychosocial wellbeing of each resident."  *Id.* §§1395i-3(d)(1)(A) (SNFs), 1396r(d)(1)(A) (NFs). Administrative requirements are also imposed on SNFs and NFs with respect to facility administrators, *id.* §§1395i-3(d)(1)(C) (SNFs), 1396r(d)(1)(C) (NFs); licensure, *id.* §§1395i-3(d)(2) (SNFs), 1396r(d)(2) (NFs); sanitation and infection control, *id.* §§1395i-3(d)(3) (SNFs), 1396r(d)(3) (NFs); and compliance with applicable federal, state, and local laws, *id.* §§1395i-3(d)(4)(A) (SNFs), 1396r(d)(4)(A) (NFs).  The Medicare Act also provides that a SNF "must meet such other requirements relating to the health, safety, and well-being of residents … as the Secretary may find necessary."  *Id.* §1395i-3(d)(4)(B).  The Medicaid Act uses nearly identical language, specifying that NFs "must meet such other requirements relating to the health and safety of residents … as the Secretary may find necessary."  *Id.* §1396r(d)(4)(B).

34.     CMS, in turn, has promulgated a single set of regulations known as the "Requirements for Long Term Care Facilities" ("Requirements of Participation" or "ROPs"), which are found in 42 C.F.R. part 483, subpart B.  SNFs and NFs must comply with the ROPs with respect to all residents, not just those who are Medicare and/or Medicaid beneficiaries.  CMS first promulgated the ROPs in 1989, when the agency was known as the Health Care Financing Administration.  *See* Medicare and Medicaid; Requirements for Long Term Care Facilities, 54 Fed. Reg. 5316 (Feb. 2, 1989).

35.     The Medicare and Medicaid Acts provide that determinations of compliance with the ROPs will be made using onsite inspections known as "surveys."  42 U.S.C. §§1395i-3(g) (SNFs), 1396r(g)(2) (NFs).  If a facility is found not to be in compliance with Medicare and/or

14

Medicaid requirements, the Secretary has discretion to impose a variety of sanctions and remedies, including termination of the facility's participation in the Medicare and Medicaid programs, denial of payment, placement of a temporary manager in the facility, and imposition of civil money penalties up to $21,393 either per incident (i.e., for each time that the deficiency occurred) or for each day that a violation existed (i.e., from the first day that a violation occurred until the deficiency was determined to have been eliminated).  *See id.* §§1395i-3(h)(2) (SNFs), 1396r(h)(2) (NFs); Adjustment of Civil Monetary Penalties for Inflation (Jan. 22, 2019).

36.     For more than 27 years, until the Original Arbitration Rule was promulgated in October 2016, the ROPs placed no restrictions on the use of arbitration agreements.  Congress has never granted HHS or CMS explicit or implicit authority to regulate the use of arbitration agreements, much less to prohibit arbitration of certain types of claims or to put conditions on when and whether arbitration agreements may be used.  Neither the Medicare Act nor the Medicaid Act addresses arbitration agreements or alternative dispute resolution—let alone clearly authorizes HHS or CMS to regulate arbitration agreements or impose conditions on them.  Thus, there is not even a plausible argument that Congress has made its "intention … clear and manifest," *Epic*, 138 S. Ct. at 1624 (internal quotations omitted), that the Medicare or Medicaid Act confers on Defendants regulatory authority to nullify or supersede the FAA's pro-arbitration mandate.

37.     In fact, Congress has repeatedly rejected legislation that would have amended the FAA to invalidate arbitration agreements between SNFs and NFs and their residents.  For example, in 2008, the House of Representatives considered the Fairness in Nursing Home Arbitration Act of 2008, H.R. 6126, 110th Cong.  That proposed legislation would have amended the FAA to provide that pre-dispute arbitration agreements between SNFs and NFs and their residents "shall not be valid or specifically enforceable."  *Id.* §2(a).  House Bill 6126 received a committee hearing,

15

*see Fairness in Nursing Home Arbitration Act of 2008: Hearing Before the Subcomm. on Commercial & Admin. Law of the House Comm. on the Judiciary*, 110th Cong. (2008), and was reported out of committee with dissenting views, *see* H.R. Rep. No. 110-894 (2008). The bill was not approved by the House of Representatives or the Senate.

38.     Notably, the then-Secretary of HHS, Michael O. Leavitt, formally opposed House Bill 6126. *See* H.R. Rep. No. 110-894, at 13-15 (reproducing Letter from Michael O. Leavitt, Sec'y of Health & Human Servs., to House Comm. on the Judiciary (July 29, 2008)). Secretary Leavitt explained that pre-dispute arbitration agreements between SNFs and NFs and their residents "do not hinder the Administration's ability to take enforcement action against nursing homes providing poor quality care." *Id.* at 13. Secretary Leavitt further explained that "[f]or the past eighty years, the federal government has consistently found that arbitration may be a favorable method of resolving disputes and, in some instances, may be preferable to litigation. In enacting the [FAA] in 1925, Congress stated a clear preference for arbitration in resolving controversies arising out of contracts or transactions involving interstate commerce." *Id.*

39.     The same year that it did not enact House Bill 6126, the Senate considered the Fairness in Nursing Home Arbitration Act, S. 2838, 110th Cong. (2008). Like House Bill 6126, Senate Bill 2838 would have amended the FAA to provide that pre-dispute arbitration agreements between SNFs and NFs and their residents "shall not be valid or specifically enforceable." *Id.* §3(4). Senate Bill 2838 also received a formal hearing, *see* S. 2838, the Fairness in Nursing Home Arbitration Act: Joint Hearing Before the Subcomm. on Antitrust, Competition Policy & Consumer Rights of the Senate Comm. on the Judiciary, and the Senate Special Comm. on Aging, 110th Cong. (2008), and was reported out of committee with dissenting views, *see* S. Rep. No. 110-518 (2008). And Congress again declined to enact this proposed legislation.

40.     Nearly identical bills were introduced, considered, and rejected in subsequent Congresses.  *See* Fairness in Nursing Home Arbitration Act of 2009, H.R. 1237, 111th Cong. §2(a) (proposing to amend the FAA to provide that pre-dispute arbitration agreements between SNFs and NFs and their residents "shall not be valid or specifically enforceable"); Fairness in Nursing Home Arbitration Act, S. 512, 111th Cong. §3(b) (2009) (same); Fairness in Nursing Home Arbitration Act of 2012, H.R. 6351, 112th Cong. §2(a) (same).  Congress thus has thoroughly— and repeatedly—considered whether to regulate or prohibit the use of arbitration agreements between SNFs and NFs and their residents, and each time has declined to embrace that approach.

## THE PELOVITZ MEMORANDUM

41.     It is not just Congress that has recognized that the ordinary rules of arbitration should apply in the context of the contractual relationships between long-term care facilities and their residents.  CMS itself previously reached that same conclusion.  In particular, in 2003, CMS issued a nationwide memorandum to federal and state officials involved in the regulatory oversight of SNFs and NFs.  *See* Ex. 5 (Memorandum from Steven A. Pelovitz, Dir., Survey & Certification Grp., Ctrs. for Medicare & Medicaid Servs., to HHS Survey & Certification Grp. Reg'l Office Mgmt., *et al*. (Jan. 9, 2003) ("Pelovitz Memorandum" or "Pelovitz Mem.")).  The stated purpose of the Pelovitz Memorandum was to "address [CMS's] position regarding binding arbitration between nursing homes and prospective or current residents, in response to recent marketplace practices."  *Id.* at 1.

42.     In relevant part, the Pelovitz Memorandum explained that "[u]nder Medicare, whether to have a binding arbitration agreement is an issue between the resident and the nursing home."  Pelovitz Mem. at 1.  "Under Medicaid," CMS stated that it would "defer to State law as to whether or not such binding arbitration agreements are permitted subject to the concerns we have where Federal regulations may be implicated."  *Id.*  At the same time, CMS stated that it

17

believed that current residents of SNFs and NFs could not be obligated to sign arbitration agreements if they had not done so prior to admission.  *Id.* at 2.  The Pelovitz Memorandum also confirmed that the "existence of a binding arbitration agreement does not in any way affect the ability of the State survey agency or CMS to assess citations for violations of certain regulatory requirements, including those for Quality of Care."  *Id.*

43.    As explained above, then-Secretary Levitt further reinforced this view in his 2008 letter to Congress, which also concluded that arbitration in this context can be beneficial to the public, including facility residents, and should not be prohibited.

**THE ORIGINAL ARBITRATION RULE**

44.    In July 2015, CMS published a notice of proposed rulemaking soliciting comments on numerous potential revisions to the ROPs.  *See* Medicare & Medicaid Programs; Reform of Requirements for Long-Term Care Facilities; Proposed Rule, 80 Fed. Reg. 42,168 (July 16, 2015). CMS proposed adding language to the ROPs that would regulate the manner in which SNFs and NFs enter into arbitration agreements with their residents and solicited comments on whether it should ban SNFs and NFs from using arbitration agreements altogether.  *See id.* at 42,211, 42,242, 42,264-65.  CMS explained that it had included the regulation of arbitration agreements in the proposed rule to address unspecified "concerns" raised by unidentified "stakeholders."  *See id.* at 42,241.  CMS did not even mention the FAA, much less explain how it could prohibit the use of arbitration agreements entirely consistent with the FAA.

45.    To comment meaningfully on CMS's arbitration proposals, the American Health Care Association ("AHCA") submitted a request to CMS under the Freedom of Information Act, 5 U.S.C. §552, asking CMS to produce a copy of the "concerns" raised by "stakeholders" that the agency had referenced.  CMS responded by informing AHCA that there was only one such document in CMS's files:  a three-year-old letter submitted to CMS by the American Association

for Justice ("AAJ"), formerly known as the Association of Trial Lawyers of America ("ATLA"). *See* Ex. 6 (Letter from Joseph Tripline, Dir., Div. of FOIA Analysis, Ctrs. for Medicare & Medicaid Servs., to Lyn Bentley, Senior Dir. of Reg. Servs., Am. Health Care Ass'n (Aug. 25, 2015) (enclosing Letter from Mary Alice McLarty, Pres., Am. Ass'n for Justice, f/k/a Ass'n of Trial Lawyers of Am., to Patrick Conway, M.D., Dir., Office of Clinical Standards & Quality, Ctrs. for Medicare & Medicaid Servs. (Aug. 14, 2012) ("AAJ Letter"))). AAJ is an organization that describes itself as a "voluntary national bar association whose members primarily represent individual plaintiffs in civil actions." Br. of Am. Ass'n for Justice as Amici Curiae in Supp. of Resps. at 1, *CompuCredit Corp. v. Greenwood*, 565 U.S. 95 (2012) (No. 10-948); *see also* Br. of Am. Ass'n for Justice as Amici Curiae in Supp. of Resps. at 1, *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011) (No. 09-893) (repeating same description). Thus, CMS, in the Original Arbitration Rule proposed to regulate arbitration between SNFs and NFs and their residents based on concerns raised by a single stakeholder with a vested interest in preserving the ability of its members to sue SNFs and NFs in patient care litigation and a well-documented history of opposition to arbitration as demonstrated, *inter alia*, by the amicus briefs noted above.

46. Comments filed with the agency explained that the proposed rule ignored the FAA and that the general language of the Medicare and Medicaid Acts permitting the Secretary to promulgate requirements relating to resident health and safety did not supply the requisite clear congressional command necessary to override the FAA. Filed comments also explained that many of the statements in the proposed rule conflicted with the facts, including the assertion that purported concerns about arbitration were driven by a recent change in business practices—an assertion that could not be reconciled with the Pelovitz Memorandum, which had been CMS' stated policy since 2003. Nevertheless, despite these weaknesses, HHS and CMS pushed the

19

Original Arbitration Rule through before the 2016 presidential election.  The Original Arbitration Rule was published on October 4, 2016, and was set to go into effect on November 28, 2016.

47.     The Original Arbitration Rule barred SNFs and NFs from entering into pre-dispute arbitration agreements with their residents, asserting that "pre-dispute arbitration clauses are, by their very nature, unconscionable."  81 Fed. Reg. at 68,867, 68,792 (Oct. 4, 2016).  The Original Arbitration Rule also asserted that "[n]o resident, resident representative, or facility is being denied the opportunity to engage in arbitration to settle a dispute" because parties can still enter into arbitration agreements after disputes arise.  *Id.* at 68,796.  Three sources of statutory authority were given for this extraordinary action: (1) the Secretary's power to "issue such rules as may be necessary to the efficient administration of the functions of [HHS]," *id.* at 68,791 (citing 42 U.S.C. §§1302, 1395hh); (2) the Secretary's power under the Medicare and Medicaid Acts to "require [SNFs and NFs] to 'meet such other requirements relating to the health, safety, [and well-being] of residents … as the Secretary may find necessary,'" *id.* (quoting 42 U.S.C. §§1395i-3(d)(4)(B) and 1396r(d)(4)(B)); and (3) the Secretary's power to "establish" patient "right[s]," *id.* (citing 42 U.S.C. §§1395i-3(c)(1)(A)(xi) and 1396r(c)(1)(A)(xi)).

48.     On October 17, 2016, before the Original Arbitration Rule could go into effect, AHCA, the Mississippi Health Care Association, and several long-term care facilities filed a complaint seeking judicial review in the U.S. District Court for the Northern District of Mississippi.  Those plaintiffs sought a preliminary injunction to enjoin the Secretary of HHS and the Acting Administrator of CMS from enforcing the rule pending judicial review.

49.     On November 7, 2016, the Northern District of Mississippi preliminarily enjoined the Secretary and Acting Administrator from enforcing the Original Arbitration Rule.  The court concluded that all four of the requirements for a preliminary injunction were met:

A.      As to likelihood of success, the court concluded that the government's analysis was, among other failings, "fundamentally illogical," and that the precedent cited by the plaintiffs "present[ed] significant legal hurdles for defendants."  *Am. Health Care Ass'n v. Burwell*, 217 F. Supp. 3d 921, 930-31 (N.D. Miss. 2016).  Specifically, the court addressed whether the rule: (i) was barred by the FAA; (ii) was authorized by the Medicare or Medicaid Acts; (iii) was arbitrary and capricious; and/or (iv) violated the Regulatory Flexibility Act ("RFA").  The court readily found that Plaintiffs were likely to succeed in their challenge.

(i)      To begin, the court stressed that the U.S. Supreme Court's "statement that the FAA was 'designed to promote arbitration' and its ruling on the basis of the 'objectives of Congress' makes it seem likely that the Supreme Court would provide some significant degree of scrutiny to CMS' decision to ban a particular form of arbitration, even if that ban did not affect existing contracts."  *Id.* at 931 (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 345 (2011)). The court also concluded that *CompuCredit*'s holding "that the FAA's mandate that arbitration agreements be 'enforce[d] … according to their terms' can be displaced only by a 'contrary congressional command' in another statute. …  presents further significant difficulties for defendants," *id.* at 932 (quoting *CompuCredit*, 565 U.S. at 98), and emphasized that any reliance on a purported "disparity in bargaining power" is "problematic in light of the Supreme Court's 2013 decision in … *Italian Colors* …."  *Id.* at 933 (citing *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013)).

(ii)     Regarding the Medicare and Medicaid Acts, the district court explained that the rule may conflict with "basic separation of powers principles." *Id.* at 935; *see also id.* at 934 ("Congress' failure to enact positive legislation should not serve as an excuse for the executive branch to assume powers which are properly reserved for the legislative branch."); *id.* at 939 ("[T]his case raises serious separation of powers concerns …."). The court reasoned that CMS's authority over "'health and safety'" and to "establish 'other right[s]' to 'protect and promote the rights of each resident'" is too "vague" to supersede the FAA's specific mandate. *Id.* at 938. The court also placed weight on the fact that Congress has rejected calls to regulate arbitration, reasoning that this evidence is "particularly strong," and "certainly seems relevant in determining whether a federal agency which asserts extraordinarily broad powers, pursuant to a vague statutory mandate, actually had the authority it claims to have had." *Id.* at 935-36; *see also id.* at 936 ("Congress has made it clear that it knows how to grant a federal agency the authority to limit arbitration agreements, and it has done so with plain and unambiguous language. This causes this court to regard CMS' argument that certain vague language in its own enabling legislation has the same effect with considerable skepticism."). Although expressing sympathy for the agency's goals, the court could not bless such an "unprecedented" and "breathtakingly broad assertion of authority." *Id.* at 939.

(iii)     The district court also concluded that *if* the Original Arbitration Rule somehow were consistent with statutory authority, an assumption that the court deemed quite "unlikely," then it would be difficult for plaintiffs to show that the

22

rule was arbitrary and capricious.  *Id.* at 940.  But the court also agreed that "the administrative record" was not "particularly strong."  *Id.*  Earlier in its analysis, moreover, the court observed that the Original Arbitration Rule was largely grounded in "anecdotes" offered by self-interested commentators rather than real "[e]mpirical evidence."  *Id.* at 939.

(iv)   Although acknowledging the "coherence" of the plaintiffs' argument that the rule would "'impose significant costs'" on long-term care facilities that should have been considered under the RFA, the district court concluded that this alternative ground for an injunction was insufficient.  *Id.* at 941.  The court noted, however, that its view of the RFA was only tentative, and stressed that "overall," the plaintiffs had established a likelihood of success on the merits.  *Id.* at 942.

B.   The district court had no difficulty concluding that the Original Arbitration Rule would irreparably harm plaintiffs.  In fact, the court found "it virtually certain that plaintiffs will, in fact, suffer at least some irreparable harm if the Rule goes into effect … and is later held unlawful.  Indeed, it is difficult to imagine that a Rule requiring nursing homes across the country to change their business practices in important ways would *not* produce at least some harmful effects which are incapable of being remedied after the fact."  *Id.* at 942 (emphasis in original); *see also id.* ("On the most obvious level, nursing homes will lose signatures on arbitration contracts which they will likely never regain.  Moreover, this court agrees with plaintiffs that 'provider Plaintiffs and other SNFs and NFs would incur immediate, substantial administrative expenses.  Admission agreements would need to be revised, and staff would require retraining on admissions and dispute-resolution

23

procedures.'").  Thus, the court concluded that this factor "clearly" favored the plaintiffs. *Id.*

       C.    The district court also concluded that the balance of harms supported an injunction.  The court agreed with the plaintiffs since the Original Arbitration Rule likely "violates the FAA and exceeds the agencies' statutory authority, … '[t]here is no harm in delaying implementation of an invalid rule.'"  *Id.* (quoting *Nat'l Fed'n of Indep. Bus. v. Perez*, No. 5:16-cv-00066-C, 2016 WL 3766121, at *45 (N.D. Tex. June 27, 2016)).  The court also found "CMS' position on the third and fourth preliminary injunction factors … significantly weakened by the fact that" while long-term care facilities had been using arbitration agreements, "until recently, [CMS] declined to oppose nursing home arbitration as a matter of agency policy."  *Id.* at 943.  The court also again reiterated the "unprecedented" nature of the government's assertion of authority, explaining that a "federal agency which seeks to use its authority in an unprecedented manner to enact a Rule which raises serious concerns under both the FAA and under general separation of powers principles should reasonably expect the courts to carefully examine it before it goes into effect."  *Id.* at 944.

       D.    Finally, as to the public interest, the district court expressed alarm that HHS and CMS were usurping the role of Congress, reasoning that whatever one's views of arbitration, the Constitution's "basic" division of powers is "even more important than the arbitration of issues."  *Id.*  Accordingly, the court "conclude[d] that the fourth preliminary injunction factor, like the other three, favors plaintiffs."  *Id.* at 946.

50.    The Northern District of Mississippi thus preliminarily enjoined HHS and CMS from enforcing the Original Arbitration Rule.  Although recognizing that Congress could change

the law regarding arbitration, the court expressed considerable doubt that Congress had done so, and the court was "unwilling to play a role in countenancing the incremental 'creep' of federal agency authority beyond" what Congress had authorized.  *Id.*

**THE AMENDED ARBITRATION RULE**

51.     Defendants did not appeal the Northern District of Mississippi's injunction. Instead, on December 9, 2016, Defendants "issued a nationwide instruction to State Survey Agency Directors, directing them not to enforce the 2016 final rule's prohibition of pre-dispute, binding arbitration provisions during the period that the court-ordered injunction remained in effect." Ex. 1 (Amended Arbitration Rule, 84 Fed. Reg. at 34,718).  Defendants further concluded that additional "analysis of the arbitration provisions was warranted."  *Id.*

52.     On June 8, 2017, Defendants published a proposed rule in the Federal Register seeking comments on whether the Original Arbitration Rule should be amended.  *See* Medicare & Medicaid Programs; Revision of Requirements for Long-Term Care Facilities: Arbitration Agreements, 82 Fed. Reg. 26,649 (June 8, 2017).  Among other changes, Defendants proposed removing the prohibition on pre-dispute, binding arbitration agreements.  Defendants explained that they had "reconsidered" their earlier position, and returned to their original view "that arbitration agreements are, in fact, advantageous to both providers and beneficiaries because they allow for the expeditious resolution of claims without the costs and expense of litigation."  *Id.* at 26,651.

53.     In response to the proposed rule, individuals, organizations, and government officials filed comments.  For example, the AHCA offered a detailed explanation of why maintaining the prohibition on pre-dispute arbitration would be unlawful and harmful to the public. AHCA explained, for instance, that "[f]orcing SNFs/NFs to abandon the use of arbitration agreements as a condition of receiving Medicare and Medicaid funds amounts to a ban on

25

arbitration because SNFs/NFs across the country would be driven into insolvency if deprived of that funding," and that arbitration is often superior to "litigation, as confirmed by both empirical evidence and common sense."  Ex. 7 (Letter from Mark Parkinson, Pres. & Chief Exec. Officer, Am. Health Care Ass'n, to Seema Verma, Adm'r, Ctrs. for Medicare & Medicaid Servs. (Aug. 7, 2017)) ("AHCA Comments") at 14.   The U.S. Chamber of Commerce also filed detailed comments, explaining, among other things, "that CMS lacks the legal authority to impose such restrictions" on arbitration, and that "[i]mposing additional regulatory requirements on arbitration agreements will simply give plaintiffs' lawyers additional ways to try to evade these agreements by suing in court and arguing that the agreements are invalid because they supposedly fail to comply with the general standards embodied in these proposed rules."  Ex. 8 (Letter from Lisa A. Rickard Pres., U.S. Chamber Institute for Legal Reform, to CMS and HHS (Aug. 7, 2017)) ("Chamber of Commerce Comments") at 3.

54.     On July 18, 2019, Defendants published the Amended Arbitration Rule in the Federal Register.  While the rule alters a few details of the Original Arbitration Rule, it continues to impose unique constraints on the use of arbitration agreements by long-term care facilities that effectively preclude SNFs and NFs from insisting on pre-dispute arbitration.   This, notwithstanding that, a little over a year earlier, Defendants had acknowledged "that arbitration agreements are, in fact, advantageous to both providers and beneficiaries because they allow for the expeditious resolution of claims without the costs and expense of litigation."  82 Fed. Reg. 26,649, 26,651 (June 8, 2017).

55.     For instance, while the Amended Arbitration Rule no longer expressly bars all pre-dispute arbitration agreements in the context of SNFs and NFs and their residents, it forbids SNFs and NFs "from require[ing] any resident or his or her representative to sign an agreement for

binding arbitration as a condition of admission to...the facility."  42 C.F.R. §483.70(n)(1); *see* 84 Fed. Reg. at 34,719.  When this prohibition on insisting on an arbitration agreement as a condition of admission is combined with CMS' existing policy against imposing arbitration on existing residents as a condition of continued residence, Pelovitz Mem. at 1, Defendants thus continue to prohibit SNFs and NFs from insisting on pre-dispute arbitration as a condition of doing business. In other words, the Amended Arbitration Rule gives a prospective resident unilateral authority to dictate whether arbitration is part of the contract, and a SNF or NF can no longer decline to enter into a contractual relationship with someone who refuses arbitration.  Yet as with the Original Arbitration Rule, Defendants do not and cannot claim that a prohibition on requiring arbitration as a condition of entering into a business relationship is a principle that applies to contracts "generally," *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687 (1996); *see also Kindred Nursing Centers Limited Partnership v. Clark*, 137 S. Ct. 1421, 1426 (2017); nor do they deny that numerous businesses in numerous contexts do, in fact, require arbitration as a condition of entering into a business relationship pursuant to ordinary contract law.

56.     The rule also imposes a requirement that facilities "explicitly grant the resident or his or representative the right to rescind the agreement within 30 calendar days of signing it." 42 C.F.R. §483.70(n)(3); *see* 84 Fed. Reg. at 34,719.  Yet Defendants do not and cannot claim that the absence of a 30-day rescission right is a lawful, well-recognized ground for invalidating contracts generally.  On the contrary, applying ordinary contract law, businesses in numerous contexts refuse to categorically allow a contracting party to rescind an agreement.  Moreover, the right to rescind further underscores that CMS continues to refuse to allow SNFs and NFs to assert the right that other businesses possess under the FAA to insist on pre-dispute arbitration as a condition of doing business.

57.     The Amended Arbitration Rule also provides that a facility "must explicitly state that neither the resident or his or her representative is required to sign an agreement for binding arbitration as a condition of admission to…the facility." 42 C.F.R. §483.70(n)(2)(iv); *see* 84 Fed. Reg. at 34,719. The arbitration agreement must also be "explained to the resident and his or her representative in a form and manner that he or she understands, including in a language that the resident and his or her representative understands." 42 C.F.R. §483.70(n)(2)(i); *see* 84 Fed. Reg. at 34,719. Defendants, however, again do not claim that any of these requirements are "grounds such as exist at law or in equity for the revocation of any contract." 9 U.S.C. §2. For example, the requirement that a resident must subjectively understand an arbitration agreement, even when the agreement is objectively understandable, is a not principle of general contract law. Indeed, this focus on subjective, rather than objective, understanding contradicts the general rule that parties are presumed to know the terms of their agreements, and indeed, flips the ordinary rule. In contract law, the party asking for an agreement to be enforced need only show an objective meaning, while a party seeking to escape enforcement may try to show—as an affirmative defense—that, among other things, it subjectively did not share that objective meaning. *See, e.g.*, 2 Williston on Contracts §6:58 (4th ed.) ("It follows from the general rule that manifested mutual assent rather than actual mental assent is the essential element in the formation of contracts, that a mistaken idea of one or both parties in regard to the making of an offer or acceptance will not generally prevent the formation of a contract. Such a mistaken idea may, under some circumstances, be a ground for relief from enforcement of the contract. This relief, however, is in its origin equitable, and by its nature it is a ground for avoidance of a contract already formed, rather than a ground upon which to assert that no contract has been formed.") (footnotes omitted). The Amended Arbitration Rule reverses that ordinary rule.

28

58.     Defendants admit that empirical support for the new regulations does not exist. *See* 84 Fed. Reg. at 34,726 ("There is  little social science research evidence demonstrating that arbitration agreements necessarily have a negative effect on quality of care.").  The Amended Arbitration Rule, therefore, requires facilities to retain copies of arbitration agreements and arbitrator's decisions for five years, supposedly so that Defendants can determine whether the restrictions on arbitration they have already imposed are justified by evidence.  *See id.* at 34,723 (explaining that "the requirement to retain copies of the arbitration agreement and the arbitrator's final decision will allow us to *learn* how arbitration is being used") (emphasis added).  Defendants once more have not identified a general principle of contract law in support of this requirement.

59.     The Amended Arbitration Rule relies on two purported grants of statutory authority:  Defendants' authority "to promulgate regulations that are 'adequate to protect the health, safety, welfare, and rights of residents and to promote the effective and efficient use of public moneys,'" and the Secretary's power "to impose 'such other requirements relating to the health and safety [and well-being] of residents as [he] may find necessary.'"  84 Fed. Reg. at 34,718 (quoting 42 U.S.C. §§1395i-3(f)(1) and 1396r(f)(1)); 42 U.S.C. §§1395i-3(d)(4)(B) and 1396r(d)(4)(B)) (brackets in original, footnote omitted).  Defendants no longer invoke (as they did with the Original Arbitration Rule) the Secretary's power to "establish" patient "right[s]," 42 U.S.C. §§1395i-3(c)(1)(A)(xi) and 1396r(c)(1)(A)(xi)).  The Amended Arbitration Rule, moreover, selectively quotes the relevant statutes.  The statutes say, in full: "It is the duty and responsibility of the Secretary to assure that requirements *which govern the provision of care in skilled nursing facilities* under this title, and the enforcement of such requirements, are adequate to protect the health, safety, welfare, and rights of residents and to promote the effective and efficient use of public moneys." *Id.* §§1395i-3(f)(1), 1396r(f)(1) (emphasis added).  Congress thus

29

has limited Defendants' authority to the regulation of *care* (i.e., nursing and health care services) provided *in* nursing facilities (i.e., not what happens after care is provided or outside the facility). Dispute resolution is not care and is not provided in or by a nursing facility.

60.     The Amended Arbitration Rule is largely based on the same policy considerations that drove the Original Arbitration Rule.  Indeed, Defendants stated that "[t]he requirements we are finalizing in this rule are designed to accomplish the same goals as the 2016 rule, namely, protecting resident's rights in matters concerning the arbitration process."  84 Fed. Reg. at 34,725. Yet Defendants conceded that they lacked empirical data that pre-dispute arbitration agreements are harmful to residents.  *See id.* at 34,726 ("While some commenters state that the existence of pre-dispute, binding arbitration agreements leads to a lower quality of care for residents, a significant number of other commenters have stated that there is, in fact, no link between arbitration and quality of care.  At this point, all sides of the issue have credible arguments supporting their position.  However, while both sides have good arguments, as noted earlier, there is little solid social science research evidence demonstrating that arbitration agreements necessarily have a negative effect on quality of care."); *see also id*. at 34,722 ("Many comments were based upon anecdotal or personal experiences, and some commenters provided articles published in various general and legal periodicals.  However, there was little solid social science research evidence to support these assertions").  Nonetheless, despite that admitted lack of empirical evidence supporting the need for regulation, Defendants still proceeded to categorically prohibit SNFs and NFs from requiring an arbitration agreement as a condition of admission, among other arbitration-specific requirements and restrictions.

61.     Both the Secretary and the Administrator approved the Amended Arbitration Rule.
*See id.* at 34,736.  The Amended Arbitration Rule is scheduled to become effective on September
16, 2019.  *See id.* at 34,718.

### GROUNDS FOR VACATING THE AMENDED ARBITRATION RULE

62.     The Amended Arbitration Rule exceeds Defendants' statutory authority; is
arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law; and was
promulgated without observance of procedure required by law.  Indeed, nothing in the Amended
Arbitration Rule resolves the fundamental problems that the Northern District of Mississippi
recognized when it preliminarily enjoined the Original Arbitration Rule.  That the Original
Arbitration Rule expressly barred all pre-dispute arbitration, while the Amended Arbitration Rule
accomplishes that result indirectly by precluding SNF and NFs from insisting on pre-dispute
arbitration as a  condition of admission, does not change the fact that the FAA authorizes long-
term care facilities to insist on arbitration as a condition of entering into contractual relationships,
just like it authorizes other businesses in other industries to require an agreement to arbitrate as a
condition of entering into contractual relationships.  Defendants have no authority to undo or
supersede what Congress has enacted.  Indeed, Congress has not clearly authorized Defendants to
regulate arbitration at all.  And even if Defendants somehow had statutory authority, their exercise
of that authority in this rulemaking is independently unlawful as both a substantive and a
procedural matter.  Notably, this case is on even stronger ground than the district court's 2016
decision that enjoined the Original Arbitration Rule.  Since that 2016 injunction, the U.S. Supreme
Court has both (1) held that unless Congress has specifically authorized it to do so, a federal agency
cannot use its regulatory authority to discourage arbitration, *see Epic Sys. Corp. v. Lewis*, 138 S.
Ct. 1612, 1630 (2018), and (2) confirmed that the FAA applies with full force in the specific

31

context of long-term care facilities to bar both direct and indirect efforts to undermine arbitration agreements, *see Kindred Nursing*, 137 S. Ct. at 1426.

63.     The Amended Arbitration Rule is a final agency action subject to immediate judicial review.  There is no sound basis in law or fact for delaying judicial review of the Amended Arbitration Rule.   Plaintiffs have presented their claims to the Secretary of HHS and the Administrator of CMS.  *See* Ex. 9 (letter to Secretary of HHS and Administrator of CMS).  Further recourse to agency proceedings would be futile.  This pre-enforcement challenge is ripe for judicial review, moreover, because the legal issues presented are fit for judicial resolution and because the Amended Arbitration Rule would require an immediate and significant change in how Plaintiffs conduct their business, with serious penalties attached to noncompliance.  In short, just as the challenge to the Original Arbitration Rule was justiciable in federal court, so is the challenge to the Amended Arbitration Rule.

64.     The Amended Arbitration Rule will irreparably harm Plaintiffs if it takes effect. SNFs and NFs that decline to comply with the rule because they believe it to be illegal will be subject to severe sanctions.  Such sanctions include termination of the facility's participation in the Medicare and Medicaid programs, denial of payment, placement of a temporary manager in the facility, and penalties up to $21,393 per occurrence or for each day that a violation is determined to exist.  Those sanctions would effectively bankrupt almost any SNF or NF, threatening the care and well-being of their residents (and future residents).  That general impact, moreover, applies specifically to Plaintiffs.  *See* Ex. 3 (Decl. of Claude E. Lee, Springdale) ¶ 12; Ex. 4 (Decl. of John McPherson, The Maples) at ¶ 12.

65.     Likewise, facilities that choose to comply with the Amended Arbitration Rule out of fear of sanctions would have to significantly change their business models.  That would also

harm facilities and their residents because arbitration is a fair and more convenient and efficient mechanism for resolving disputes.  Legal costs would also increase, which may result in money that otherwise would be spent on patient care being used for insurance premiums and court fees. This would harm the very residents that the Amended Arbitration Rule purports to aid.  The subjectivity inherent in the Amended Arbitration Rule's new requirements, moreover, would needlessly increase costs and invite litigation, as Plaintiffs would no longer be able to train their staff to provide the same explanation of the arbitration provision to each prospective resident. Allowing residents to rescind their agreements would also increase a facility's costs, administrative burdens, and overall unpredictability, and may divert disputes to court such that the right to arbitration would forever be lost.  Because of Defendants' sovereign immunity, these injuries can never be remedied.

66.    Defendants would not suffer cognizable harm if the relief requested herein is granted, and the public interest would be served by such relief.  As the Northern District of Mississippi correctly recognized, "'[t]here is no harm in delaying implementation of an invalid rule.'"  *Am. Health Care Ass'n v. Burwell*, 217 F. Supp. 3d 921, 942 (N.D. Miss. 2016) (quoting *Nat'l Fed'n of Indep. Bus. v. Perez*, No. 5:16-cv-00066-C, 2016 WL 3766121, at *45 (N.D. Tex. June 27, 2016)).  Moreover, the status quo for decades has been that requiring arbitration agreements in this context is lawful, including the type of arbitration agreements subject to the Amended Arbitration Rule.  Defendants are hard pressed to claim that such a longstanding practice will harm the public, especially when CMS itself has recognized in the past (and, indeed, even now) that arbitration is beneficial.  Thus, the same analysis employed by the Northern District of Mississippi also applies here.  At the same time, Defendants signed off on the Amended Arbitration Agreement in February 2019, but did not publish it in the Federal Register until July 2019.  *See* 84

Fed. Reg. at 34736.   After waiting nearly five months to publish an already finished rule, Defendants cannot claim that urgent enforcement is necessary.

## CLAIMS FOR RELIEF

### COUNT ONE
### THE AMENDED ARBITRATION RULE VIOLATES THE ADMINISTRATIVE PROCEDURE ACT BECAUSE IT CONTRADICTS THE FAA

67.     Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1-66 above.

68.     Pursuant to 5 U.S.C. §706, a "reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be … in excess of statutory jurisdiction, authority, or limitations" or "or otherwise not in accordance with law."  5 U.S.C. §706(2)(C), (A). The APA further provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. §702.

69.     Under the FAA, a "written provision in … a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, … shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. §2.  The regulations on arbitration in the Amended Arbitration Rule contradict ordinary principles of contract law.

70.     Because statutory provisions must be harmonized, the Supreme Court has recently reiterated that a federal agency cannot create exceptions to the FAA's pro-arbitration mandate unless Congress has clearly authorized the agency to do so with express statutory language.  *See Epic*, 138 S. Ct. at 1624; *see also, e.g.*, *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012).

71.     No federal statute, including the Medicare Act and Medicaid Act, contains any language, let alone express and unambiguous language, authorizing Defendants to regulate the use

34

of arbitration agreements by long-term care facilities in ways contrary to the FAA.  Indeed, Congress has rejected proposals to revise the FAA's pro-arbitration mandate in the context of long-term care facilities.  Thus, Defendants have no authority to impose conditions on the use of arbitration agreements by long-term care facilities that violate the FAA.

72.     The Amended Arbitration Rule cannot be defended on the ground that it is not a direct regulation of arbitration, but rather an exercise of CMS's power to place conditions on receipt of Medicare funds.  Just as the FAA prohibits agencies from regulating arbitration directly absent clear congressional authorization, it prohibits them from regulating arbitration indirectly by imposing a substantial disincentive on the use of arbitration.  Moreover, CMS's threat of a total loss of Medicare or Medicaid funding and civil money penalties or other sanctions to coerce a long-term care facility into giving up its rights under the FAA is the legal equivalent of regulation. *See, e.g.*, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 582 (2012) (condemning "economic dragooning that leaves the States with no real option but to acquiesce in the Medicaid expansion").

73.     The Amended Arbitration Rule's exception for post-dispute arbitration agreements does not suffice to vindicate the rights protected by the FAA.  Even if a few residents enter into post-dispute arbitration agreements, almost all of the cost savings afforded by binding pre-dispute arbitration agreements will be forever lost, resulting in higher costs for long-term care facilities and higher prices for residents.  To preserve the benefits of arbitration, such facilities must be permitted to require residents to enter into pre-dispute arbitration agreements as a condition for admission, as Congress, through the FAA, gave them the right to do.

74.     The Amended Arbitration Rule is precluded by the FAA's pro-arbitration mandate because it forbids business practices that the FAA allows.  The Amended Arbitration Rule

therefore is "in excess of statutory authority" and is "not in accordance with law."  Accordingly, Plaintiffs are entitled to relief under 5 U.S.C. §§702, 706(2)(A), (C).

## COUNT TWO
### THE AMENDED ARBITRATION RULE VIOLATES THE ADMINISTRATIVE PROCEDURE ACT BECAUSE IT EXCEEDS DEFENDANTS' STATUTORY AUTHORITY UNDER THE MEDICARE ACT

75.     Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1-74 above.

76.     The Amended Arbitration Rule exceeds Defendants' statutory authority under the Medicare Act and therefore is independently unlawful.

77.     The Medicare Act does not contain any language, let alone express and unambiguous language, authorizing the Secretary to regulate the use of arbitration agreements by NFs.

78.     The Amended Arbitration Rule cannot be based on Defendants' authority to prescribe regulations that are ''adequate to protect the health, safety, welfare, and rights of residents and to promote the effective and efficient use of public moneys'' or to promulgate "such other requirements relating to the health, safety, and well-being of residents" of SNFs "as the Secretary may find necessary."  42 U.S.C. §§1395i-3(d)(4)(B), (f)(1).  These general provisions do not authorize Defendants to regulate the terms of dispute resolution between SNFs and residents, which are unrelated to residents' health, safety, or well-being.  Any suggestion to the contrary offered by Defendants is devoid of legal and evidentiary support.

79.     Because the Medicare Act does not authorize the rule, the Amended Arbitration Rule is "in excess of statutory authority" and is "not in accordance with law."  Accordingly, Plaintiffs are entitled to relief under 5 U.S.C. §§702, 706(2)(A), (C).

## COUNT THREE
### THE AMENDED ARBITRATION RULE VIOLATES THE ADMINISTRATIVE

36

**PROCEDURE ACT BECAUSE IT EXCEEDS DEFENDANTS' STATUTORY AUTHORITY UNDER THE MEDICAID ACT**

80.     Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1-79 above.

81.     The Amended Arbitration Rule exceeds Defendants' statutory authority under the Medicaid Act and therefore is independently unlawful.

82.     The Medicaid Act does not contain any language, let alone express and unambiguous language, authorizing the Secretary to regulate the use of arbitration agreements by NFs.

83.     The Amended Arbitration Rule cannot be based on Defendants' authority to prescribe regulations that are ''adequate to protect the health, safety, welfare, and rights of residents and to promote the effective and efficient use of public moneys'' or to promulgate "such other requirements relating to the health and safety of residents" of NFs "as the Secretary may find necessary."   42 U.S.C. §§1396r(d)(4)(B), (f)(1).   These general provisions do not authorize Defendants to regulate the terms of dispute resolution between NFs and residents, which are unrelated to residents' health or safety.  Any suggestion to the contrary offered by Defendants is devoid of legal and evidentiary support.

84.     Because the Medicaid Act does not authorize the rule, the Amended Arbitration Rule is "in excess of statutory authority" and is "not in accordance with law."   Accordingly, Plaintiffs are entitled to relief under 5 U.S.C. §§702, 706(2)(A), (C).

**<u>COUNT FOUR</u>**
**THE AMENDED ARBITRATION VIOLATES THE ADMINISTRATIVE PROCEDURE ACT BECAUSE IT IS ARBITRARY, CAPRICIOUS, AND AN ABUSE OF DISCRETION**

85.     Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1-84 above.

86.    The Amended Arbitration Rule is arbitrary, capricious, and an abuse of discretion. Agency action is unlawful if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency also acts unlawfully if it changes its position without "supply[ing] a reasoned analysis for the change." *Id.* at 42. An agency must at least "display awareness that it is changing position and show that there are good reasons for the new policy." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (quotation omitted). And "[i]n explaining its changed position, an agency must also be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Id.* (quotation omitted).

87.    The Amended Arbitration Rule is arbitrary, capricious, and an abuse of discretion because Defendants based their conclusions on anecdotes from self-interested sources rather than on empirical evidence. Despite acknowledging the dearth of "solid social science research evidence," 84 Fed. Reg. at 34,726, Defendants nonetheless imposed fundamental changes on the long-term care industry. Indeed, Defendants admit that the reason that the Amended Arbitration Rule requires facilities to retain copies of arbitration decisions and agreements is to enable CMS to determine whether regulation is even necessary. *See id*. at 34,723. Accordingly, as with the Original Arbitration Rule, the Amended Arbitration Rule's prohibitions of longstanding business practices relating to arbitration necessarily are based on selective anecdotes rather than actual empirical evidence demonstrating the need for regulation, collected and assessed using sound methodological principles.

38

88.     In fact, the overwhelming empirical evidence before Defendants confirms that there is no need for this regulation.  That evidence demonstrated that (i) arbitration is fair to all sides; (ii) arbitration reduces the costs of dispute resolution, increasing claimants' access to justice and making it more likely that residents can bring claims; and (iii) residents are not required to agree to confidentiality in order to arbitrate.  *See, e.g.*, Ex. 7 (AHCA Comments); Ex. 8 (Chamber of Commerce Comments).  The Amended Arbitration Rule is thus unlawful because Defendants' conclusions "run[] counter to the evidence before the agency." *State Farm*, 463 U.S. at 43.

89.     The Amended Arbitration Rule is also arbitrary, capricious, and an abuse of discretion because it is an unreasoned departure from CMS's earlier positions, expressed in the Pelovitz Memorandum, in Secretary Leavitt's letter to Congress, and in the preamble to the June 8, 2017 proposal to amend the Original Arbitration Rule, that arbitration between long-term care facilities and residents is beneficial and should be permitted.  The long-term care industry has relied on that position and entered into millions of arbitration agreements with residents.  In reliance on Pelovitz Memorandum and Secretary Leavitt's letter to Congress, many long-term care facilities have built their economic and pricing models on the right to require residents to enter into pre-dispute arbitration agreements as a condition to any contractual relationship.  Plaintiffs here, for instance, have long used business practices that Defendants now purport to forbid, even though the same agencies previously deemed them perfectly lawful.

90.     The Original Arbitration Rule asserted that its ban on arbitration did not "contradict" the Pelovitz Memorandum because the Original Arbitration Rule did "not in any way prohibit the use of post-dispute arbitration agreements." 81 Fed. Reg. at 68,792.  That assertion is untrue.  The Pelovitz Memorandum "address[ed] the use of an agreement that requires disputes between a *prospective* or current resident and a nursing home be resolved through binding

39

arbitration"—*i.e.*, a pre-dispute arbitration agreement.  Ex. 5 at 1 (emphasis added).  The Pelovitz Memorandum also stated that the decision whether to have any arbitration agreement was "an issue between the resident and the nursing home."  *Id.*  In the Original Arbitration Rule, CMS failed to offer any reason why it departed from its earlier conclusion.  The Amended Arbitration Rule, which amends the Original Arbitration Rule, also fails to offer any reason why CMS has departed from the agency's earlier conclusion.  Yet the Amended Arbitration Rule prohibits what the Pelovitz Memorandum allowed.  Thus, Defendants have not adequately explained CMS's departure from the agency's longstanding policy announced and explained in the Pelovitz Memorandum.

91.     The Original Arbitration Rule likewise asserted that its ban on arbitration did not contradict Secretary Leavitt's letter because the Original Arbitration Rule banned only pre-dispute arbitration.  81 Fed. Reg. at 68,792.  But that assertion was also untrue and contrary to historical fact.  Secretary Leavitt also endorsed the use of pre-dispute arbitration agreements, stating that "[p]re-dispute arbitration agreements are an excellent way for patients and providers to control costs, resolve disputes, and speed resolution of conflicts."  H.R. Rep. 110-894 at 13.  In the Original Arbitration Rule, CMS failed to offer any reason why it departed from Secretary Leavitt's conclusion.  The Amended Arbitration Rule, which amends the Original Arbitration Rule, also fails to offer any reason why CMS has departed from Secretary Leavitt's conclusion.  Thus, Defendants have not adequately explained CMS's departure from the agency's longstanding policy announced and explained in Secretary Leavitt's letter.

92.     Pursuant to the APA, a "reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. §706(2)(A).

93.     The Amended Arbitration Rule is arbitrary, capricious, and an abuse of discretion. Accordingly, Plaintiffs are entitled to relief under 5 U.S.C. §§702, 706(2)(A).

## COUNT FIVE
## THE AMENDED ARBITRATION RULE VIOLATES THE ADMINISTRATIVE PROCEDURE ACT BECAUSE IT MISAPPLIES THE RFA

94.     Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1-93 above.

95.     Under the RFA, an agency rule must contain a "regulatory flexibility analysis" that gives "a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the Arbitration Rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected."  5 U.S.C. §604(a)(6).  The agency may omit this analysis if "the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities."  5 U.S.C. §605(b).

96.     Defendants did not conduct that required analysis because the Secretary here certified that the Amended Arbitration Rule would not have the requisite significant economic impact.  *See* 84 Fed. Reg. at 34,734 ("We are not preparing an analysis for the RFA because we have determined, and the Secretary certifies, that this final rule will not have a significant economic impact on a substantial number of small entities.").  Yet Defendants' analysis did not contain any assessment of costs or any explanation why the Amended Arbitration Rule would not have a significant economic impact on countless long-term care facilities.

97.     Defendants thus failed to comply with the RFA.  It is indisputable that the Amended Arbitration Rule will impose costs on long-term care facilities by requiring them to resolve disputes more expensively in court, raising their insurance premiums (and perhaps pricing some

41

facilities out of the insurance market altogether), and forcing them to change their longstanding internal procedures and business practices.  Indeed, the attached declarations confirm these points. *See* Ex. 3 (Decl. of Claude E. Lee, Springdale); Ex. 4 (Decl. of John McPherson, The Maples). The Amended Arbitration Rule should have acknowledged these costs and assessed whether they would have a significant economic impact on long-term care facilities.  Instead, Defendants gave short shrift to this statutory obligation and offered no meaningful analysis at all.

98.     Pursuant to the APA, a "reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be … without observance of procedure required by law." 5 U.S.C. §706(2)(D); *see also, e.g.*, *Nat'l Fed'n of Indep. Bus. v. Perez*, 2016 WL 3766121, at *38 (N.D. Tex. June 27, 2016) (concluding that Department of Labor violated RFA by failing to consider important costs of a rule).

99.     By giving short shrift to the RFA's statutory requirements, the Amended Arbitration Rule was promulgated "without observance of procedure required by law." Accordingly, Plaintiffs are entitled to relief under 5 U.S.C. §§702, 706(2)(D).

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

A.      Provide for expeditious proceedings in this action in light of the Amended Arbitration Rule's September 16, 2019, effective date;

B.      Stay the effective date of the Amended Arbitration Rule pending this Court's entry of a final judgment in this action;

C.      Preliminarily enjoin the Secretary of HHS and Administrator of CMS, their employees, and their agents from enforcing the Amended Arbitration Rule in any respect, pending this Court's entry of a final judgment in this action;

D.      Enter judgment in favor of Plaintiffs;

E.      Declare that the Amended Arbitration Rule is in excess of Defendants' statutory authority, arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law, and was promulgated without observance of procedure required by law.

F.      Vacate the Amended Arbitration Rule;

G.      Permanently enjoin the Secretary of HHS and Administrator of CMS, their employees, and their agents from enforcing the Amended Arbitration Rule;

H.      Award Plaintiffs attorneys' fees and costs; and

I.      Provide such further relief as the Court may deem just and proper.

Dated: September 3, 2019                    Respectfully submitted,

Kirkman T. Dougherty
Kirkman T. Dougherty (Ark. Bar No. 91133)
HARDIN, JESSON & TERRY, PLC
5000 Rogers Avenue, Suite 500
Fort Smith, AR  72903
Tel: (479) 452-2200
Fax: (479) 452-9097
kdoughterty@hardinlaw.com

Paul D. Clement (pro hac vice forthcoming)
Erin E. Murphy (pro hac vice forthcoming)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC  20004
Tel: (202) 389-5000
Fax: (202) 389-5200
paul.clement@kirkland.com
erin.murphy@kirkland,com

*Attorneys for Northport Health Services of
Arkansas, LLC d/b/a Springdale Health and
Rehabilitation Center and NWA Nursing Center
d/b/a The Maples*

## CERTIFICATE OF SERVICE

I, Kirkman T. Dougherty, do hereby certify that the foregoing is being filed with the Court on this 3rd day of September, 2019.  This document is being served by hand to the following:

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
200 Independence Ave SW
Washington, D.C. 20201

ALEX M. AZAR II
*In his official capacity as Secretary of Health*
 *and Human Services*
200 Independence Ave SW
Washington, D.C. 20201

CENTERS FOR MEDICARE & MEDICAID SERVICES
7500 Security Boulevard
Baltimore, MD 21244

SEEMA VERMA
*In her official capacity as Administrator of the*
 *Centers for Medicare and Medicaid Services,*
7500 Security Boulevard
Baltimore, MD 21244

Kirkman T. Dougherty