**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

NORTHPORT HEALTH SERVICES OF ARKANSAS, LLC;
NWA NURSING CENTER, LLC; CHAPEL RIDGE NURSING
CENTER, LLC; ET AL.

PLAINTIFFS

NO.  5:19-cv-05168-TLB

v.

UNITED STATES DEPARTMENT OF HEALTH AND
HUMAN SERVICES; ALEX M. AZAR II, *in his official*
*capacity as Secretary of the United States Department of Health*
*and Human Services*; CENTERS FOR MEDICARE &
MEDICAID SERVICES, SEEMA VERMA, *in her official*
*capacity as the Administrator of the Centers for Medicare &*
*Medicaid Services*

DEFENDANTS

**<u>BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

STATEMENT OF THE CASE.............................................................................. 2

    A.    Pre-dispute Arbitration Agreements Are Widely Used in the Long-Term Care Industry................................................................................................ 2

    B.    Defendants Reverse Course and Ban Pre-Dispute Arbitration Agreements, Only To Have that Rule Preliminarily Enjoined........................................ 5

    C.    CMS Promulgates the Amended Arbitration Rule. ................................... 8

    D.    Plaintiffs' Current Practices Violate the Amended Arbitration Rule, Subjecting Them to Severe Sanctions..................................................... 12

LEGAL STANDARD.......................................................................................... 15

ARGUMENT ...................................................................................................... 15

    A.    The Amended Arbitration Rule Violates the APA Because It Contravenes the FAA.................................................................................................... 16

    B.    The Amended Arbitration Rule Violates the APA Because Neither the Medicare Act Nor the Medicaid Act Grants to CMS Authority To Regulate Arbitration in the Long-Term Care Industry. ........................... 22

    C.    The Amended Arbitration Rule Violates the APA Because It Is Arbitrary, Capricious, and an Abuse of Discretion. ............................................... 26

    D.    The Amended Arbitration Rule Violates the APA Because It Does Not Comply with the Regulatory Flexibility Act. ....................................... 29

CONCLUSION.................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Accrediting Council for Indep. Colls. & Schs. v. DeVos*,
    303 F. Supp. 3d 77 (D.D.C. 2018)....................................................................... 14

*Am. Bioscience, Inc. v. Thompson*,
    269 F.3d 1077 (D.C. Cir. 2001)........................................................................... 14

*Am. Express Co. v. Italian Colors Rest.*,
    133 S. Ct. 2304 (2013) ......................................................................................... 6

*Am. Health Care Ass'n v. Burwell*,
    217 F. Supp. 3d. 921 (N.D. Miss. 2016) ....................................................*passim*

*AT&T Mobility v. Concepcion*,
    563 U.S. 333 (2011) ....................................................................................... 6, 16

*Bowen v. Georgetown Univ. Hosp.*,
    488 U.S. 204 (1988) ........................................................................................... 22

*CompuCredit Corp. v. Greenwood*,
    132 S. Ct. 665 (2012) ..................................................................................... 6, 19

*CompuCredit Corp. v. Greenwood*,
    565 U.S. 95 (2012) ............................................................................................. 19

*Doctor's Assocs., Inc. v. Casarotto*,
    517 U.S. 681 (1996) ........................................................................................... 18

*Encino Motorcars, LLC v. Navarro*,
    136 S. Ct. 2117 (2016) ................................................................................. 26, 28

*Epic Sys. Corp. v. Lewis*,
    138 S. Ct. 1612 (2018) .................................................................................*passim*

*Fourth Estate Pub. Benefit Corp. v. Wall-Street.com, LLC*,
    139 S. Ct. 881 (2019) ......................................................................................... 21

*Gonzales v. Oregon*,
    546 U.S. 243 (2006) ........................................................................................... 15

*J. L. Metz Furniture Co. v. Thane Lumber Co.*,
    298 F. 91 (8th Cir. 1924)................................................................................... 18

*Kindred Nursing Ctrs. L.P. v. Clark*,
    137 S. Ct. 1421 (2017) .................................................................................*passim*

*Louisiana v. Salazar*,
    170 F. Supp. 3d 75 (D.D.C. 2016) ....................................................................... 15

*Marmet Health Care Ctr., Inc. v. Brown*,
    132 S. Ct. 1201 (2012) (per curiam) .......................................................... 16, 19

*Michigan v. EPA*,
    268 F.3d 1075 (D.C. Cir. 2001) .......................................................................... 22

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
    460 U.S. 1 (1983) ................................................................................................ 16

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ......................................................................................... 25, 26

*N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
    514 U.S. 645 (1995) ............................................................................................ 25

*Nat'l Fed. of Ind. Business v. Perez*,
    2016 WL 3766121 (N.D. Tex. 2016) .................................................................... 7

*NE Colo. Cellular, Inc. v. City of N. Platte*,
    2015 WL 3513963 (D. Ne. June 4, 2015) ............................................................. 2

*Simone Enters., LLC v. U.S. Dep't of Agriculture*,
    2011 WL 3236222 (E.D. Wis. July 27, 2011) ...................................................... 2

*Smithville R-II Sch. Dist. v. Riley*,
    28 F.3d 55 (8th Cir. 1994) .................................................................................. 21

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*,
    135 S. Ct. 2507 (2015) ....................................................................................... 21

*Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*,
    515 U.S. 528 (1995) ............................................................................................ 19

*Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*,
    489 U.S. 468 (1989) ............................................................................................ 16

**Statutes**

5 U.S.C. §604(a)(6) ........................................................................................... 2, 29

5 U.S.C. §605(b) ..................................................................................................... 29

5 U.S.C. §706 .................................................................................... 2, 15, 19, 22

9 U.S.C. §2 .............................................................................................................. 16

12 U.S.C. §5518(b) ................................................................................................. 20

15 U.S.C. §78o(o) ................................................................................................... 20

28 U.S.C. §1331 .................................................................................................................. 15

42 U.S.C. §1395aa .............................................................................................................. 13

42 U.S.C. §1395i ............................................................................................................ *passim*

42 U.S.C. §1396r ................................................................................................................ 24

**Regulations**

42 C.F.R. §431.153 ............................................................................................................ 14

42 C.F.R. §431.610(f)(1) .................................................................................................... 13

42 C.F.R. §483.25 .............................................................................................................. 24

42 C.F.R. §483.25(a) .......................................................................................................... 24

42 C.F.R. §483.25(i) ........................................................................................................... 24

42 C.F.R. §483.25(k) .......................................................................................................... 24

42 C.F.R. §483.70(2)(i) ...................................................................................................... 18

42 C.F.R. §483.70(n) ...................................................................................................... 5, 17

42 C.F.R. §483.70(n)(1) ..................................................................................................... 10

42 C.F.R. §483.70(n)(1)(4) ................................................................................................ 10

42 C.F.R. §483.70(n)(2)(i) ................................................................................................. 11

42 C.F.R. §483.70(n)(3) ..................................................................................................... 10

42 C.F.R. §483.70(n)(6) ................................................................................................ 11, 17

42 C.F.R. §488.10(a) .......................................................................................................... 13

42 C.F.R. §488.26(c) .......................................................................................................... 13

42 C.F.R. §488.26(d) .......................................................................................................... 13

42 C.F.R. §488.308(a) ........................................................................................................ 13

42 C.F.R. §488.330 .......................................................................................................... 3, 13

42 C.F.R. §488.401 ............................................................................................................ 14

**Other Authorities**

81 Fed. Reg. 68,688 ............................................................................................................. 5

81 Fed. Reg. 68,792 ........................................................................................................ 27, 28

81 Fed. Reg. 68,800 ............................................................................................................... 5

82 Fed. Reg. 26,649 ............................................................................................................ 2, 8

84 Fed. Reg. 34,718 ..................................................................................................... *passim*

H.R. Rep. No. 110-894 (2008) ........................................................................................ 4, 28

S. Rep. No. 110-518 (2008) ................................................................................................... 4

2 Williston on Contracts §6:58 (4th ed.) ............................................................................ 18

## INTRODUCTION

The latest rulemaking by the federal government restricting the ability of long-term care facilities to enter into pre-dispute arbitration agreements with prospective residents (the "Amended Arbitration Rule" or "Rule") is fraught with legal infirmities under the Administrative Procedure Act: It violates the Federal Arbitration Act, lacks a statutory underpinning, is arbitrary and capricious, and violates the Regulatory Flexibility Act. The Rule cannot stand as a matter of law, and this Court should enter summary judgment for Plaintiffs on all counts of the First Amended Complaint, Dkt.25.

Plaintiffs are long-term care facilities that currently enter into arbitration agreements with prospective residents. For years, consistent with the nearly-century-old congressional policy favoring arbitration, Plaintiffs and other long-term care facilities have used such agreements with the express blessing of the Centers for Medicare & Medicare Services ("CMS") within the U.S. Department of Health and Human Services ("HHS") (together with CMS, "Defendants"). Yet, notwithstanding that century-old preference and Congress' repeated rejection of proposals to deviate from that general policy in the specific context of long-term care facilities, Defendants now claim the authority, pursuant to their general rulemaking powers, to enact rules that "single out arbitration" for unfavorable treatment. *Kindred Nursing Ctrs. L.P. v. Clark*, 137 S. Ct. 1421, 1428 n.2 (2017). Defendants assert such authority even though the Supreme Court recently reaffirmed—in this very context, no less—that such arbitration-specific rules violate the Federal Arbitration Act ("FAA"). *Id.* Because Congress has not empowered Defendants to override the FAA's mandates—and has never articulated anything approaching a "clearly expressed congressional intention" that Defendants may do so, *see Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018)—Plaintiffs are entitled to summary judgment on their claims that the Amended

1

Arbitration rule is in excess of Defendants' power and contrary to law, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. §706.

In fact, neither the Medicare nor Medicaid Acts—Defendants' purported authority for enacting the Amended Arbitration Rule—empower Defendants to regulate dispute resolution *at all*, further underscoring that Defendants have strayed far outside the bounds of their statutory authority.  Summary judgment should be granted, and the Rule set aside, on that score, as well. Moreover, CMS' and HHS' unexplained departure from their prior approval of arbitration agreements, and their reliance on improper evidence, renders the rule arbitrary and capricious and an abuse of discretion.  And on top of all that, Defendants failed to perform a "regulatory flexibility analysis" as required by the Regulatory Flexibility Act ("RFA"), 5 U.S.C. §604(a)(6).

For any and all of these reasons, Plaintiffs are entitled to summary judgment under the APA, and the Amended Arbitration Rule must be set aside.

## STATEMENT OF THE CASE[1]

### A.    Pre-dispute Arbitration Agreements Are Widely Used in the Long-Term Care Industry.

Long-term care facilities and their residents, like many other types of businesses and their customers, have relied on arbitration to resolve disputes for decades.  Arbitration is fair, faster, simpler, and less adversarial and expensive than litigating in court.  *See, e.g.*, A.R. 34,184-88 ("Revision of Requirements for Long-Term Care Facilities: Arbitration Agreements, 82 Fed. Reg. 26,649 (June 8, 2017)"); *see also* A.R. 34,165-83 ("Revision of Requirements for Long-Term Care

---

[1] These facts are taken from the administrative record and are not subject to dispute.  *See Simone Enters., LLC v. U.S. Dep't of Agriculture*, 2011 WL 3236222, at *4 (E.D. Wis. July 27, 2011) ("[T]he administrative record ... contains adjudicative facts and is 'not subject to reasonable dispute' because the source's 'accuracy cannot reasonably be questioned.'" (citation omitted)); *see also NE Colo. Cellular, Inc. v. City of N. Platte*, 2015 WL 3513963, at *1 n.2 (D. Ne. June 4, 2015) ("[W]hile the legal significance of the facts in the administrative record is subject to dispute, the facts themselves are not.").

Facilities: Arbitration Agreements, 84 Fed. Reg. 34,718 (July 18, 2019)").  And by reducing the cost of dispute resolution, providers can devote additional resources to resident and patient care.

Plaintiffs Northport Health Services of Arkansas, LLC d/b/a Springdale Health and Rehabilitation Center ("Springdale"); NWA Nursing Center, LLC d/b/a The Maples at Har-Ber Meadows ("The Maples"); and Chapel Ridge Nursing Center, LLC, along with the related, similarly situated entities named in Exhibit A to the First Amended Complaint (collectively, "Plaintiffs") operate long-term care facilities that enter into pre-dispute arbitration agreements with their residents.  Dkt.25-3 (Decl. of Claude E. Lee) ("Lee Decl.") ¶8; Dkt.25-4 (Decl. of John McPherson) ("McPherson Decl.") ¶8.  Plaintiffs are certified as "skilled nursing facilities" ("SNFs") under the Medicare Act and "nursing facilities" ("NFs") under the Medicaid Act. Plaintiffs are "dually certified" facilities, meaning that they each entered a provider agreement with CMS to participate in the federal Medicare program and a separate provider agreement with the Arkansas Department of Human Services to participate in the Arkansas state Medicaid program. *See* 42 U.S.C. §§1395i-3(g), 1396r(g); 42 C.F.R. §488.330.

For years, Plaintiffs' practice of entering pre-dispute arbitration agreements comported with CMS' and HHS' longstanding view approving the use of arbitration in the long-term care industry.  In 2003, CMS issued a memorandum to "address [CMS'] position regarding binding arbitration between nursing homes and prospective or current residents, in response to recent marketplace practices."  A.R. 34,019 ("Pelovitz Memorandum").  That document, known as the Pelovitz Memorandum, provided that "[u]nder Medicare, whether to have a binding arbitration agreement is an issue between the resident and the nursing home," and "[u]nder Medicaid," CMS "will defer to State law as to whether or not such binding arbitration agreements are permitted." A.R. 34,019.  Refuting the argument that arbitration agreements might adversely impact the ability

of state and federal inspectors to assure that long-term care facilities are providing quality care, the Pelovitz Memorandum confirmed that the "existence of a binding arbitration agreement does not in any way affect the ability of the State survey agency or CMS to assess citations for violations of certain regulatory requirements, including those for Quality of Care."  A.R. 34,020.

HHS took a similar position in 2008, when then-Secretary Michael Leavitt explained to Congress that "[f]or the past eighty years, the federal government has consistently found that arbitration may be a favorable method of resolving disputes and, in some instances, may be preferable to litigation." A.R. 31,954 ("H.R. Rep. No. 110-894," at 13 (2008)) (reproducing Letter from Michael O. Leavitt, Sec'y of Health & Human Servs., to H. Comm, on the Judiciary (July 29, 2008)).  Secretary Leavitt emphasized that pre-dispute arbitration agreements between long-term care facilities and their residents "do not hinder the Administration's ability to take enforcement action against nursing homes providing poor quality care."  A.R. 31,954.

Congress has long shared the same view.  Congress' strong preference for arbitration dates back to 1925, when it enacted the FAA.  And although Congress has confronted occasional proposals in more recent years to restrict the use of arbitration agreements by long-term care facilities, Congress repeatedly has declined to enact any of them.  *See, e.g.*, *Fairness in Nursing Home Arbitration Act of 2008: Hearing Before the Subcomm. on Commercial & Admin. Law of the H. Comm, on the Judiciary*, 110th Cong. (2008) (reported out of committee with dissenting views, *see* H.R. Rep. No. 110-894 (2008), but failed to obtain a vote by the full House or the Senate); Fairness in Nursing Home Arbitration Act, S. 2838 (received a formal hearing, *see S. 2838, the Fairness in Nursing Home Arbitration Act: Joint Hearing Before the Subcomm. on Antitrust, Competition Policy, and Consumer Rights of the S. Comm, on the Judiciary, and the S. Spec. Comm, on Aging*, 110th Cong. (2008), was reported out of committee with dissenting views,

*see* S. Rep. No. 110-518 (2008), but failed to obtain a vote by the full Senate or the House); *Fairness in Nursing Home Arbitration Act of 2009*, H.R. 1237, 111th Cong. §2(a) (considered but rejected); *Fairness in Nursing Home Arbitration Act*, S. 512, 111th Cong. §3(4) (2009) (same); *Fairness in Nursing Home Arbitration Act of 2012*, H.R. 6351, 112th Cong. §2(a) (same). Accordingly, both the executive branch and legislative branch have left long-term care facilities and their residents just as free as any other contracting parties to enter into arbitration agreements on mutually agreeable terms.

### B. Defendants Reverse Course and Ban Pre-Dispute Arbitration Agreements, Only To Have that Rule Preliminarily Enjoined.

Despite this longstanding policy, and Congress' repeated refusals to constrain the use of arbitration agreements in the specific context of long-term care, in October 2016, CMS published a rule flatly prohibiting long-term care facilities from entering into such agreements with their residents. *See* 81 Fed. Reg. 68,688, 68,800 (final decision) & 68,867 (text of §483.70(n) (Oct. 4, 2016)) ("Original Arbitration Rule"). Before that rule could take effect, several long-term care facilities and health care trade associations filed a complaint seeking judicial review of the rule in the U.S. District Court for the Northern District of Mississippi. The plaintiffs in that case challenged the Original Arbitration Rule on substantially the same grounds as Plaintiffs challenge the rule at issue here: They argued that the rule violated the FAA, that CMS lacked statutory authority to promulgate it, and that the rule was arbitrary and capricious. *See Am. Health Care Ass'n v. Burwell*, 217 F. Supp. 3d. 921 (N.D. Miss. 2016).

The Northern District of Mississippi preliminarily enjoined the Secretary and Acting Administrator from enforcing the rule, concluding that all four of the requirements for a preliminary injunction were met. *Id.* at 946. The court held that the plaintiffs were likely to succeed on the merits because the law likely violated the FAA. *Id.* at 933-34. The court stressed

that the U.S. Supreme Court's "statement that the FAA was 'designed to promote arbitration' and [the Court's] ruling on the basis of the 'objectives of Congress' makes it seem likely that the Supreme Court would provide some significant degree of scrutiny to CMS' decision to ban a particular form of arbitration, even if that ban did not affect existing contracts." *Id.* at 931 (quoting *AT&T Mobility v. Concepcion*, 563 U.S. 333, 345 (2011)). The court also concluded that multiple Supreme Court holdings "present[ ] further … difficulties for Defendants," including the Court's ruling "that the FAA's mandate that arbitration agreements be 'enforce[d] … according to their terms' can be displaced only by a 'contrary congressional command' in another statute," *id.* at 932 (quoting *CompuCredit Corp. v. Greenwood*, 132 S. Ct. 665, 699 (2012)); *see also id.* at 933 (citing *Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304 (2013)).

The district court also explained that the rule likely conflicted with "basic separation of powers principles," as "Congress' failure to enact positive legislation should not serve as an excuse for the executive branch to assume powers which are properly reserved for the legislative branch." *Id.* at 934-35. The court reasoned that Defendants' general authority under the Medicare Act and Medicaid Act to regulate to promote "'health and safety'" and to "establish 'other right[s]' to 'protect and promote the rights of each resident'" is too "vague" to supersede the FAA's much more specific mandate. *Id.* at 934, 939. The court also found it significant that Congress has specifically rejected calls to regulate arbitration in the long-term care context. *See id.* at 935. And the court emphasized that "Congress has made it clear that it knows how to grant a federal agency the authority to limit arbitration agreements," which raised "considerable skepticism" of CMS' argument "that certain vague language in its own enabling legislation has the same effect." *Id.* at 936. In short, the district court found no statutory basis for Defendants' "unprecedented" and "breathtakingly broad assertion of authority." *Id.* at 939.

The district court also found that long-term care facilities were "virtually certain" to suffer irreparable harm absent injunctive relief.  As the court explained, it was "difficult to imagine that a Rule requiring nursing homes across the country to change their business practices in important ways would not produce at least some harmful effects which are incapable of being remedied after the fact." *Id.* at 942.  "On the most obvious level," the court observed, "nursing homes will lose signatures on arbitration contracts which they will likely never regain," and "provider Plaintiffs and other [long-term care facilities] would incur immediate, substantial administrative expenses," as "[a]dmission agreements would need to be revised, and staff would require retraining on admissions and dispute-resolution procedures.'" *Id.*

Finally, the district court concluded that the balance of harms and public interest supported an injunction.  The court agreed with the plaintiffs that because the Original Arbitration Rule likely "violates the FAA and exceeds the agencies' statutory authority," there would be "no harm in delaying implementation of an invalid rule." *Id.* (quoting *Nat'l Fed. of Ind. Business v. Perez*, 2016 WL 3766121, at *45 (N.D. Tex. 2016)).  And the court explained that whatever one's views of arbitration, the Constitution's "basic" division of powers is "even more important." *Id.* at 944. The court also found Defendants' position on these factors "significantly weakened" by the fact that, "until recently, [CMS] declined to oppose nursing home arbitration as a matter of agency policy." *Id.* at 943.  And the court again reiterated the "unprecedented" nature of the government's assertion of authority, explaining that a "federal agency which seeks to use its authority in an unprecedented manner to enact a Rule which raises serious concerns under both the FAA and under general separation of powers principles should reasonably expect the courts to carefully examine it before it goes into effect." *Id*. at 944.

At bottom, in granting preliminary relief, the court said that it was "unwilling to play a role in countenancing the incremental 'creep' of federal agency authority beyond that envisioned by the U.S. Constitution." *Id.* at 946.

### C.    CMS Promulgates the Amended Arbitration Rule.

Defendants dismissed their appeal of the Northern District of Mississippi's preliminary injunction.  On December 9, 2016, CMS issued a nationwide instruction suspending enforcement of the Original Arbitration Rule's prohibition of pre-dispute, binding arbitration provisions during the period that the court-ordered injunction remained in effect.  *See* Memorandum from CMS to State Survey Agency Directors (Dec. 9, 2016), *available at* https://go.cms.gov/2pC5J5y.

On June 8, 2017, Defendants published a proposed rule in the Federal Register seeking comments on whether the Original Arbitration Rule should be amended.  *See* A.R. 34,184-88 ("Revision of Requirements for Long-Term Care Facilities: Arbitration Agreements, 82 Fed. Reg. 26,649 (June 8, 2017)").  Among other changes, Defendants proposed removing the prohibition on pre-dispute, binding arbitration agreements. A.R. 34,185-87.  Defendants explained that they had "reconsidered" their earlier position and returned to their original view "that arbitration agreements are, in fact, advantageous to both providers and beneficiaries because they allow for the expeditious resolution of claims without the costs and expense of litigation." *Id.* at 34,186.

Yet notwithstanding Defendants' view that arbitration is "advantageous to both providers and beneficiaries," *id.*, the proposed rule continued to include burdensome restrictions on long-term care facilities' ability to enter into arbitration agreements with their residents.  The proposed rule retained many of the burdensome requirements of the Original Arbitration Rule, including the requirement that those facilities provide individualized explanations of arbitration provisions that "the resident and his or her representative understands," and that they retain arbitration-related records for five years.  *See id.* at 34,185-86.  The proposed rule did not prohibit long-term care

facilities that participate in the Medicare or Medicaid programs from requiring residents to sign an arbitration agreement as a condition of admission; to the contrary, Defendants stated that they were proposing to amend the Original Arbitration Rule to eliminate the prohibition on requiring an agreement to arbitrate as a condition of admission. *Id.* at 34,185 ("[W]e also propose removing the prohibition at §483.70(n)(2)(iii) banning facilities from requiring that residents sign arbitration agreements as a condition of admission to a facility."); *id.* at 34,188 (proposing that "[i]f an agreement for binding arbitration is a condition of admission, it must be included in plain language in the admission contract.").

Numerous individuals, organizations, and government officials filed comments in response to the proposed rule. The American Healthcare Association ("AHCA"), a trade association of which Plaintiffs are members, explained that "[f]orcing" long-term care facilities "to abandon the use of arbitration agreements as a condition of receiving Medicare and Medicaid funds amounts to a ban on arbitration because [those facilities] across the country would be driven into insolvency if deprived of that funding." *Id.* at 35,337 ("Letter from Mark Parkinson, Pres. & Chief Exec. Officer, Am. Health Care Ass'n, to Seema Verma, Adm'r, Ctrs. for Medicare & Medicaid Servs. (Aug. 7, 2017)") ("AHCA Comments"). AHCA further explained that arbitration is often superior to "litigation, as confirmed by both empirical evidence and common sense." A.R. 35,327. The U.S. Chamber of Commerce also filed detailed comments, explaining, among other things, "that CMS lacks the legal authority to impose such restrictions," and that "[i]mposing additional regulatory requirements on arbitration agreements will simply give plaintiffs' lawyers additional ways to try to evade these agreements by suing in court and arguing that the agreements are invalid because they supposedly fail to comply with the general standards embodied in these proposed

rules."  A.R. 35,373-74 ("Letter from Lisa A. Rickard Pres., U.S. Chamber Institute for Legal Reform, to CMS and HHS (Aug. 7, 2017)") ("Chamber of Commerce Comments").

On July 18, 2019, Defendants published the final rule in the Federal Register.  The final rule largely rejects these comments and continues to restrict the use of arbitration agreements by long-term care facilities and their residents.  *See* A.R. 34,165-83 ("Revision of Requirements for Long-Term Care Facilities: Arbitration Agreements, 84 Fed. Reg. 34,718 (July 18, 2019)") ("Amended Arbitration Rule").  While the Amended Arbitration Rule differs from the Original Arbitration Rule in a few respects, it still precludes long-term care facilities from insisting on an agreement to arbitrate as a condition of doing business, and it still claims the power to regulate in ways that run afoul of the FAA, while failing to identify anything in the Medicare or Medicaid Acts that empowers Defendants to regulate dispute resolution, including arbitration, at all.

For example, although the Amended Arbitration Rule no longer expressly bars all pre-dispute arbitration agreements between long-term care facilities and their residents, it—in a complete reversal of course from the proposed rule—prohibits those facilities "from requiring any resident or his or her representative to sign an agreement for binding arbitration as a condition of admission to the facility."  *Id.* at 34,166.  Indeed, the Amended Arbitration Rule mandates that the facility "explicitly inform the resident or his or her representative of his or her right not to sign the agreement as a condition of admission to, or as a requirement to continue to receive care at, the facility," and it requires that the agreement itself "explicitly state that neither the resident nor his or her representative is required to sign an agreement for binding arbitration as a condition of admission to, or as a requirement to continue to receive care at, the facility."  A.R. 34,182-83; 42 C.F.R. §483.70(n)(1) & (4).  Combined with CMS' current position that existing residents cannot

be forced to enter arbitration agreements, this prohibition prevents facilities from insisting on an agreement to arbitrate as a condition for doing business.

The Amended Arbitration Rule also imposes additional restrictions on the ability of long-term care facilities to enter into pre-dispute arbitration agreements with their residents.  It requires "that facilities grant to residents a 30 calendar day period during which they may rescind their agreement to an arbitration agreement."  A.R. 34,166; 42 C.F.R. §483.70(n)(3).  It requires facilities to ensure that any arbitration agreement "is explained to the resident and his or her representative in a form and manner that he or she understands."  A.R. 34,182; 42 C.F.R. §483.70(n)(2)(i).  Finally, it requires facilities to retain copies of arbitration agreements and arbitrator's decisions for five years, so that Defendants can better assess whether the rule they have already imposed is in fact beneficial.  *See* A.R. 34,183; 42 C.F.R. §483.70(n)(6); *see also* A.R. 34,170 (explaining that "the requirement to retain copies of the arbitration agreement and the arbitrator's final decision will allow us to learn how arbitration is being used").

The Amended Arbitration Rule asserts that Defendants have authority to issue it based on two statutory provisions:  (1) the Secretary's general authority "to promulgate regulations that are 'adequate to protect the health, safety, welfare, and rights of resident[s] and to promote the effective and efficient use of public moneys,'" and (2) the Secretary's even more generic power "to impose 'such other requirements relating to the health and safety [and well-being] of residents as [he] may find necessary.'"  A.R. 34,165 (quoting 42 U.S.C. §§1395i-3(f)(1) & 1396r(f)(1)); 42 U.S.C. §§1395i-3(d)(4)(B) & 1396r(d)(4)(B)) (brackets in original).  Defendants no longer invoke (as they did with the Original Arbitration Rule) the Secretary's power to "establish[ ]" patient "right[s]," 42 U.S.C. §§1395i-3(c)(1)(A)(xi) & 1396r(c)(1)(A)(xi)).

Defendants justify the Amended Arbitration Rule based on largely the same policy considerations that they claimed justified the Original Arbitration Rule.  Only 2,000 pages of the 36,000-page administrative record post-date the 2016 rule, and the vast majority of new materials are public comments.   Indeed, Defendants stated that "[t]he requirements we are finalizing in this rule are designed to accomplish the same goals as the 2016 rule, namely, protecting resident's rights in matters concerning the arbitration process."  A.R. 34,172.  Yet Defendants acknowledged that they continue to lack any empirical data that pre-dispute arbitration agreements are harmful to residents, noting that "there is little solid social science research evidence demonstrating that arbitration agreements necessarily have a negative effect on quality of care."  A.R. 34,173; *see also* A.R. 34,169 ("Many comments were based upon anecdotal or personal experiences, and some commenters provided articles published in various general and legal periodicals.  However, there was little solid social science research evidence to support these assertions").  Despite the admitted lack of evidence supporting the need for any regulation, Defendants proceeded to expressly prohibit long-term care facilities from requiring an arbitration agreement as a condition for admission, among other arbitration-specific requirements and restrictions.

The Secretary and the Administrator approved the Amended Arbitration Rule.  The CMS' Administrator signed the Amended Arbitration Rule on February 6, 2019, and the HHS Secretary signed it on February 13, 2019; the Office of the Federal Register, however, did not receive it until five months later, on July 10, 2019.  *See* A.R. 34,183.  The Amended Arbitration Rule was scheduled to take effect on September 16, 2019.  A.R. 34,165.

### D.   Plaintiffs' Current Practices Violate the Amended Arbitration Rule, Subjecting Them to Severe Sanctions.

Plaintiffs' current policies and practices with respect to arbitration agreements run afoul of the Amended Arbitration Rule.   For instance, Springdale requires a new resident (or his

representative) to sign an arbitration agreement as a condition of admission to the facility, a resident does not have the unconditional right to unilaterally rescind that agreement within 30 days, and Springdale does not maintain arbitration-related records for five years.  Lee Decl. ¶11. Moreover, Springdale trains its admissions staff to provide the same reasonable and accurate explanation of the arbitration agreement to each prospective resident or his representative.  *Id.* ¶8. Similarly, The Maples enters into arbitration agreements with its residents (although not as a condition of admission), and likewise does not grant a resident the unconditional right to unilaterally rescind the agreement within 30 days, does not maintain arbitration-related records for five years, and does not train its staff to provide individualized explanations of the arbitration provision in the admission agreement.  McPherson Decl. ¶11.

In light of these policies, Plaintiffs would be in violation of the Amended Arbitration Rule if it is allowed to take effect after January 17, 2020.  *See* Dkt.#23.  Such violations will subject them to enforcement actions and potentially substantial penalties, including, among other possibilities, termination of participation in the Medicare or Medicaid programs.   That would be devastating to Plaintiffs, as Medicare and Medicare fund the overwhelming majority of resident care at both facilities.  *See* Lee Decl. ¶3; McPherson Decl. ¶3.

By way of background, a long-term care facility that wishes to receive payments from the federal Medicare program or the state Medicaid program must enter into provider agreements with each program that require the facility, among other things, to undergo an annual survey.  *See* 42 U.S.C. §§1395i-3(g), 1396r(g); 42 C.F.R. §488.330.  The federal government contracts with state agencies to conduct the surveys, 42 U.S.C. §§1395aa, 1395i-3(g), 1396r(g); 42 C.F.R. §§488.10(a), 488.26(c), 488.308(a), and the surveys follow a specific protocol, 42 U.S.C. §§1395i-3(g)(2)(C), (g)(3), 1396r(g)(2)(C), (g)(3).   During the survey, a team of inspectors, known as

13

"surveyors," uses the prescribed inspection protocol to determine whether the long-term care facility is in substantial compliance with requirements for participation in the Medicare and Medicaid programs. *See, e.g.*, 42 C.F.R. §431.610(f)(1), 488.26(c)-(d). As relevant here, that would include whether the facility is complying with the Amended Arbitration Rule.

If, during the survey, the state surveyor concludes that the facility is not in compliance with all requirements, then the surveyor cites the facility for a "deficiency" and imposes sanctions or recommends that CMS or HHS impose sanctions. 42 U.S.C. §§1395i-3(h)(1), 1396r(h)(1). Among other sanctions, Defendants may terminate the facility's ability to participate in the Medicare and Medicaid programs, deny payments, place a temporary manager or state monitor in the facility, or assess civil money penalties up to (as applicable here) $21,393 per incident or per day that a violation is determined to exist. *See id.* §§1395i-3(h)(2), 1396r(h)(2). A long-term care facility sometimes may avoid or mitigate sanctions by submitting a "plan of correction" that is acceptable to CMS. *See* 42 CFR §488.401. The plan of correction must explain what the facility will do to correct the cited violation and assure that the violation will not recur. *See generally* CMS, *State Operations Manual,* Ch. 7 (rev. Nov. 16, 2018), *available at* https://go.cms.gov/ 2cGR6Xy. An acceptable plan of correction in these circumstances necessarily must state that the facility would not seek to enforce already-signed arbitration agreements found to violate the rule and that the facility would not require arbitration agreements as a condition of admission in the future. If the agency determines that a plan of correction is sufficient to avoid sanctions, the facility will have no right to appeal the deficiency. *See* 42 CFR §431.153. Plaintiffs thus could force an appeal based on a finding of a violation, if at all, only by refusing to submit a plan of correction, which itself would increase the chances of facing a sanction as severe as being kicked out of the Medicare and/or Medicaid programs.

14

## LEGAL STANDARD

"[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal.  The 'entire case' on review is a question of law."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).  The central legal question is "whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  *Accrediting Council for Indep. Colls. & Schs. v. DeVos*, 303 F. Supp. 3d 77, 94 (D.D.C. 2018) (citation and quotation marks omitted).  In answering this question, *Chevron* deference "is not applicable in all situations involving agency interpretations.  It 'is warranted only when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.'"  *Louisiana v. Salazar*, 170 F. Supp. 3d 75, 84 (D.D.C. 2016) (quoting *Gonzales v. Oregon*, 546 U.S. 243, 255-56 (2006)).

## ARGUMENT

The APA provides that a "reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be … in excess of statutory jurisdiction, authority, or limitations"; "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; or "without observance of procedure required by law."  5 U.S.C. §706(2)A, (C), (D).[2] Plaintiffs are entitled to summary judgment on their APA claims because (1) the Amended Arbitration Rule violates the FAA; (2) Defendants lacked statutory authority under the Medicare or Medicaid Acts to promulgate the Amended Arbitration Rule; (3) the Amended Arbitration Rule is arbitrary, capricious, and an abuse of discretion; and (4) the Amended Arbitration Rule was adopted in violation of the RFA.  The problems with the agencies' efforts to restrict the use of

---

[2] This Court has jurisdiction under 28 U.S.C. §1331 because the claims arise under the APA. There is no statutory provision providing for judicial review in a court of appeals.

arbitration agreements in the long-term care context were readily apparent to the Northern District of Mississippi when it confronted—and preliminarily enjoined—the analogous Original Arbitration Rule in 2016.  Those problems have been made even more glaring by the Supreme Court's intervening decisions in *Kindred Nursing* and *Epic Systems*.  As those cases underscore, rules (including those promulgated by administrative agencies) that single out arbitration agreements for disfavored treatment are no more permissible in this context than any other, and such rules cannot be imposed by a federal agency absent clear congressional approval to override the mandates of the FAA.  Defendants plainly have no such mandate.

**A.     The Amended Arbitration Rule Violates the APA Because It Contravenes the FAA.**

The first problem with the Amended Arbitration Rule is that it flatly violates the FAA.  The FAA provides that "[a] written provision in any … contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. §2.  The Supreme Court recently reiterated that this clause means exactly what it says:  The FAA prohibits imposing on contracts involving arbitration special restrictions that do not apply to *any* contract.  Thus, when confronted with a state-court effort to restrict the use of arbitration agreements by nursing homes, the Court held that the FAA forecloses efforts to "single[ ] out arbitration for disfavored treatment."  *Kindred Nursing*, 137 S. Ct. at 1425.

*Kindred Nursing* follows a long line of Supreme Court precedent firmly "establish[ing] 'a liberal federal policy favoring arbitration agreements.'"  *Epic*, 138 S. Ct. at 1621 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)); *Marmet Health Care Ctr., Inc. v. Brown,* 132 S. Ct. 1201, 1203 (2012) (per curiam) (the FAA "reflects an emphatic federal policy in favor of arbitral dispute resolution"); *AT&T Mobility LLC v. Concepcion*, 563

U.S. 333, 345 (2011) ("[O]ur cases place it beyond dispute that the FAA was designed to promote arbitration.").  As those cases confirm, the FAA protects contracting parties' freedom to "structure their arbitration agreements as they see fit," and to "specify by contract the rules under which … arbitration will be conducted."  *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.,* 489 U.S. 468, 479 (1989).  To that end, the FAA puts "arbitration agreements on equal footing with all other contracts."  *Kindred Nursing*, 137 S. Ct. at 1424 (quotation marks omitted).  This "equal-treatment rule" means that the only permissible restrictions on arbitration agreements are restrictions that would "apply to 'any' contract."  *Epic*, 138 S. Ct. at 1622.

The Amended Arbitration Rule violates the FAA's equal-treatment rule in several respects. *First*, the Amended Arbitration Rule dictates the terms on which long-term care facilities may require an agreement to arbitrate, prohibiting them from declining to enter into a contractual relationship for care and services with someone who refuses to agree to arbitration.  42 C.F.R. §483.70(n)(1).  *Second*, the Rule dictates terms that the arbitration agreement must contain, providing that "[t]he agreement must explicitly grant the resident or his or her representative the right to rescind the agreement within 30 calendar days of signing it," and that "[t]he agreement must explicitly state that neither the resident nor his or her representative is required to sign an agreement for binding arbitration as a condition of admission to, or as a requirement to continue to receive care at, the facility."  *Id.* §483.70(n)(3) & (4).  *Third*, the Rule dictates the process that long-term care facilities must use to enter arbitration agreements with residents and their representatives:  The facility "must explicitly inform the resident or his or her representative of his or her right not to sign the agreement as a condition of admission to, or as a requirement to continue to receive care at, the facility," must explain the arbitration agreement "to the resident and his or her representative in a form and manner that he or she understands," and must obtain the resident

or representative's "acknowledge[ment] that he or she understands the agreement." *Id.* §483.70(n)(1) & (2)(i)-(ii). *Finally*, the Rule imposes documentation and record-keeping requirements applicable only to arbitration agreements: "When the facility and a resident resolve a dispute through arbitration, a copy of the signed agreement for binding arbitration and the arbitrator's final decision must be retained by the facility for 5 years after the resolution of that dispute on and be available for inspection upon request by CMS or its designee." *Id.* §483.70(n)(6).

None of those restrictions has any basis in contract law "generally." *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996); *see also Kindred Nursing*, 137 S. Ct. at 1426. Indeed, numerous businesses in numerous contexts require arbitration as a condition of entering into a business relationship.[3] And ordinary contract law certainly does not give one party to an agreement a unilateral, unconditional right to rescind the agreement within 30 days. To the contrary, the touchstone of contract rescission under ordinary contract principles is mutual assent. *See J. L. Metz Furniture Co. v. Thane Lumber Co.*, 298 F. 91, 92 (8th Cir. 1924) ("It is fundamental that, in the absence of a legal ground for rescission, a contract cannot be rescinded or abrogated, except by mutual agreement, or meeting of the minds, similar to that required to establish the contract.").

The Amended Arbitration Rule's requirement that an arbitration agreement must be "explained to the resident and his or her representative in a form and manner that he or she understands," 42 C.F.R. §483.70(2)(i), is no more compatible with general contract law principles. Ordinarily, when a party seeks to enforce a contract, it need show only that the meaning of the

---

[3] The Supreme Court's FAA decisions show the breadth of use of arbitration agreements in the economy, involving purchases of cell phones, employment agreements, and franchise agreements, as well as health care.

contract was *objectively* clear.  That is because "[a] mistaken idea of one or both parties in regard to the making of an offer or acceptance will not generally prevent the formation of a contract."  2 Williston on Contracts §6:58 (4th ed.).  To be sure, "under some circumstances," such a mistake may "be a ground for relief from enforcement of the contract."  *Id.*  But if a party seeks to escape enforcement on the ground that there was no meeting of the minds, it is that party's burden to show—as an *affirmative defense*—that, among other things, it subjectively did not understand the agreement.  *See id.*  The Amended Arbitration Rule reverses that ordinary order of operation, transferring the burden to the party that seeks to *enforce* the agreement to demonstrate that the counterparty *subjectively* "understood" it—a fact-intensive inquiry ill-suited to hindsight analysis (and subject to potential abuse by those seeking to avoid their contractual obligations).

In short, none of the Amended Arbitration Rule's provisions has any basis in ordinary contract law.  Instead, each is a patent effort to single out arbitration and discourage its use in the long-term care industry.  But the FAA "emphatic[ally] … favor[s]" arbitration, *Marmet*, 132 S. Ct. at 1203, and it puts "arbitration agreements on equal footing with all other contracts," *Kindred Nursing*, 137 S. Ct. at 1424 (quotation marks omitted).  The Amended Arbitration Rule therefore must be "set aside" as "not in accordance with law."  5 U.S.C. §706(2)(A).

Defendants cannot excuse this clear conflict with the FAA by claiming that the Medicare or Medicaid Act contains a "contrary congressional command" that displaces the FAA.  *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012).  As the Supreme Court made abundantly clear in *Epic Systems*, an agency claiming the power to restrict the use of arbitration agreements "faces a stout uphill climb."  138 S. Ct. at 1624.  "A party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing 'a clearly expressed congressional intention' that such a result should follow."  *Id.* (quoting *Vimar*

*Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 533 (1995)).  Because there is a "strong presumption that repeals by implication are disfavored and that Congress will specifically address preexisting law when it wishes to suspend its normal operations in a later statute," *id.* (quotation marks and alterations omitted), if the other statute is "silent" on the issue of arbitration, then the FAA controls, *CompuCredit,* 132 S. Ct. at 673.  Thus, the Supreme Court has cautioned those who claim that authority under one statute displaces the FAA:  "In many cases over many years, this Court has heard and rejected efforts to conjure conflicts between the Arbitration Act and other federal statutes.  In fact, this Court has rejected *every* such effort to date."  *Epic Systems*, 138 S. Ct. at 1627.

Here, nothing in the Medicare or Medicaid Acts addresses dispute resolution at all, much less evinces a "clear and manifest" intent to suspend the operation of the FAA with respect to long-term care facilities.  *Id.* at 1624 (internal quotation marks and citations omitted).[4]  That is certainly not because Congress does not know how to grant agencies specific authority to regulate arbitration.  As the federal district court in Mississippi explained when it preliminarily enjoined the Original Arbitration Rule, "Congress has made it clear that it knows how to grant a federal agency the authority to limit arbitration agreements, and it has done so with plain and unambiguous language."  *Am. Health Care Ass'n*, 217 F. Supp. 3d at 936.  For example, Section 1028 of the Dodd-Frank Wall Street Reform and Consumer Protection Act provides that, if certain conditions are met, the Consumer Financial Protection Bureau "may prohibit or impose conditions or limitations on the use of an agreement between a covered person and a consumer for a consumer

---

[4] Indeed, arbitration agreements used by long-term care facilities are notably the only arbitration agreements in the health care sector that Defendants ever have sought to regulate.  Arbitration agreements used by hospitals, hospices, Home Health Agencies, clinical laboratories, Durable Medical Equipment suppliers, physician practice groups and ambulance service suppliers, among other participants in the health care industry, have never been subject to regulation by Defendants.

financial product or service providing for arbitration of any future dispute between the parties." 12 U.S.C. §5518(b); *see also, e.g.*, 15 U.S.C. §78o(o) (authorizing the Securities and Exchange Commission to, "by rule … prohibit, or impose conditions or limitations on the use of, agreements that require customers or clients of any broker, dealer, or municipal securities dealer to arbitrate any future dispute between them arising under the Federal securities laws").

The absence of any express authorization to regulate the use of arbitration in either the Medicare Act or Medicaid Act stands in stark contrast to statutes in which Congress has expressly vested federal agencies with the authority to regulate or prohibit the use of arbitration agreements in other industries. Indeed, there is *no* language—let alone any plain or unambiguous language— in the Medicare or Medicaid Acts that suggests that Congress intended either statute to impliedly repeal the FAA. The Supreme Court has "stressed that the absence of any specific statutory discussion of arbitration or class actions is an important and telling clue that Congress has not displaced the Arbitration Act." *Epic Systems*, 138 S. Ct. at 1627 (citations omitted). That should be the end of the matter, for even assuming that the "policy justification" for an agency's action is "a reasonable one or even a good one," an agency cannot take an action that is "contrary to the policy decision Congress made … , which is clearly expressed in [a] statute." *Smithville R-II Sch. Dist. v. Riley*, 28 F.3d 55, 58 (8th Cir. 1994).

Defendants' claim of power to override the clear mandates of the FAA is particularly misplaced given that Congress has repeatedly considered—and repeatedly *rejected*—proposals to constrain the use of arbitration agreements by long-term care facilities and their residents. *See supra* at 4-5. The federal court in Mississippi afforded significant weight to this history, *see Am. Health Care Ass'n*, 217 F. Supp. 3d at 935-36, and this Court should do the same. *See also, e.g., Fourth Estate Pub. Benefit Corp. v. Wall-Street.com, LLC*, 139 S. Ct. 881, 892 (2019) (finding it

"[n]oteworthy" in construing Copyright Act's registration requirement for bringing suit that "[t]ime and again, … Congress has maintained registration as prerequisite to suit, and rejected proposals that would have eliminated registration"); *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2519-20 (2015) (rejecting statutory interpretation that would have eliminated disparate-impact liability because Congress "made a considered judgment to retain the relevant statutory text" permitting that liability and "rejected a proposed amendment that would have eliminated disparate-impact liability"). In short, Congress' policy favoring arbitration is clearly expressed in the FAA, has been repeatedly affirmed by the Supreme Court, and is nowhere overridden by the Medicare or Medicaid Acts. Defendants cannot, without express statutory authority, prohibit what the FAA protects.

> **B.    The Amended Arbitration Rule Violates the APA Because Neither the Medicare Act Nor the Medicaid Act Grants to CMS Authority To Regulate Arbitration in the Long-Term Care Industry.**

Plaintiffs are also entitled to summary judgment on their APA claims because Defendants lack any authority under the Medicare Act or Medicaid Act to regulate the use of arbitration agreements. The Amended Arbitration Rule thus must be set aside on the independent ground that it was issued "in excess of [Defendants'] statutory jurisdiction." 5 U.S.C. §706(2)(C).

"It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Thus, in "determining the validity" of the Amended Arbitration Rule, "the threshold question" is whether the "structure and language" of the statutory provisions Defendants invoke actually "authorize[ ]" the rulemaking. *Id.* at 208-09; *see Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001) (an executive agency has "only those authorities conferred upon it by Congress"). Here, Defendants invoke two grants of statutory authority for the restrictions the Rule imposes: the Secretary's authority "to assure that requirements which govern the provision of care

in skilled nursing facilities are adequate to protect the health, safety, welfare, and rights of residents and to promote the effective and efficient use of public moneys" under 42 U.S.C. §§1395i-3(f)(1) and 1396r(f)(1), and the Secretary's power "to impose 'such other requirements relating to the health and safety [and well-being] of residents as [he] may find necessary'" under 42 U.S.C. §§1395i-3(d)(4)(B) and 1396r(d)(4)(B).  *See* 84 Fed. Reg. 34,718.

The first and fatal problem with these provisions is that neither says one word about regulating the terms of dispute resolution between long-term care facilities and their residents. That alone dooms Defendants' efforts to identify statutory authority to issue the Amended Arbitration Rule.  As noted, the Supreme Court has repeatedly refused to find that agencies were empowered to regulate arbitration absent a clear congressional command, and Congress has repeatedly demonstrated that it knows how to empower agencies to regulate arbitration when it wants to do so.  *See supra* at 20.  While both the Medicare and Medicaid Acts were passed long after the FAA, Congress did not imbue the agencies with the power to regulate arbitration when it enacted them, and it has declined to do so ever since.

Defendants' general rulemaking powers cannot confer the power to regulate the use of arbitration because Congress has expressly withheld that power through the FAA.  Indeed, the government itself has recognized that, if the FAA is to be supplanted, the Supreme Court's cases require a specific statutory statement conferring the power to regulate arbitration—and has done so in the context of statutory provisions that, unlike those at issue here, at least had something to do with dispute resolution.  *See* Brief for United States as Amicus Curiae Supporting Petitioners in Nos. 16-285 and 16-300 and Supporting Respondents in No. 16-307, *Epic*, 2017 WL 2665007, at 18 ("When examining text and legislative history, the Court has looked for evidence that Congress intended to address arbitration agreements *in particular*.  A statute's general reference

to litigation rights, even when combined with a provision forbidding the waiver of statutory protections, is insufficient to overcome the FAA's presumption of enforceability.").

But even beyond the clear statement rule that governs agency authority to regulate arbitration, any attempt to predicate authority for the Amended Arbitration Rule in the generic provisions that Defendants invoked rests on atextual readings of those provisions that distort their plain meaning, and which, if adopted, would confer near boundless authority on Defendants. Defendants have quoted selectively from the statutes suggesting that the statute's generic provisions imbue them with a near limitless authority to regulate to achieve certain *objectives* (i.e., promoting "health, safety, welfare, and rights of residents"). However, Congress actually confined Defendants' authority to regulate to "*the provision of care*" provided "*in* skilled nursing facilities," and did not authorize any regulation that might arguably promote the "health, safety, welfare, and rights of residents."  42 U.S.C. §§1395i-3(f)(1) (emphases added); *see also id.* §1396r(f)(1) (similar).  Defendants have no general warrant to regulate anything and everything that might promote the "health, safety, welfare, and rights of residents."

Consistent with that understanding, in the ordinary course, CMS uses this authority to impose requirements that actually involve resident care in a skilled nursing facility (Medicare) or nursing facility (Medicaid)—for example, ensuring proper treatment for mental and psychosocial problems, *see generally* 42 C.F.R. §483.25, adequate nutrition and hydration, *id.* §483.25(g), respiratory care, *id.* §483.25(i), pain management, *id.* §483.25(k), and assistive devices to maintain vision and hearing, *id.* §483.25(a).  The Amended Arbitration Rule is far afield from these kinds of rules.  Arbitration agreements simply have no connection to *how* long-term care providers administer care to residents.  Nor do they have any connection to "the provision of care *in* skilled nursing facilities."  42 U.S.C. §§1395i-3(f)(1) (emphasis added); *see id.* §1396r(f)(1).  An

24

agreement to arbitrate disputes required as a condition of admission is entered as a condition precedent to the provision of care. Likewise, an agreement to arbitrate entered before admission precedes the "the provision of care in skilled nursing facilities." As such, the agreement to arbitrate operates *before* an individual becomes a resident of a long term care facility and *before* "the provision of care" by Plaintiffs' facilities.

Defendants cannot escape these textual limitations on their rulemaking authority by invoking the statutes' broad "relating to" language. As the Supreme Court has explained, "[i]f 'relate to' were taken to extend to the furthest stretch of its indeterminacy," then "Congress's words of limitation" would be a "mere sham," because "'[r]eally, universally, relations stop nowhere.'" *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995) (citation omitted). Defendants' boundless conception of their rulemaking power suffers from precisely that problem.

It is also particularly troubling for Defendants to try to ground authority for the Amended Arbitration Rule in patient-care provisions given the admitted dearth of evidence that arbitration has any impact on patient care. As CMS itself acknowledged in the final rule, "there is little solid social science research evidence demonstrating that arbitration agreements necessarily have a negative effect on quality of care." 84 Fed. Reg. 34,726. Given that lack of evidence, Defendants simply cannot claim authority to regulate arbitration based on their general authority to ensure patient health, safety, and welfare. That is especially so since the power Defendants seek to wield falls where the FAA's interests are the greatest (enforceability of arbitration agreements) and Defendants' own interests are the weakest (before patient care even begins).

25

C.     **The Amended Arbitration Rule Violates the APA Because It Is Arbitrary, Capricious, and an Abuse of Discretion.**

Plaintiffs are entitled to summary judgment because the Amended Arbitration Rule, even if within CMS' statutory authority, is arbitrary, capricious, and an abuse of discretion.  Agency action is arbitrary, capricious, and an abuse of discretion if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  An agency also acts unlawfully if it changes its position without "supply[ing] a reasoned analysis for the change."  *Id.* at 42.  An agency must at least "display awareness that it is changing position and show that there are good reasons for the new policy."  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (quotation omitted).  And "[i]n explaining its changed position, an agency must also be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account."  *Id.* (quotation omitted).  Here, Defendants both based their conclusions on insufficient and improper evidence and changed their positions without explanation.

First, Defendants candidly admitted throughout the process of promulgating the Rule that it was not grounded on empirical evidence.  In fact, Defendants repeatedly noted that they had no reliable evidence either that regulation was necessary or, if it was, of what terms any regulation should impose.[5]  Yet despite acknowledging the dearth of "solid social science research evidence,"

---

[5] *See, e.g.*, 84 Fed. Reg. 34,722 ("[T]here was very little statistical data (although a great deal of anecdotal evidence and reportage) upon which we made our decisions that supported this provision of the 2016 final rule.  Many comments were based upon anecdotal or personal experiences, and some commenters provided articles published in various general and legal periodicals.  However, there was little solid social science research evidence to support these assertions."); *id.* at 34,726

84 Fed. Reg. 34,726, Defendants nonetheless imposed fundamental changes on the business practices of the long-term care industry.  Indeed, Defendants admit that the reason the Rule requires facilities to retain copies of arbitration decisions and agreements is to enable CMS to determine whether its effort to regulate of arbitration agreements is even necessary.  *See id.* at 34,723.  In other words, instead of relying on empirical evidence to justify its rule, Defendants have burdened Plaintiffs (in an area expressly protected by Congress through the FAA, no less) so that Defendants can *collect* evidence to determine whether there is any need for the very requirement they already have imposed.  That puts the cart before the horse.

Second, the Amended Arbitration Rule is an unreasoned—and unexplained—departure from Defendants' prior positions, expressed in the Pelovitz Memorandum and Secretary Leavitt's letter to Congress, that arbitration between long-term care facilities and residents is beneficial and should be permitted.  *See supra* at 3.  The long-term care industry has relied on that position to enter into millions of arbitration agreements with residents.   In reliance on the Pelovitz Memorandum and Secretary Leavitt's letter to Congress, many long-term care facilities have built their economic and pricing models on the right to require residents to enter into pre-dispute arbitration agreements as a condition to any contractual relationship.  Plaintiffs here, for instance, have long used business practices that Defendants now seek to forbid, even though the same agencies previously deemed them perfectly lawful.  *See* Lee Decl. ¶8; McPherson Decl. ¶8.

---

("[T]here is little solid social science research evidence demonstrating that arbitration agreements necessarily have a negative effect on quality of care."); *id.* at 34,727 ("While there is little empirical evidence supporting the consequences claimed by these commenters, we also agree that prohibiting pre-dispute, binding arbitration agreements could impose an unnecessary burden on LTC facilities.  Prohibiting the use of these agreements would deny facilities a method of resolving disputes that is potentially more cost effective and efficient."); *id.* at 34,729 ("Given the lack of hard social science data, we do not believe that removing the ban on pre-dispute, binding arbitration agreements will increase the occurrence of any of the serious incidents that the commenters and the media are describing.").

The Original Arbitration Rule asserted that its ban on arbitration did not "contradict" the Pelovitz Memorandum because the Original Arbitration Rule did "not in any way prohibit the use of post-dispute arbitration agreements." 81 Fed. Reg. 68,792. But the Pelovitz Memorandum did not address only post-dispute agreements; it "address[ed] the use of an agreement that requires disputes between a *prospective* or current resident and the nursing home be resolved through binding arbitration"—i.e., a *pre-dispute* arbitration agreement. A.R. 34,019 (emphasis added). That memorandum also stated that the decision whether to have any arbitration agreement was "an issue between the resident and the nursing home." *Id.* In the Original Arbitration Rule, CMS failed to offer any reason why it departed from its earlier conclusion. So, too, with respect to the Amended Arbitration Rule. Defendants thus have not adequately explained CMS' departure from its longstanding policy announced and explained in the Pelovitz Memorandum.

The Original Arbitration Rule likewise asserted that its ban on arbitration did not contradict Secretary Leavitt's letter because the Original Arbitration Rule banned only pre-dispute arbitration. 81 Fed. Reg. 68,792. But Secretary Leavitt also endorsed the use of pre-dispute arbitration agreements, stating that "[p]re-dispute arbitration agreements are an excellent way for patients and providers to control costs, resolve disputes, and speed resolution of conflicts." H.R. Rep. 110-894, at 13. In the Original Arbitration Rule, CMS failed to offer any reason why it departed from Secretary Leavitt's conclusion concerning pre-dispute arbitration. The Amended Arbitration Rule, which amends the Original Arbitration Rule, also fails to offer any reason why CMS has departed from Secretary Leavitt's conclusion. Defendants thus have not adequately explained CMS's departure from the agency's longstanding policy announced and explained in Secretary Leavitt's letter.

And even assuming, *arguendo,* that Defendants had statutory authority to reverse their position on this issue from the position expressed in the Pelovitz Memorandum and Secretary Leavitt's letter, they were required at least to "display awareness that [they were] changing position and show that there are good reasons for the new policy." *Encino Motorcars*, 136 S. Ct. at 2126 (internal quotation marks and citation omitted).  Defendants made no mention of their past policies when they adopted the Original Arbitration Rule, and they doubled down on that error here.  That failure alone is ground to set aside the Amended Arbitration Rule under the APA and grant summary judgment to Plaintiffs.

### D.     The Amended Arbitration Rule Violates the APA Because It Does Not Comply with the Regulatory Flexibility Act.

Finally, Plaintiffs are entitled to summary judgment on Count Five because Defendants failed to comply with the RFA, which requires an agency to include in its rule a "regulatory flexibility analysis, which is

> a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.

5 U.S.C. §604(a)(6).  The agency may omit this analysis only if "the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities."  5 U.S.C. §605(b).

Defendants did not conduct the required analysis under the RFA because the Secretary certified that the Amended Arbitration Rule would not have a significant economic impact.  *See* 84 Fed. Reg. 34,734 ("We are not preparing an analysis for the RFA because we have determined, and the Secretary certifies, that this final rule will not have a significant economic impact on a substantial number of small entities.").  But Defendants provide no basis whatsoever for this

conclusion; in fact, the rule did not contain *any* assessment of costs or *any* explanation of why it would not have a significant economic impact on countless long-term care facilities, many of whom are relatively small entities.  Indeed, Plaintiffs alone are just 109 facilities, *see* Dkt.25 Ex. A, which is only a small fraction of the more than 13,000 facilities providing care nationwide.  *See* AHCA, *Membership Overview* (2017), *available at* https://bit.ly/2pIsrZX.

Had Defendants considered those issues, they readily would have concluded that the Amended Arbitration Rule, if allowed to take effect, would in fact have a significant economic impact on those entities that the rule directly regulates.  It is indisputable that the rule will impose costs on long-term care facilities by requiring them to resolve disputes more expensively in court, raising their insurance premiums, and forcing them to change their longstanding internal procedures and business practices.  *See* Lee Decl. ¶¶13-20; McPherson Decl. ¶¶13-19.  Defendants should have acknowledged these costs in the rule and assessed whether they would have a significant economic impact on long-term care facilities.  Instead, they paid only lip service to this statutory obligation, offering no meaningful analysis at all.  That approach violates the RFA and provides an additional independent ground to set aside the rule under the APA.

## CONCLUSION

Plaintiffs respectfully request entry of summary judgment against Defendants setting aside the Amended Arbitration Rule.

Dated: October 4, 2019                          Respectfully submitted,

*/s/ Kirkman T. Dougherty*
Kirkman T. Dougherty
Kirkman T. Dougherty (Ark. Bar No. 91133)
HARDIN, JESSON & TERRY, PLC
5000 Rogers Avenue, Suite 500
Fort Smith, AR  72903
Tel: (479) 452-2200
Fax: (479) 452-9097
kdougherty@hardinlaw.com

Paul D. Clement (admitted *pro hac vice*)
Erin E. Murphy (admitted *pro hac vice*)
Kasdin M. Mitchell (admitted *pro hac vice*)
Damon C. Andrews (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC  20004
Tel: (202) 389-5000
Fax: (202) 389-5200
paul.clement@kirkland.com
erin.murphy@kirkland,com
kasdin.mitchell@kirkland.com
damon.andrews@kirkland.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I, Kirkman T. Dougherty, hereby certify that on this 4th day of October, 2019, the foregoing is being electronically filed with the Clerk of the Court using the CM/ECF System Court which will send notification of such filing to all parties of record.


*/s/ Kirkman T. Dougherty*
Kirkman T. Dougherty