**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

| | |
|---|---|
| _____ ) | |
| NORTHPORT HEALTH SERVICES OF ) | |
| ARKANSAS, LLC D/B/A SPRINGDALE ) | |
| HEALTH AND REHABILITATION ) | |
| CENTER, *et. al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| v. ) | Civil Action No.: 19-5168-TLB |
| ) | |
| THE UNITED STATES DEPARTMENT ) | |
| HEALTH AND HUMAN SERVICES, ) | |
| *et. al.*, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**BRIEF IN SUPPORT OF DEFENDANTS' RESPONSE TO**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 3

    I.    MEDICARE AND MEDICAID ............................................................................ 3

    II.   LONG-TERM CARE FACILITIES ...................................................................... 4

    III.  CMS'S 2016 RULEMAKING .......................................................................... 6

    IV.  INJUNCTION OF 2016 RULE AND CMS'S RENEWED RULEMAKING ........................ 10

STANDARD OF REVIEW ............................................................................................... 14

ARGUMENT ................................................................................................................ 15

    I.    THE 2019 RULE IS CONSISTENT WITH THE FAA ............................................. 15

        A.    The 2019 Rule Imposes No Legal Barrier to Arbitration ......................... 16

        B.    The 2019 Rule Attaches a Valid Condition to the Receipt of Federal Funds ........... 21

    II.   THE FINAL RULE FITS SQUARELY WITHIN CMS'S AUTHORITY TO PROTECT MEDICAID AND MEDICARE PATIENTS ...................................................................... 24

    III.  THE RECORD AMPLY SUPPORTS CMS'S DECISION TO ADOPT THE 2019 RULE ................... 28

    IV.  THE SECRETARY COMPLIED WITH THE REGULATORY FLEXIBILITY ACT ...................... 32

CONCLUSION ............................................................................................................. 34

**Cases**

*Aeronautical Repair Station Ass'n, Inc. v. FAA,*
  494 F.3d 161 (D.C. Cir. 2007) ........................................................................34

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,*
  570 U.S. 205 (2013) .................................................................................21, 22

*Alenco Commc'ns, Inc. v. FCC,*
  201 F.3d 608 (5th Cir. 2000) .......................................................................33

*Allied-Bruce Terminex Cos. v. Dobson,*
  513 U.S. 265 (1995) .....................................................................................15

*Am. Health Care Ass'n v. Burwell,*
  217 F. Supp. 3d 921 (N.D. Miss. 2016) ...................................................10, 20

*Ark. Dep't of Health & Human Servs. v. Ahlborn,*
  547 U.S. 268 (2006) .......................................................................................3

*AT&T Mobility LLC v. Concepcion,*
  563 U.S. 333 (2011) ................................................................15, 16, 17, 19

*Atkinson v. Inter-Am. Dev. Bank,*
  156 F.3d 1335 (D.C. Cir. 1998) ....................................................................27

*Beverly Health & Rehab. Servs., Inc. v. Thompson,*
  223 F. Supp. 2d 73 (D.D.C. 2002) .................................................................5

*Bowles v. Willingham,*
  321 U.S. 503 (1944) .....................................................................................23

*Burditt v. U.S. Dep't of Health & Human Servs.,*
  934 F.2d 1362 (5th Cir. 1991) ...........................................................3, 23, 27

*Chamber of Commerce of the United States v. NLRB,*
  118 F. Supp. 3d 171 (D.D.C. 2015) ..............................................................31

*Chamber of Commerce v. SEC,*
  412 F.3d 133 (D.C. Cir. 2005) .....................................................................30

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
  467 U.S. 837 (1984) .....................................................................................26

*Cicle v. Chase Bank USA,*
  583 F.3d 549 (8th Cir. 2009) .......................................................................15

*CompuCredit v. Greenwood,*
    565 U.S. 95 (2012) ..................................................................................................... 19, 21

*Dean Witter Reynolds, Inc. v. Byrd,*
    470 U.S. 213 (1985) .................................................................................................... 19, 20

*Doctor's Assocs., Inc. v. Casarotto,*
    517 U.S. 681 (1996) .................................................................................................... 17, 19

*EEOC v. Waffle House,*
    534 U.S. 279 (2002) ............................................................................................................20

*Epic Sys. Corp. v. Lewis,*
    138 S. Ct. 1612 (2018) ............................................................................................... 16, 17

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ............................................................................................................32

*Grocery Servs., Inc. v. USDA Food & Nutrition Serv.,*
    No. CIV.A. H-06-2354, 2007 WL 2872876 (S.D. Tex. Sept. 27, 2007) ............................33

*Helicopter Ass'n Int'l, Inc. v. FAA,*
    722 F.3d 430 (D.C. Cir. 2013) .........................................................................................33

*Kindred Nursing Ctrs. Ltd. P'ship v. Clark,*
    137 S. Ct. 1421 (2017) ............................................................................................... 16, 19

*Maher v. Roe,*
    432 U.S. 464 (1977) ...........................................................................................................21

*Marmet Health Care Ctr., Inc. v. Brown,*
    565 U.S. 530 (2012) ...........................................................................................................19

*Melcher v. FCC,*
    134 F.3d 1143 (D.C. Cir. 1998) ........................................................................................30

*Minn. Ass'n. of Heath Care Facilities, Inc. v. Minn. Dep't of Public Welfare,*
    742 F.2d 442 (8th Cir. 1984), *cert. denied* 469 U.S. 1215 (1985) ...................................22

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,*
    460 U.S. 1 (1983) ..............................................................................................................19

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ...................................................................................................... 14, 28

*N.C. Fisheries Ass'n, Inc. v. Gutierrez,*
    518 F. Supp. 2d 62 (D.D.C. 2007) ...................................................................................33

*Nat'l Ass'n of Clean Air Agencies v. EPA,*
  489 F.3d 1221 (D.C. Cir. 2007)..................................................................28

*Nat'l Ass'n of Regulatory Utility Comm'rs v. FCC,*
  737 F.2d 1095 (D.C. Cir. 1984)................................................................31

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
  545 U.S. 967 (2005) ..................................................................................32

*Nat'l Tel. Coop. Ass'n v. FCC,*
  563 F.3d 536 (D.C. Cir. 2009)............................................................ 32, 33

*New York v. United States,*
  505 U.S. 144 (1992) ..................................................................................22

*Peck v. Thomas,*
  697 F.3d 767 (9th Cir. 2012) ....................................................................31

*Pension Ben. Guar. Corp. v. LTV Corp.,*
  496 U.S. 633 (1990) ..................................................................................28

*Perez v. Mortg. Bankers Ass'n,*
  135 S. Ct. 1199 (2015) ..............................................................................34

*10 Ring Precision, Inc. v. Jones,*
  722 F.3d 711 (5th Cir. 2013) ....................................................................28

*Rumsfeld v. Forum for Acad. & Institutional Rights,*
  547 U.S. 47 (2006) ....................................................................................21

*Rust v. Sullivan,*
  500 U.S. 173 (1991) ............................................................................ 21, 22

*Sacora v. Thomas,*
  628 F.3d 1059 (9th Cir. 2010) ..................................................................31

*Schweiker v. Gray Panthers,*
  453 U.S. 34 (1981) ......................................................................................3

*Se. Ark. Hospice, Inc. v. Burwell,*
  815 F.3d 448 (8th Cir. 2016) ....................................................................22

*Sebelius v. Auburn Reg'l Med. Ctr.,*
  568 U.S. 145 (2013) ....................................................................................3

*Sierra Club v. EPA,*
  252 F.3d 943 (8th Cir. 2001) .............................................................. 14, 28

*South Dakota v. Dole,*
  483 U.S. 203 (1987) ..................................................................................22

*Stillwell v. Office of Thrift Supervision,*
  569 F.3d 514 (D.C. Cir. 2009) .............................................................. 30, 31

*United States v. Eurodif S. A.,*
  555 U.S. 305 (2009) ..................................................................................27

*Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.,*
  489 U.S. 468 (1989) .............................................................................. 16, 17

*Webb v. R. Rowland & Co., Inc.,*
  800 F.2d 803 (8th Cir. 1986) ....................................................................15

*Whitney v. Heckler,*
  780 F.2d 963 (11th Cir. 1986) ..................................................................23

*Wis. Dep't of Health & Family Servs. v. Blumer,*
  534 U.S. 473 (2002) ....................................................................................3

*Zuber v. Allen,*
  396 U.S. 168 (1969) ..................................................................................28

**Statutes**

5 U.S.C. § 604(a) ..........................................................................................32

5 U.S.C. § 604(b) ..........................................................................................33

5 U.S.C. § 605(b) ................................................................................... 32, 33

5 U.S.C. § 611(a)(4)(A)–(B) .........................................................................34

5 U.S.C. § 706(2)(A) ....................................................................................14

9 U.S.C. § 2 ............................................................................................ 14, 17

42 U.S.C. § 1395i-3 ...............................................................................*passim*

42 U.S.C. § 1395i-3(h) .................................................................................23

42 U.S.C. § 1395i–3(g) ..................................................................................5

42 U.S.C.A. § 1395i-3(f)(1) ................................................................... 25, 26

42 U.S.C. § 1395cc .........................................................................................3

42 U.S.C. § 1395dd .................................................................................................27

42 U.S.C. § 1395hh ...................................................................................................3

42 U.S.C. § 1395kk ....................................................................................................3

42 U.S.C. §§ 1395-1396w-5 .......................................................................................3

42 U.S.C. § 1396a ......................................................................................................3

42 U.S.C. § 1396r .............................................................................................*passim*

42 U.S.C. § 3058g(a)(5)(B) ................................................................................ 7, 29

Pub. L. No. 100-203, 101 Stat 1330 (1987) ...............................................................4

**Regulations**

42 C.F.R. § 418.100(d) ............................................................................................27

42 C.F.R. § 418.26 ...................................................................................................27

42 C.F.R. § 483.75(d) ..............................................................................................27

42 C.F.R. § 488.415 .................................................................................................27

45 C.F.R. § 1324.13(a) ....................................................................................... 7, 29

80 Fed. Reg. 42,168 (July 16, 2015) ..........................................................6, 7, 8, 33

81 Fed. Reg. 68,688 (Oct. 4, 2016) (2016 Rule) ...............................................*passim*

82 Fed. Reg. 26,649 (June 8, 2017) .........................................................................11

84 Fed. Reg. 34,718 (July 18, 2019) (2019 Rule) .............................................*passim*

**Legislative Material**

H.R. Rep. No 100-391 (1987) .........................................................................4, 5, 24

## **INTRODUCTION**

Thousands of Americans enter nursing homes every year. Many are elderly and suffer from chronic illness; others seek admission because injury or surgery has rendered them unable to care for themselves. To protect these vulnerable patients, Congress has granted the Secretary of Health and Human Services (HHS) expansive authority to regulate the activities of nursing homes treating patients covered by Medicaid and Medicare.

Exercising that statutory authority, the Secretary—acting through the Centers for Medicare & Medicaid Services (CMS)—promulgated a new rule in 2019 limiting the tactics that nursing homes participating in CMS's programs could use to pressure their residents into signing binding pre-dispute arbitration agreements. *See Revision of Requirements for Long-Term Care Facilities: Arbitration Agreements*, 84 Fed. Reg. 34,718 (July 18, 2019) (2019 Rule). A voluminous record, collected through two rounds of a formal notice-and-comment process, indicated that such agreements are ripe for abuse, and likely to harm patients, when they are presented as coercive ultimatums: that is, when a nursing home forces a patient in need of care to decide between committing to arbitration or forgoing the care she requires in the facility best suited to her needs. To address this problem, CMS's new rule permits nursing homes to continue asking their residents to sign binding pre-dispute arbitration agreements—but requires that facilities explain any such agreement to residents, give residents time to consider it, and *not* present the agreement as a condition of admission to the facility nor as a condition of continuing to receive care.

These requirements reflect the agency's reasoned reconsideration of a prior rule, promulgated in 2016 as part of a comprehensive revision of nursing-home standards, which had imposed a wholesale ban on nursing homes using pre-dispute arbitration agreements. *See Reform of Requirements for Long-Term Care Facilities*, 81 Fed. Reg. 68,688 (Oct. 4, 2016) (2016 Rule). A district court had

preliminarily enjoined that rule shortly after its issuance, finding, among other things, that the agency had not adequately justified such a categorical bar.

Despite the fact that, unlike its predecessor, the 2019 Rule imposes no bar to arbitration—and is, in fact, merely designed to decouple arbitration agreements from the provision of needed care—Plaintiffs, Northport Health Services of Arkansas, LLC and 108 other nursing homes with some common ownership (collectively, Northport), ask this Court to strike the Rule down on largely the same grounds. *See generally* Am. Compl., Oct. 4, 2019, ECF No. 25. The Rule, they claim, violates the Federal Arbitration Act (FAA), is beyond CMS's authority under the Medicare and Medicaid statutes, is arbitrary and capricious, and is inconsistent with the Regulatory Flexibility Act. *See generally* Pl. Br., Oct. 4, 2019, ECF No. 27. These arguments all fail.

As explained below, the Supreme Court has never held that the FAA bars the types of procedural requirements imposed by the 2019 Rule. Nor has it ever suggested that the FAA precludes the government from conditioning federal funding on how a recipient negotiates for arbitration. The FAA, the Supreme Court has made clear, exists to give effect to validly executed arbitration agreements. The statute is not implicated where, as here, no legal barrier to formation of those agreements is imposed.

Likewise, the fact that the 2019 Rule does not prohibit arbitration agreements, but merely seeks to decouple them from the provision of needed medical care, places the Rule well within CMS's broad statutory authority to protect the health, safety, and well-being of Medicaid and Medicare patients. Contrary to Northport's suggestion, the administrative record before CMS amply demonstrates the need for this decoupling. And CMS followed all appropriate procedures in promulgating the Rule.

Northport may be unhappy with the policy embodied in the 2019 Rule, or the effect the Rule may have on its business practices. But that does not make for a successful challenge. As a legal matter, Northport's claims lack merit, and the Court should enter judgment for HHS.

## BACKGROUND

## I.   MEDICARE AND MEDICAID

Under the Social Security Act, the Medicare and Medicaid programs provide health insurance coverage for persons who are elderly, have a severe disability, or have low income. *See* 42 U.S.C. §§ 1395-1396w-5. Medicare is operated by the federal government, and Medicaid is a joint federal-state program.

Under both Medicare and Medicaid, health care services are provided by private organizations and health care professionals that meet the statutory and regulatory requirements for participation. Participation in both programs is voluntary. *See, e.g., Burditt v. U.S. Dep't of Health & Human Servs.*, 934 F.2d 1362, 1376 (5th Cir. 1991). If a provider chooses to participate, it enters into an agreement under which it consents to be bound by the program's conditions of participation. *See* 42 U.S.C. § 1395cc.

Medicare and Medicaid are administered by the Secretary of Health and Human Services, acting through CMS. *See, e.g., id.* §§ 1395i-3, 1395kk, 1395hh, 1396a, 1396r. Congress has entrusted the Secretary with "exceptionally broad authority" in administering both programs. *See Wis. Dep't of Health & Family Servs. v. Blumer*, 534 U.S. 473, 497 (2002) (*quoting Schweiker v. Gray Panthers*, 453 U.S. 34, 43 (1981)); *see also Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 156 (2013) ("Congress vested in the Secretary large rulemaking authority to administer the Medicare program."); *Ark. Dep't of Health & Human Servs. v. Ahlborn*, 547 U.S. 268, 275 (2006) (noting that administration of Medicaid "is entrusted to the Secretary of Health and Human Services . . . who in turn exercises his authority through the Centers for Medicare and Medicaid Services").

## II.  LONG-TERM CARE FACILITIES

Long-Term Care (LTC) facilities, often called nursing homes, provide residential nursing services, medication, rehabilitation, and other services for elderly and disabled persons.  In light of the circumstances of the residents, "admission to a LTC facility is usually an extremely stressful time for the resident and his or her family.  The resident may have a serious injury, surgery, or illness, [may be] removed from their usual living arrangements, [or may be] admitted to a facility for an indeterminate period of time."  81 Fed. Reg. at 68,796.  Many residents end up spending "an extended period of time" in an LTC facility.  *Id.* at 68,794.  LTC facilities that participate in Medicare are officially known as "skilled nursing facilities," and those that participate in Medicaid are officially known as "nursing facilities."  [1]

In the Nursing Home Reform Act, part of the Omnibus Budget Reconciliation Act of 1987 (OBRA '87), Pub. L. No. 100-203, 101 Stat. 1330 (1987), Congress substantially revised the statutes regarding the participation of nursing homes in the Medicare and Medicaid programs.  Those changes were prompted by concerns about the treatment and condition of residents.  The House Budget Committee, for example, was "deeply troubled by persistent reports that, despite [a] massive commitment of Federal resources, many nursing homes receiving Medicaid funds are providing poor quality care to . . . vulnerable elderly and disabled beneficiaries."  H.R. Rep. No. 100-391, pt. 1, at 448, 452 (1987).  The committee cited a report by the General Accounting Office (now the Government Accountability Office) indicating that "41 percent of skilled nursing facilities and 34 percent of intermediate care facilities were out of compliance during three consecutive inspections with one or more of the Medicaid requirements most likely to affect patient health and safety," and that "[n]ursing

---

[1]  Because there is no material difference between the two for purposes of this case, we will refer to both as "nursing homes" throughout this brief.

homes can remain in the Medicare and Medicaid programs for years with serious deficiencies that threaten patient health and safety by taking corrective action to keep from being terminated each time they get caught." *Id.* at 451. The committee also cited a report by the National Academy of Sciences saying that "in many . . . government certified nursing homes, individuals who are admitted receive very inadequate—sometimes shockingly deficient—care that is likely to hasten the deterioration of their physical, mental, and emotional health," and that "the poor-quality [nursing] homes outnumber the very good homes." *Id.* at 452.

Thus, OBRA '87 effectuated a "major overhaul" in the requirements for participation of nursing homes in Medicare and Medicaid programs. *Id.* Among other things, Congress established over 100 conditions that nursing homes would have to meet to participate in these programs. *See generally* 42 U.S.C. §§ 1395i–3(g), 1396r(g); *Beverly Health & Rehab. Servs., Inc. v. Thompson*, 223 F. Supp. 2d 73, 79 (D.D.C. 2002). These include the requirement that facilities provide nursing services, rehabilitative services, medically-related social services, pharmaceutical services, and other services "to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident." 42 U.S.C. §§ 1395i-3(b)(4)(A), 1396r(b)(4)(A). Facilities are further required to "protect and promote the rights of each resident," including the right to privacy, the right to confidentiality, the right to express grievances, and the right to "prompt efforts by the facility to resolve grievances." *Id.* §§ 1395i-3(c)(1)(A), 1396r(c)(1)(A).

OBRA '87 also expanded the Secretary's responsibilities in relation to the participation of nursing homes in the Medicare and Medicaid programs. The Secretary is responsible, among other things, for ensuring that the requirements for nursing homes and the enforcement of those requirements are "adequate to protect the health, safety, welfare, and rights of residents and to promote the effective and efficient use of public moneys." *Id.* §§ 1395i-3(f)(1), 1396r(f)(1). In addition to the requirements expressly enumerated in the statutes and regulations, OBRA '87—and current

law—authorizes the Secretary to impose "such other requirements relating to the health and safety [and well-being] of residents . . . as [he] may find necessary." *Id.* §§ 1395i- 3(d)(4)(B), 1396r(d)(4)(B). The Secretary may also establish "other right[s]" for residents, in addition to those expressly set forth in the statutes and regulations, to "protect and promote the rights of each resident." *Id.* §§ 1395i-3(c)(1)(A)(xi), 1396r(c)(1)(A)(xi).

Beyond that, OBRA '87 expanded and strengthened the provisions for monitoring the performance of nursing homes. Each facility undergoes an annual "standard survey," or inspection, covering "the quality of care furnished, as measured by indicators of medical, nursing, and rehabilitative care, dietary and nutrition services, activities and social participation, and sanitation, infection control, and the physical environment." *Id.* §§ 1395i-3(g)(2)(A)(ii)(I), 1396r(g)(2)(A)(ii)(I). A facility may also be required to undergo a "special survey" within two months of any change of ownership, administration, or management. *Id.* §§ 1395i- 3(g)(2)(A)(iii)(II), 1396r(g)(2)(A)(iii)(II). Additionally, any facility found, through a standard survey, to have provided substandard care immediately undergoes an "extended survey" to examine its practices, staffing, and training more thoroughly. *Id.* §§ 1395i-3(g)(2)(B), 1396r(g)(2)(B).

## III.  CMS'S 2016 RULEMAKING

In July 2015, CMS proposed a comprehensive review of the regulations governing participation of nursing homes in the Medicare and Medicaid programs—the first such review since 1991. 80 Fed. Reg. 42,168, 42,169 (July 16, 2015) (proposed rule). The purpose of this review, CMS explained, was "to improve the quality of life, care, and services in LTC facilities, optimize resident safety, [and] reflect current professional standards." *Id.* The review covered a broad range of matters, including resident rights, facility responsibilities, quality of care and quality of life, quality assurance, protecting residents from abuse and neglect, and specific services provided by the facilities. *Id.*

In the proposed rule, CMS expressed a number of concerns about the use of agreements requiring nursing home residents to submit any disputes with the facility to binding arbitration. Unlike other forms of alternative dispute resolution, the agency observed, "binding arbitration requires that both parties waive the right to any type of judicial review or relief." *Id.* at 42,211. CMS was concerned about that result in light of "the facilities' superior bargaining power," which "could result in a resident feeling coerced into signing the agreement." *Id.* Also, the agency noted, "if the agreement is not explained to the resident, he or she may be waiving an important right, the right to judicial relief, without fully understanding what he or she is waiving." *Id.* Further, the agency expressed concern that "the increasing prevalence of these agreements could be detrimental to residents' health and safety and may create barriers for surveyors and other responsible parties to obtain information related to serious quality of care issues." *Id.* This concern arose out of not only "the residents' waiver of judicial review, but also . . . the possible inclusion of confidentiality clauses [in agreements] that prohibit the resident and others from discussing any incidents with individuals outside the facility, such as surveyors and representatives of the Office of the State Long-Term Care Ombudsman." *Id.*[2]

In light of these concerns, CMS proposed, and requested public comments on, several requirements regarding the execution and content of arbitration agreements, including a requirement that admission to a facility "not be contingent upon the resident or the [resident's] representative signing a binding arbitration agreement." *Id.* at 42,265. The agency also expressed concern that the requirements it contemplated might be insufficient. CMS was "concerned that despite the protections [it had] proposed in th[e] rule, some nursing home residents and potential residents may feel pressured

---

[2] Each State has a Long-Term Care Ombudsman, who, among other things, resolves complaints from residents and their families, monitors the implementation of applicable statutes and regulations, and represents the interests of residents before governmental agencies. *See* 42 U.S.C. § 3058g(a)(5)(B); 45 C.F.R. § 1324.13(a). These ombudsmen are thus an independent group charged with advocating for residents. *See id.*

to sign these agreements," such as where a potential resident is hospitalized and has not had "the time to do research and visit multiple homes." *Id.* at 42,242. Therefore, the agency solicited comments on whether arbitration agreements should be prohibited entirely. *Id.* at 42,211, 42,242.

CMS received more than 9,800 public comments on the comprehensive revision of the regulations, almost 1,000 of which related to arbitration. 81 Fed. Reg. at 68,692, 68,799. The commenters included long-term care patients, patient advocacy groups, organizations representing providers, health care associations, legal organizations, and individual health professionals. *Id.* at 68,692. Comments on the arbitration provisions expressed a wide range of views. Some commenters argued that even the proposed requirements regarding arbitration agreements were unnecessary, whereas others argued that pre-dispute agreements should be prohibited. *Id.* at 68,790, 68,793. Still others argued that even post-dispute arbitration agreements should be prohibited. *Id.* at 68,793.

In addition to reviewing the public comments received, CMS reviewed relevant literature and court opinions. *Id.* at 68,793; *see also,* AR 33,318–501 (judicial decisions); 33,502–591 (policy statements); 33592-33980 (journal articles); 33,981–34,017 (news articles and editorials).[3] The agency noted that many of the articles it reviewed "provided evidence that predispute arbitration agreements were detrimental to the health and safety of LTC facility residents." 81 Fed. Reg. at 68,793. For example, the articles discussed "the unequal bargaining power between the resident and the LTC facilities; inadequate explanations of the arbitration agreement; the inappropriateness of presenting the agreement upon admission, an extremely stressful time for the residents and their families; negative incentives on staffing and care as a result of not having the threat of a substantial jury verdict for sub-standard care; and the unfairness of the arbitration process for the resident." *Id.* One article, the

---

[3] "AR __" refers to the corresponding page number in the administrative record submitted in this case.

agency observed, noted that "residents of nursing homes are frail and elderly people who are completely dependent on the facility and its employees for their safety and health." *Id.*

CMS also considered the secrecy of arbitration. The agency found that most arbitration agreements have "confidentiality clauses that prohibit both parties from discussing the dispute and what happens during the arbitration process, including the decision, with outside parties." *Id.* at 68,797. Thus, CMS was "concerned that the arbitration process, especially the secrecy it involves, could result in some facilities evading responsibility for substandard care." *Id.* at 68,797–98. "[P]ublic knowledge about a dispute and a public record of a decision," the agency believed, "are vitally important for checking the worst abuses of non-compliant LTC facilities." *Id.* at 68,794.

After considering all of the factors, see *id.* at 68,790–800, CMS determined in the 2016 final rule that "requiring residents to sign pre-dispute arbitration agreements is fundamentally unfair because, among other things, it is almost impossible for residents or their decision-makers to give fully informed and voluntary consent to arbitration before a dispute has arisen." *Id.* at 68,792. Thus, the agency decided to promulgate a requirement that nursing homes that participate in Medicare or Medicaid "must not enter into a predispute agreement for binding arbitration with any resident or resident's representative nor require that a resident sign an arbitration agreement as a condition of admission to the LTC facility." 81 Fed. Reg. at 68,867. This approach, CMS observed, would "allow residents to avail themselves of the benefits of arbitration once a dispute has arisen and the resident and/or his/her representatives can determine whether it may be an advantageous forum for them." *Id.* at 68,795. Additionally, CMS imposed a number of requirements on post-dispute arbitration, specifying certain clauses that such agreements must contain. *See id.* at 68,867.

## IV.    INJUNCTION OF 2016 RULE AND CMS'S RENEWED RULEMAKING

Shortly after the promulgation of the 2016 Rule, the American Health Care Association (AHCA)—a trade group representing healthcare facilities—and several affiliated nursing homes filed a complaint in the Northern District of Mississippi challenging the 2016 Rule's arbitration provisions. *See Am. Health Care Ass'n v. Burwell*, 217 F. Supp. 3d 921 (N.D. Miss. 2016) (*AHCA*).  AHCA argued that prohibiting pre-dispute arbitration was inconsistent with the FAA, beyond CMS's statutory authority under the Medicaid and Medicaid statutes, and not supported by sufficient evidence in the record.

The district court granted AHCA's motion for a preliminary injunction against the 2016 Rule. *See id.*  The bar on pre-dispute arbitration agreements, the court held, was likely inconsistent with the FAA because it effectively banned a category of new arbitration agreements.  *Id.* at 930–31.  Acknowledging that there was no definitive precedent on the issue, the court tentatively determined that plaintiffs had identified more helpful authority on this point.  *Id.* at 931.  The situation might be different, the court reasoned, if the agency had conducted studies or adduced empirical evidence showing, for example, that many nursing home residents lack the mental capacity to enter into pre-dispute arbitration agreements, such that a blanket ban on them might be justified as a matter of general contract law.  *Id.* at 933–34.  For similar reasons, the court found it likely that the 2016 Rule exceeded CMS's authority under the Medicaid and Medicare statutes.  *Id.* at 934–38.  Though, as the court noted, "the practice of executing arbitration contracts during the nursing home admissions process raises valid concerns, on a public policy level, since many residents and their relatives are 'at wit's end' and prepared to sign anything to gain admission," in the court's preliminary view the record simply did not establish a sufficient connection between the use of arbitration agreements and health outcomes for patient to enable CMS to ban the practice wholesale.  *Id.* at 937–38.

Rather than seek further review of the district court's preliminary injunction decision or litigate the case to final judgment, CMS decided to reconsider the 2016 rule. Accordingly, in December 2016 the agency issued a nationwide instruction to surveyors directing them not to enforce the 2016 Rule's prohibition on pre-dispute arbitration agreements. 84 Fed. Reg. at 34,718. And in June 2017, CMS published a proposed rule "to remove provisions that [CMS] believed on reconsideration did not strike the best balance between the advantages and disadvantages of pre-dispute, binding arbitration." 84 Fed. Reg. at 34,718–19; *Revision of Requirements for Long-Term Care Facilities: Arbitration Agreements*, 82 Fed. Reg. 26,649 (June 8, 2017). In particular, CMS proposed removing (1) the prohibition on facilities entering into pre-dispute, binding arbitration agreements with their patients; (2) any restriction on the use of arbitration agreements as a condition of admission; and (3) the requirements governing the required terms of arbitration agreements. *See* 82 Fed. Reg. at 26,650–51.

In response, the agency received another outpouring of over 1,000 public comments, representing a diverse set of viewpoints. *See generally* 84 Fed. Reg. 34,719. As before, the comments came from a broad range of individuals and entities. "The overwhelming majority of commenters were opposed to [the] proposal to remove the prohibition on pre-dispute, binding arbitration agreements." 84 Fed. Reg. 34,719. These "commenters included consumer advocates, legal organizations, health care providers and practitioners, and members of the public." *Id.*[4] On the other

----

[4] Indeed, numerous individual comments opposed any rule that allowed nursing homes to make signing an arbitration agreement a condition of admission. *See e.g,* AR 34,312; AR 34,341; AR 34,346; AR 34,403; AR 34,416; AR 34,423. These comments were echoed by a number of legal aid groups, bar associations, and other organizations. *See e.g.,* AR 34,670 (Center for Elder Law & Justice); AR 34, 685 (Vermont Ombudsman Project); AR 34,700 (Montana Ombudsman); AR 34,716 (Our Mother's Voice); AR 34,974 (Maryland Long Term Care Ombudsman); AR 34,708 (Chicago Ombudsman); AR 34,723 (Los Altos, CA Ombudsman); AR 34,729 (Public Counsel *pro bono* law firm); AR 34,723 (Center for Independence of the Disabled); AR 34,738 (New York Legal Assistance Group); AR 34,749 (Watertown, NY Ombudsman); AR 34,755 (Justice in Aging); AR 34,767 (Legal Counsel for the Elderly on behalf of the D.C. Long-Term Care Ombudsman Program); AR 34,784 (Mass. Chapter, National Academy of Elder Law Attorneys); AR 34,792 (Michigan Developmental Disabilities Council); AR 34,807 (AARP); AR 34,859 (American Bar Association); AR 34,988 (Mass.

hand, a number of industry groups touted the benefits of arbitration, and argued that all restrictions on arbitration should be eliminated. *See*, *e.g.*, AR 35,324 (comments of American Health Care Association).

After considering the comments, CMS decided to chart a middle path. In particular, CMS decided to remove the wholesale prohibition on pre-dispute arbitration agreements and instead create procedural "protections against the abuses associated with [those] agreements." 84 Fed. Reg. at 34,719. Most significantly, the 2019 Rule provides that "arbitration agreements must not be used as a condition of admission to, or as a requirement for a resident to continue to receive care at, [a] facility." *Id.* Further, under the Rule, "agreement[s] [must] explicitly grant the resident the [] right to rescind the agreement within 30 calendar days of signing it." *Id.* Finally, the Rule requires that: (1) any agreement be explained to a resident; (2) the agreement provide for the selection of a neutral arbitrator and a convenient forum; and (3) the agreement "may not contain any language that prohibits or discourages the resident or anyone else from communicating with federal, state, or local officials." *Id.* 34,735–36.[5] In short, nursing homes are free to enter into pre-dispute arbitration agreements with their residents after convincing them of the merits of such agreements, but nursing homes may not use residents' ability to receive needed care as a bargaining chip. The 2019 Rule also requires that nursing homes maintain copies of arbitration agreements and an arbitrator's decision for five years after a dispute with a resident is resolved through arbitration. *Id.* at 34,736.

_____

Advocates for Nursing Home Reform); AR 35,013 (The Elder Justice Coalition); AR 35,034 (Public Citizen); AR 35,049 (National Centers for Health Research).

[5] Northport does not challenge the requirements that arbitration agreements provide for a neutral arbitrator and a venue that is convenient for both parties; the propriety of these provisions is therefore not in dispute. *See generally* Am. Compl.; Pl. Br. at 17–19.

CMS explained the reasons for each of these requirements over the course of eighteen pages in the Federal Register. Among other things, CMS noted that it was removing the categorical ban on pre-dispute arbitration agreements because the overall connection between a facility's quality of care and its use of arbitration agreements was unclear, and worth studying further. *See* 84 Fed. Reg. at 34,721. At the same time, however, CMS noted that many comments indicated that "a significant number of claims subjected to arbitration address quality of care issues," and expressed the view that "many substandard nursing homes continue providing poor care because the consequences for their conduct are insignificant." *Id.* These issues, CMS observed, were exacerbated when agreements were unduly coercive or when they limited oversight of the nursing home. *See id.* ("We note the sincere concerns of many individual commenters that residents are not being treated fairly in facilities that use pre-dispute, binding arbitration agreements and that quality of care is negatively impacted by the use of these agreements.").

As CMS explained, "the choice of nursing homes may [already] be limited based on various factors" and "residents, their families, and caregivers" should have the ability "to choose a LTC facility based upon what is best for the resident's health and safety without having to be required to sign a pre-dispute, binding arbitration agreement." 84 Fed. Reg. at 34,735. In light of the numerous comments raising concerns about the stress of the admissions process, the lack of choice in nursing homes, and the secrecy that often accompanies arbitration, CMS concluded that the requirements finalized in the 2019 Rule were "essential to ensure that arbitration agreements are not barriers to the resident receiving care and that there is no interference with federal, state, or local officials investigating quality of care issues." 84 Fed. Reg. at 34,720; *see, e.g.*, AR 34,812 ("The lack of transparency in binding pre-dispute arbitration thus deprives future residents, their families, and advocates of information that may be helpful to select safe and appropriate LTC facilities and to encourage facilities' legal compliance before disputes arise") (AARP comment); AR 34,873 ("This

decision often occurs under extreme time pressure of a hospital discharge. Residents and their families do not have the luxury of time to wait and search around extensively for placement options.") (American Bar Association comments).

The Rule was scheduled to take effect on September 16, 2019. 84 Fed. Reg. at 34,718. Plaintiffs filed their complaint challenging the Rule on September 4, 2019, and subsequently filed an amended complaint with their motion for summary judgment on October 4, 2019. Pursuant to the parties' agreement, enforcement of the Rule is stayed with respect to plaintiffs until January 17, 2020. *See* Order, Sept. 17, 2019, ECF No. 23. The Rule is currently in effect as to all other nursing homes that participate in the Medicare and Medicaid programs.

## STANDARD OF REVIEW

Northport has brought all its claims pursuant to the APA. Under the APA, a reviewing court must affirm an agency's decision unless that decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). This standard of review is narrow and gives agency decisions a high degree of deference. *Sierra Club v. EPA*, 252 F.3d 943, 947 (8th Cir. 2001); *see also Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. An agency's decision may be deemed arbitrary and capricious only in circumstances where the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or its decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. The Court may not "substitute its judgment for that of the agency." *Id.*

# ARGUMENT

## I.     THE 2019 RULE IS CONSISTENT WITH THE FAA

At the outset, the Court should reject Northport's attempts to wield the FAA as a cudgel against CMS's rulemaking.  The operative portion of the FAA, section 2, states that arbitration agreements shall be "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  On its face, this provision has no bearing on the 2019 Rule.

Unlike its 2016 predecessor, the 2019 Rule does not preclude nursing homes from entering into arbitration agreements.  *See* 84 Fed. Reg. at 34,719.  Nor does the Rule invalidate or impede any arbitration agreement that is already in place.  *See id.*  Rather, the Rule merely requires that, going forward, facilities participating in the Medicare or Medicaid programs follow certain procedures.  Most significantly, nursing homes must explain arbitration agreements to their residents; must give residents thirty days to consider an agreement they enter; and must *not* present "agreement[s] for binding arbitration as a condition of admission [], or as a requirement to continue to receive care."  *Id.* at 34,735–36.  Nursing homes also must keep records regarding their arbitration agreements.  *Id.*  Taken together, these requirements establish what a nursing home receiving Medicare or Medicaid funds must and must not do when attempting to persuade patients to arbitrate, but they erect no legal impediment to enforcement of any arbitration agreement residents and nursing homes ultimately sign.  *See id.* at 34,719.

Northport insists that even these procedural requirements are inconsistent with how the Supreme Court has interpreted the FAA's umbra.  *See* Pl. Br. at 16–22.  But Northport is wrong.  The Supreme Court has never determined that a purely procedural rule like the one here violates the FAA.  And concluding that the FAA precludes an agency from attaching these types of conditions to the receipt of federal funding would mark a dramatic break from established law.

## A.    The 2019 Rule Imposes No Legal Barrier to Arbitration

The FAA was designed "to overcome judicial hostility to arbitration agreements." *Cicle v. Chase Bank USA*, 583 F.3d 549, 554 (8th Cir. 2009) (quoting *Allied-Bruce Terminex Cos. v. Dobson*, 513 U.S. 265, 272 (1995)); *see, e.g.*, *Webb v. R. Rowland & Co., Inc.*, 800 F.2d 803, 806 (8th Cir. 1986) (noting that, prior to the FAA, many states treated arbitration agreements as "revocable at will any time before issuance of an award"). Accordingly, the "'principal purpose' of the FAA is to 'ensur[e] that private arbitration agreements are enforced according to their terms.'" *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011) (quoting *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989)). Effectuating this purpose, the Supreme Court has held, requires "plac[ing] arbitration agreements on an equal footing with other contracts"—and setting aside rules that invalidate arbitration agreements based on principles which "apply only to arbitration or [which] derive their meaning from the fact that an agreement to arbitrate is at issue." *Id.* at 339 (internal quotes and citations omitted); *see also Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1425–26 (2017); *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612 (2018). This principle, however, does not operate in the way Northport claims.

The Supreme Court's decision in *Kindred Nursing* illustrates what kinds of rules run afoul of the "equal-treatment" principle. In *Kindred Nursing*, the Supreme Court reviewed a Kentucky state court decision that declined to "give effect to two arbitration agreements executed" by the legal representatives of nursing home patients on the principle that representatives generally lack "authority to waive [their principals'] fundamental constitutional right to access the courts [and] to trial by jury." *Kindred Nursing*, 137 S. Ct. at 1424–25 (internal quotes and citations omitted). This rule was impermissible, the Supreme Court held, because it subjected arbitration agreements to uncommon barriers "by virtue of their defining trait"—namely, the "waiver of the right to go to court and receive a jury trial"—in violation of the FAA's command that such agreements be enforced "save upon such

grounds as exist at law or in equity for the revocation of any contract." *Id.* at 1427. The same would be true, the Supreme Court observed, even if the Kentucky court rule were characterized as a limit on contract formation, because special rules precluding the formation of arbitration agreements would wholly undermine the FAA's goals. *Id.* at 1428–29.

The holding in *Kindred Nursing* is echoed in the earlier *Concepcion* case and in the more recent *Epic Systems* decision. In *Concepcion*, the Supreme Court invalidated a California judicial rule that prohibited as unconscionable class-action waivers in consumer contracts. *Concepcion*, 563 U.S. at 343–44. As in *Kindred*, the Supreme Court explained that this kind of prohibition was impermissible because "the availability of classwide [action] interferes with fundamental attributes of arbitration and [] creates a scheme" hostile to the FAA's purpose. *Id.* And in *Epic*, the Supreme Court held that the National Labor Relation Act's prohibition on class and collective action waivers could not be used to invalidate arbitration agreements the parties had previously entered, because (as in *Concepcion* and *Kindred*) the prohibition did not apply to "'any' contract" and thus could not fall within the "saving clause" of section 2 of the FAA. *Epic*, 138 S.Ct. at 1622.

These cases demonstrate that scrutiny attaches to legal rules that are, in one way or another, wielded to preclude or invalidate an agreement to arbitrate—and which therefore stand as an impediment to those agreements' enforcement. Under the plain text of the FAA, such rules can only survive if they "exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; *see also Concepcion*, 563 U.S. at 339 (noting that FAA permits invalidation of agreements "by generally applicable contract defenses, such as fraud, duress, or unconscionability, but not by defenses that apply only to arbitration").

By contrast, rules that form no legal barrier to the creation or enforcement of arbitration contracts require no such analysis: they easily pass muster because they frustrate neither the FAA's purpose nor its plain text. Thus, for example, in *Volt Information Sciences*, the Supreme Court sustained

a state procedural rule, incorporated by the parties into their arbitration agreement, which had the effect of staying arbitration during a related judicial proceeding. 489 U.S. at 478. Such a rule, the Court explained, governed only the order of proceedings and did not "undermine the [FAA's] goals and policies" of "ensur[ing] that private agreements to arbitrate are enforced according to their terms." *Id.* at 478–79. *See also Doctor's Assoc., Inc. v. Casarotto*, 517 U.S. 681, 688 (1996) (noting that *Volt* upheld a law that "did not affect the enforceability of the arbitration agreement itself").

CMS's 2019 Rule is squarely in the latter category. As noted above, the Rule has several main components, all of which are fundamentally procedural. The first component—prohibiting nursing homes from presenting arbitration agreements as a condition of care—establishes a limit on the negotiating tactics that facilities can use in pressing residents to sign up for arbitration. *See* 84 Fed. Reg. 34,735. This decoupling of arbitration agreements from the admission process is designed to give patients a chance to evaluate the merits of an agreement fairly, without the fear that any refusal will come at the cost of medical treatment in the facility that is bests suited to their needs. *See id.* In other words, this requirement removes duress or the potential for duress from the negotiating process. Likewise, the Rule's second and third components—requiring that nursing homes explain the terms of the proposed agreement and give patients the right to rescind an agreement within 30 days of signing—ensure that the contract is negotiated in a way that is transparent, and affords parties time to understand its provisions. *See id.* 34,735–36. And the Rule's fourth requirement—establishing that nursing homes must keep records of arbitration agreements—is a recordkeeping provision designed to give state surveyors and CMS the information it needs to uncover instances of abuse or neglect by nursing homes, as well as data to continue studying the effect of arbitration agreements on patient care. *See id.*

These provisions may impose some administrative costs on Northport.[6] They may even make it harder for Northport to persuade some residents to arbitrate any claims. Indeed, it is entirely possible that more patients may decline to sign arbitration agreements when they are not forced to decide between forgoing their rights to sue and forgoing much-needed care. *See generally* 84 Fed. Reg. 34,735 (noting that the Rule will "ensure that no resident . . . will have to decide between signing this type of agreement and . . . receiving the care he or she needs"). But equalizing bargaining power between nursing homes and residents in this manner is not a *legal barrier* to the formation of arbitration agreements. *See, e.g.*, *Kindred*, 137 S.Ct. at 1428 (identifying as impermissible rules that would form such barriers). And enhancing nursing-home residents' bargaining power certainly forms no barrier to the enforcement of any agreement that is formed. In fact, no provision of the 2019 Rule impedes the FAA's core objectives of ensuring that, once executed, arbitration agreements are enforced. *See Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218-21 (1985) ("The preeminent concern of Congress in passing the Act was to enforce private agreements into which parties had entered, and that concern requires that [courts] rigorously enforce agreements to arbitrate[.]").

Tellingly, Northport points to no case in which a court has struck down a procedural rule similar to the one here. To the contrary, every Supreme Court case Northport cites to support its

---

[6] Notably, Northport appears to be something of an outlier in believing these provisions are burdensome. The American Health Care Association, which identifies itself as "the nation's largest association of long-term and post-acute care providers," opposed some of the provisions of the 2019 Rule, but nonetheless explained to CMS that many nursing homes "have built in safeguards to the contracting process," including "a 30-day cooling off period during which an arbitration agreement may be rescinded, [] to ensure that residents and their families have a meaningful opportunity to consider whether to agree to arbitrate their claims." AR 35,334–35. Further, Northport itself notes that The Maples nursing home, one of the plaintiffs in this case, does not condition admission on signing an arbitration agreement. *See* Pl. Br. at 13. Clearly, many nursing homes have no problem with this requirement.

argument involved enforcement of an executed arbitration agreement.[7]  Likewise, the district court decision in *AHCA*, which preliminarily enjoined the 2016 Rule's arbitration provisions, was grounded in the fact that those provisions "ban[ned] an entire form of arbitration" without a sufficiently-demonstrated need.  217 F. Supp. 3d at 933.  Indeed, the court in that case repeatedly noted that the Rule amounted to "a ban," and observed that the agency's "stated bases for *banning* arbitration [were] problematic" in light of Supreme Court precedent.  *Id.* at 929, 933 (emphasis added).  Nothing close to a ban exists with the 2019 Rule.

That Northport cannot adduce any relevant authority is not surprising.  The FAA does not exist to dictate the terms by which parties negotiate entry into arbitration agreements; nor does it exist to steer parties into arbitration no matter the circumstances.  Rather, the statute exists to respect the knowing choice of parties who actually agreed to arbitrate their claims.  *See EEOC v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002) ("[N]othing in the statute authorizes a court to compel arbitration of an issue, or by any parties, that are not already covered in the agreement."); *Dean Witter Reynold*, 470 U.S. at 219–20 ("The Act . . . does not mandate the arbitration of all claims, but merely the enforcement—upon the motion of one of the parties—of privately negotiated arbitration agreements.").  The 2019 Rule serves that very goal.  By ensuring that a resident understands the agreement she signs and is not coerced into signing it, the Rule helps facilitate the formation of valid,

---

[7]  *See Marmet Health Care Ctr., Inc. v. Brown*, 565 U.S. 530, 531 (2012) (finding preemption by the FAA where "state court held unenforceable all predispute arbitration agreements that apply to claims alleging personal injury or wrongful death against nursing homes"); *CompuCredit v. Greenwood*, 565 U.S. 95, 96 (2012) (considering "whether the Credit Repair Organizations Act . . . precludes enforcement of an arbitration agreement in a lawsuit alleging violations of that Act"); *Concepcion*, 563 U.S. at 336 (analyzing "whether the FAA prohibits States from conditioning the enforceability of certain arbitration agreements on the availability of classwide arbitration procedures"); *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 688 (1996) (finding preemption where state "notice requirement would invalidate the [arbitration] clause" in the contract); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983) (addressing procedural issues in case where "basic issue presented . . . was the arbitrability of the dispute between [the parties]").

enforceable agreements to arbitrate. Given that the Supreme Court has rejected attempts to use the FAA as a means to force unwilling parties into arbitration, Northport cannot establish that some broader pro-arbitration policy countermands the Rule. *See Waffle House*, 534 U.S. at 293–94 (rejecting argument that the FAA should preclude parties other than those that actually agree to arbitration from litigating claims); *see generally* Pl. Br. at 21–22.

Northport may ultimately be dissatisfied with CMS's decision to stem nursing homes' use of federally-funded medical care as a bargaining chip to induce residents to sign up for arbitration. But it cannot establish any conflict between CMS's rulemaking and the FAA. Because there is no such conflict, there is no need to seek contrary authority in the Medicare or Medicaid statutes to override the FAA's mandate. *See generally* Pl. Br. at 19–22; *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012) (analysis whether one statute "overrid[es]" the FAA required when there is a conflict). CMS's 2019 Rule is entirely consistent with the FAA's purpose and text.

### B.    The 2019 Rule Attaches a Valid Condition to the Receipt of Federal Funds

Even if there were some conflict between the FAA and the 2019 Rule, which there is not, setting the Rule aside would still be inappropriate, given that the Rule imposes conditions only on entities that choose to accept federal funds—not on a universe of unwilling private parties.

The Supreme Court has recognized that the Government has "far broader" power to impose conditions on funding than to legislate direct restrictions. *Maher v. Roe*, 432 U.S. 464, 475 (1977). This is because "[t]here is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity[:]" a "refusal to fund protected activity, without more, cannot be equated with the imposition of a penalty on that activity." *Rust v. Sullivan*, 500 U.S. 173, 193 (1991) (internal quotes and citations omitted). "As a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013); *see also Rust*, 500 U.S. at 194 ("Within far broader limits

than petitioners are willing to concede, when the Government appropriates public funds to establish a program it is entitled to define the limits of that program."). This is often true even when the conditions relate to expressive conduct or other constitutional right. *See, e.g.*, *Rumsfeld v. Forum for Acad. & Institutional Rights*, 547 U.S. 47 (2006) (upholding congressional requirement that educational institutions receiving federal assistance provide equal recruiting access to the military); *Rust*, 500 U.S. 173 (upholding regulation, promulgated to implement congressional spending provision, that federally-subsidized family planning recipients not use federal funds for abortion activities).[8]

In line with this precedent, courts in this Circuit and elsewhere have repeatedly upheld against constitutional challenges a variety of conditions imposed in the Medicare and Medicaid programs. For example, in *Minnesota Ass'n of Health Care Facilities, Inc. v. Minnesota Dep't of Pub. Welfare*, the Eighth Circuit held that a state statute limiting fees that nursing homes participating in the state's Medicaid program could charge to non-Medicaid patients did not constitute an unconstitutional taking because those facilities' participation in the program was a choice. 742 F.2d 442, 446 (8th Cir. 1984), *cert. denied* 469 U.S. 1215 (1985). In doing so, the Court specifically rejected the idea that "business realities prevent nursing homes from" foregoing Medicaid funding. *Id.* While there may be "strong financial inducement to participate in Medicaid, a nursing home's decision to do so is nonetheless voluntary."

---

[8] There are, to be sure, limits on what kinds of conditions the Government may attach to funding. Conditions that impinge on First Amendment rights may be impermissible under some circumstances. *See, e.g.*, *Agency for Int'l Dev.*, 570 U.S. at 214. More relevant here, "conditions on federal grants might be illegitimate if they are unrelated to the federal interest in particular national projects or programs." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (citation omitted). This "relatedness" showing, however, does not pose a difficult hurdle. *See id.* at 208 (upholding a provision conditioning receipt of federal highway funds on the only loosely-related requirement that a state adopt a minimum drinking age of twenty-one). The Government need only identify "some relationship" between spending conditions and "the purpose of the federal spending." *New York v. United States*, 505 U.S. 144, 167 (1992). Here, as we discuss in the following section, the need CMS identified to decouple arbitration agreements from the provision of medical care provides a more than sufficient relationship between the conditions CMS imposed and the purpose of the funding program.

*Id.* The court recently reaffirmed this holding in rejecting a challenge to a Medicare reimbursement cap. *See Se. Ark. Hospice, Inc. v. Burwell*, 815 F.3d 448, 450 (8th Cir. 2016).

Likewise, the Eleventh Circuit rejected the argument that a "temporary freeze on their actual charges to Medicare patients constitutes a taking" on the ground that "price regulation does not constitute a taking of property where the regulated group is not required to participate in the regulated industry." *Whitney v. Heckler*, 780 F.2d 963, 972 (11th Cir. 1986) (citing *Bowles v. Willingham*, 321 U.S. 503, 517-18 (1944)). The Fifth Circuit has rejected constitutional challenges to a requirement that hospitals and physicians participating in federal programs treat all people who enter the emergency room on the same basis. *See Burditt*, 934 F.2d at 1376.

These cases establish that an entity choosing to accept federal funds can permissibly be required to forgo certain aspects of its normal business practices or particular types of contractual arrangements as a condition of receiving those funds. CMS's 2019 Rule does not go that far: as we detailed above, the Rule does not prevent nursing homes from entering into arbitration agreements.[9] But even if the Rule were more burdensome, Northport's voluntary decision to participate in the Medicare and Medicaid programs (thus subjecting itself to the Rule) would bar Northport from asserting that the Rule infringes on its property rights. The same should be true of Northport's claims under the FAA. Indeed, it would make little sense to find that a party can be validly required to surrender constitutional property interests as a condition of participating in a federal program—but

---

[9] In this way, the 2019 Rule is much less drastic than other rules CMS has imposed, such as requiring that facilities forgo "the right to pursue the patient for payment when the patient has no way of knowing that services are not covered by Medicare," requiring that nursing homes "give Medicare beneficiaries written advanced notifications of noncovered services," and limiting certain marketing activities. 81 Fed. Reg. 68,791. And it is also much less drastic than the authority Congress granted the Secretary in the nursing home context to deny payments, issue civil monetary penalties, monitor the management of facilities, and even force the transfer of residents from a facility in cases where noncompliance with the quality of care rules results in immediate jeopardy to patients. *See* 42 U.S.C. § 1395i-3(h).

*cannot* be required to forgo a statutory enforcement mechanism that Congress has established for an entirely different goal. The fact that the 2019 Rule does not even require Northport to forgo that statutory enforcement mechanism only serves to highlight the weakness of Northport's FAA claims.

Put simply, Northport's decision to participate in the Medicaid and Medicare programs defeats its attempts to paint the 2019 Rule as infringing on its FAA rights. If Northport believes that the Rule infringes on its interests in arbitration, the solution is in Northport's own hands: forgo the funding that Medicare and Medicare establish. *See Minnesota Ass'n of Health Care Facilities*, 742 F.2d at 446. Northport can identify no right to have federal money subsidize its current means of forcing residents to arbitrate their claims.

## II. THE FINAL RULE FITS SQUARELY WITHIN CMS'S AUTHORITY TO PROTECT MEDICAID AND MEDICARE PATIENTS

As an alternate theory, Northport asserts that regulating anything related to arbitration falls beyond CMS's authority under the Medicaid and Medicare statutes. A number of Northport's arguments on this point, however, merely restate its view that CMS cannot override the FAA: these arguments fail for all the reasons discussed in the last section. *See* Pl. Br. at 23–24. And Northport fares no better in claiming that regulating aspects of arbitration is categorically off limits to CMS.

The Social Security Act and its history make clear that Congress was broadly concerned about the health and wellbeing of nursing home residents. *See* H.R. Rep. No. 100-391, pt. 1, at 448, 451. To protect those residents, Congress strengthened and expanded the statutory requirements that facilities have to meet to participate in Medicare and Medicaid—and charged the Secretary of HHS with expansive authority to impose additional requirements and supervise nursing homes' compliance. *See generally* 42 U.S.C. §§ 1395i-3, 1396r. Among other things, Congress specifically authorized the Secretary to promulgate "such other requirements relating to the health, safety, and well-being of residents . . . as [he] may find necessary." 42 U.S.C. §§ 1395i-3(d)(4)(B), 1396r(d)(4)(B). Further, Congress charged the Secretary with "the duty and responsibility . . . to assure that requirements which

govern the provision of care in skilled nursing facilities . . . and the enforcement of such requirements, are adequate to protect the health, safety, welfare, and rights of residents[.]" 42 U.S.C. § 1395i-3(f)(1).

The 2019 Rule's requirements fall squarely within the ambit of these provisions. As CMS explained, there is a real problem with nursing homes making arbitration agreements a condition of admission. 84 Fed. Reg. 34,726. Admission, CMS previously observed, is "an extremely stressful time for the [prospective] resident and his or her family," especially given that the resident "may have a serious injury, surgery, or illness." 81 Fed. Reg. at 68,796. This stress is exacerbated when, for many patients, "the choice of nursing home is severely limited." *Id.* at 34,727 (noting that many times "there is only one nursing home within a reasonable geographic distance of the resident's family or friends"). In this vulnerable condition, when patients are often in urgent need of care, any demand that the patients surrender their right to judicial review or else forgo treatment and medical care is inherently coercive. Indeed, the evidence before CMS indicated that many residents do not even understand the terms or nature of the agreements they sign. *See* 84 Fed. Reg. 34,735.

Coerced agreements directly harm patient health when they contain confidentiality provisions that make it difficult for government officials to identify and correct quality-of-care deficiencies. *See* 84 Fed. Reg. at 34,728. But even absent such confidentiality provisions, forcing a patient to choose between maintaining her constitutional right to sue and her ability to receive treatment can limit her medical options by excluding her from a facility where she otherwise wants to seek care. *See* 84 Fed. Reg. 34,735.

The requirements CMS imposed in the 2019 Rule remove these barriers to patient choice and facility oversight. Specifically, as detailed above, the Rule's procedural provisions empower patients to make an informed choice about arbitration *separate* from their decision about which facility to enter for treatment, recognizing that the latter decision should be based solely on the patients' needs and medical condition. Further, the Rule provides transparency about arbitration both to residents and to

government regulators.  *See* 84 Fed. Reg. 34,720 (explaining that the requirements in the Rule are "essential to ensure that arbitration agreements are not barriers to the resident receiving care and that there is no interference with federal, state, or local officials investigating quality of care issues"); *see also* 84 Fed. Reg. at 34,728 ("By prohibiting secrecy, surveyors can review the facts giving rise to the arbitration and keep those issues in mind when conducting the survey to, among other things, determine whether the LTC facility has taken steps to prevent similar problems from arising.").  In this way, the Rule effectively *disconnects* arbitration from the quality of care a patient receives.

Northport cannot logically claim that decoupling arbitration from medical care in this way is unrelated to patient health and welfare.  *See* Pl. Br. at 24–25.  To the contrary, it should be self-evident that removing extrinsic barriers to care—and, in the process, promoting informed patient choice and facility oversight—is an essential component of regulating "the health, safety, and well-being of residents," which Congress charged the Secretary to do under 42 U.S.C. §§ 1395i-3(d)(4)(B), 1396r(d)(4)(B).

Likewise, it makes little sense for Northport to argue that removing such barriers is beyond the Secretary's authority under 42 U.S.C. § 1395i-3(f)(1).  *See* Pl. Br. at 24–25.  Though the Secretary has, as Northport correctly observes, relied on that section to establish minimum standards of care for patients already living in a facility, the section's language—authorizing the Secretary to "govern the provision of care in skilled nursing facilities"—is broad.  42 U.S.C. § 1395i-3(f)(1).  As a matter of ordinary meaning, it is hard to see how removing obstacles to treatment would not be a "requirement[] which govern[s] the *provision* of care."  *Id.* (emphasis added).  And even if there were any ambiguity on this point, CMS's view that the authority to regulate the "provision of care" encompasses regulating barriers to treatment is reasonable, and should therefore prevail under the canonical *Chevron* framework.  *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984) ("[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the

agency's answer is based on a permissible construction of the statute[;]" "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency."); *see also United States v. Eurodif S. A.*, 555 U.S. 305, 316 (2009) ("[T]he whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency." (internal quotes and citations omitted)).

Notably, this effort to remove improper barriers to patients receiving treatment is echoed in many other rules that apply to facilities participating in the Medicare and Medicaid programs. These include requirements that participating facilities do not deny patients access, or discharge them, except for certain permissible reasons. *See, e.g.*, 42 U.S.C. § 1395dd (providing that hospitals must provide appropriate examination of all people who seek emergency medical treatment); 42 C.F.R. § 418.26 (providing permissible reasons for a hospice to discharge patients); 42 C.F.R. § 418.100(d) (providing that a "hospice may not discontinue or reduce care provided to a Medicare or Medicaid beneficiary because of the beneficiary's inability to pay for that care"); *see also Burditt*, 934 F.2d at 1376. In the context of nursing homes specifically, the Secretary has even broader powers. Among other things, the Nursing Home Reform Act grants the Secretary authority to regulate nursing homes' internal procedures and business practices—even, in some instances, to remove the facility's management and appoint temporary management to oversee operations while a facility is closed or sold. *See, e.g.*, *See* 42 U.S.C. § 1395i-3(h)(2)(B)(iii); 42 C.F.R. § 488.415; *see also See* 42 U.S.C. §§ 1395i-3(f)(5)(A); 1395i-3(d)(1)(C); *see also*, 42 C.F.R. § 483.75(d) (setting minimum requirements for a corporate governing body).[10]

---

[10]    Northport notes that bills to prohibit nursing homes from using pre-dispute arbitration have failed to pass in Congress. *See* Pl. Br. at 4–5, 21. Contrary to what Northport claims, however, such history is irrelevant. *See Atkinson v. Inter-Am. Dev. Bank*, 156 F.3d 1335, 1342 (D.C. Cir. 1998) ("Congress does not express its intent by a failure to legislate."). The Supreme Court has observed that "[c]ongressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, 'including the inference that the existing legislation already

All of these requirements share the goal of promoting patient health and welfare by decoupling care from extraneous factors or barriers. All are similar to the 2019 Rule in that they impose conditions only on entities that willingly choose to participate in CMS's programs. And all are well within CMS's right to regulate under the broad authority Congress granted the Secretary under the Medicare and Medicaid statutes.

## III. THE RECORD AMPLY SUPPORTS CMS'S DECISION TO ADOPT THE 2019 RULE

Just as Northport cannot make out a statutory challenge to the 2019 Rule, so too does it fail to show that promulgating the rule was arbitrary and capricious. *See* Pl. Br. at 26–29.

As a matter of black-letter law, review of agency action under the arbitrary-and-capricious standard is narrow. *See Sierra Club*, 252 F.3d at 947. The court should "ensure that the agency examined the relevant data," based its decision on "a consideration of relevant factors," and "articulated a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 42; *Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007). In this process, the Court "must be mindful not to substitute [its] judgment for the agency's." *10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 723 (5th Cir. 2013). Rather, the Court must "uphold an agency's action if its reasons and policy choices satisfy minimum standards of rationality." *Id.*

The 2019 Rule easily satisfies this standard. First, contrary to what Northport suggests, Pl. Br. at 26–27, the need to promulgate the procedural requirements found in the 2019 Rule is grounded in extensive evidence. During the course of its 2016 rulemaking, CMS gathered significant material suggesting a potential "connection between the use of pre-dispute arbitration clauses and the health

---

incorporated the offered change.'" *Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) (quoting *United States v. Wise*, 370 U.S. 405, 411 (1962)); *see also Zuber v. Allen*, 396 U.S. 168, 185 n.21 (1969) ("Congressional inaction frequently betokens unawareness, preoccupation, or paralysis."). And, in any event, legislative attempts to ban arbitration in nursing homes is not probative here given that the 2019 Rule enacts no bar to nursing homes continuing to employ pre-dispute arbitration agreements as a matter of course.

and safety of LTC facility residents." 81 Fed. Reg. 68,793. Indeed, the majority of public comments and academic literature indicated that requiring residents to arbitrate all claims could be a way for nursing homes to shield themselves from the publicity—and potentially even the legal consequences—of providing substandard care, because arbitration proceedings are often shrouded in secrecy. *See id.*[11] A group of state nursing home ombudsmen, statutorily charged with serving as independent advocates for residents, echoed these concerns. *See, e.g.,* AR 34,684 (Vermont Legal Aid on behalf of Vermont Long-Term Care Ombudsman Project); AR 34,766-67 (Legal Counsel for the Elderly on behalf of the D.C. Long-Term Care Ombudsman Program); AR 35,511 (National Ass'n of State Long-Term Care Ombudsman); AR 35,726–57 (joint letter by state ombudsman programs and various advocacy groups); *see generally* 42 U.S.C. § 3058g(a)(5)(B); 45 C.F.R. § 1324.13(a). These ombudsmen's first-hand experience and independent status as patient advocates gives their observations particular weight.

In its second round of rulemaking, CMS weighed this evidence (and additional evidence it received making similar assertions) against the comments discussing the potential benefits of arbitration, and (as Northport correctly notes) concluded that the overall link between facilities' quality of care and the use of arbitration agreements was unclear, and worth studying further. *See* 84 Fed. Reg. 34,721. Beyond cavil, however, was the potential for abuse associated with "unfairly coerced agreements"—particularly those presented as a condition of admission. 84 Fed. Reg. 34,726.

---

[11] *See, e.g.,* AR 34,670 (Center for Elder Law & Justice); AR 34,729 (Public Counsel *pro bono* law firm); AR 34,723 (Center for Independence of the Disabled); AR 34,738 (New York Legal Assistance Group), AR 34,755 (Justice in Aging); AR 34,784 (Mass. Chapter, National Academy of Elder Law Attorneys); AR 34,792 (Michigan Developmental Disabilities Council); AR 34,807 (AARP), AR 34,834 (Legal Assistance Foundation of Metropolitan Chicago); AR 34,859 (American Bar Association); AR 34,892 (Long Term Care Community Coalition); AR 34,988 (Mass. Advocates for Nursing Home Reform), AR 35,013 (The Elder Justice Coalition); AR 35,034 (Public Citizen); AR 35,049 (National Centers for Health Research); AR 35,702 (Center for Advocacy for the Rights and Interests of the Elderly).

In fact, CMS consistently recognized, based on all the evidence before it, that coercive agreements could shield nursing homes from oversight and improperly limit patients' choice of care. *Compare* 84 Fed. Reg. 34,735 (noting that "the choice of nursing homes may [already] be limited based on various factors" and "residents, their families, and caregivers" should have the ability "to choose a LTC facility based upon what is best for the resident's health and safety without having to be required to sign a pre-dispute, binding arbitration agreement.") *with* 81 Fed. Reg. at 68796 (concluding that "any waiver of this right should be voluntary and informed. Would-be-residents are often presented a 'take-it-or-leave-it' contract under circumstances where meaningful or informed consent for pre-dispute arbitration is often lacking."). And, as we detailed previously, that is precisely the problem CMS solved by imposing procedural requirements on the way agreements are negotiated. This solution is tailored to the problem, and based on the evidence presented. *See supra* pp. 11–12, 29.

Northport contends that the evidence before CMS was not sufficiently empirical. Pl. Br. at 26. As a legal matter, however, that is irrelevant. "The APA imposes no general obligation on agencies to produce empirical evidence[;] [r]ather, an agency has to justify its rule with a reasoned explanation." *Stillwell v. Office of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009). Courts have repeatedly held that agencies have great discretion in the kinds of data they can consider, and are not required to conduct rigorous scientific or statistical research. *See Chamber of Commerce v. SEC,* 412 F.3d 133, 142 (D.C. Cir. 2005) (quoting *Melcher v. FCC,* 134 F.3d 1143, 1158 (D.C. Cir. 1998) (An agency "need not—indeed cannot—base its every action upon empirical data; depending upon the nature of the problem, an agency may be 'entitled to conduct . . . a general analysis based on informed conjecture.'); *see also, Peck v. Thomas*, 697 F.3d 767, 775 (9th Cir. 2012) (While empirical studies are sufficient for APA compliance, agencies "are not required to develop and rely on detailed statistics before promulgating [a] rule."). A federal agency is "'entitled to use its experience in interpreting and administering a statute.'" *Peck,* 697 F.3d at 776 (quoting *Sacora v. Thomas,* 628 F.3d 1059, 1067 (9th

Cir. 2010) (internal citation omitted) (brackets added)). Even if it "may have been preferable for [an agency] to support its conclusions with empirical research,' it [is] reasonable for [an agency] to rely on its experience, even without having quantified it in the form of a study.'" *Id.* This is particularly true where, as here, the conclusions the agency drew from its experience "found support in various comments submitted in response to the proposed rule." *Stillwell,* 569 F.3d at 519. *See* AR citations, *supra. See also, Nat'l Ass'n of Regulatory Utility Comm'rs v. FCC,* 737 F.2d 1095, 1124 (D.C. Cir. 1984) ("A degree of agency reliance on these comments is not only permissible but often unavoidable. . . .[W]e have never held that an agency must conduct this analysis without relying on the comments submitted during the rulemaking."); *Chamber of Commerce of the United States v. NLRB,* 118 F. Supp. 3d 171, 183 (D.D.C. 2015) ("The agency may rely on comments submitted during the notice and comment period as justification for the rule, so long as the submissions are examined critically." (internal citation omitted)).

As a separate point, Northport complains that the 2019 Rule represents an unexplained departure from CMS's prior positions "that arbitration between long-term care facilities and residents is beneficial and should be permitted." Pl. Br. at 27. These arguments likewise miss the mark. The policy materials Northport cites spoke to the benefits of arbitration in the nursing home context generally. *See* Pl. Br. at 27–28; AR 34,019; AR 31,954. These materials may, as Northport suggests, stand in tension with the rule CMS promulgated in 2016, which contained a categorical prohibition on pre-dispute arbitration agreements. But the 2019 Rule is an entirely different creation. As detailed above, it enacts no legal barrier to arbitration; it merely sets procedural requirements. The materials Northport references say nothing about the desirability of using arbitration as a condition of admission—nor do these materials commend coercing patients into arbitration agreements when those patients do not understand the agreements' terms. *See id.* Northport's conclusory assertion that the 2019 Rule and its 2016 predecessor are one and the same simply will not do.

Regardless, as a legal matter, an agency is not held to a "heightened standard" when it changes policy; it need only demonstrate that "the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better, which the conscious change of course adequately indicates." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). An agency is free "to change course if it adequately justifies the change." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 1001 (2005). Here, CMS thoroughly explained the need for the kinds of changes it was making through its Rule over the course of eighteen pages in the Federal Register. *See also,* 81 Fed. Reg. at 68791-93 (explaining CMS's earlier correspondence on arbitration). That explanation itself represented the culmination of two rounds of notice and comment, where the agency received and thoroughly analyzed a plethora of viewpoints. Nothing more is required under the APA.

## IV.   THE SECRETARY COMPLIED WITH THE REGULATORY FLEXIBILITY ACT

Finally, the Court should reject Northport's contention that the 2019 Rule violated the Regulatory Flexibility Act (RFA).

The RFA generally requires an agency that "promulgates a final rule" to "prepare a final regulatory flexibility analysis." 5 U.S.C. § 604(a). That requirement does not apply, however, where the agency certifies that the regulation "will not . . . have a significant economic impact on a substantial number of small entities." *Id.* § 605(b). As courts have recognized, the statute is a "[p]urely procedural" mandate, prescribing no specific outcome and imposing no requirement that an agency adopt substantive measures to reduce the impact of regulations on small business. *Nat'l Tel. Coop. Ass'n v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009) (internal quotes and citations omitted). A court reviews agency compliance with the RFA "only to determine whether an agency has made a reasonable, good-faith effort to carry out [the statute's] mandate." *Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 625 (5th Cir. 2000) (internal quotation marks omitted). Thus, the court's review of an agency's certification under 5 U.S.C. § 604(b) is "highly deferential, 'particularly . . . with regard to an

agency's predictive judgments about the likely economic effects of a rule.'" *Helicopter Ass'n Int'l, Inc. v. FAA*, 722 F.3d 430, 432-33 (D.C. Cir. 2013) (quoting *Nat'l Tel. Coop. Ass'n*, 563 F.3d at 541).

Here, during the 2016 rulemaking, the Secretary engaged in a detailed Regulatory Flexibility Analysis, covering six pages of the proposed rule and ten and one-half pages of the final rule. *See* 80 Fed. Reg. at 42,235-240; 81 Fed. Reg. at 68,836-946. That analysis included a lengthy, detailed discussion of the costs associated with the final rule. *Id.* at 68,838-844. As part of that discussion, the Secretary referred to the required Regulatory Flexibility Analysis and certified that the final rule would "not have a significant economic impact on a substantial number of small entities." *Id.* at 68,846. The 2019 Rule imposed many fewer requirements than its 2016 predecessor. And the requirements it imposed were procedural steps that pale in comparison to the comprehensive updates to facility practices the 2016 Rule imposed. In light of those facts, the Secretary again certified that the 2019 Rule "will have no impact on a substantial number of small entities." 84 Fed. Reg. 34,734. With this certification, the Secretary fully discharged his obligations under the RFA, and this Court's inquiry is at an end. *See* 5 U.S.C. § 605(b).

Northport may disagree with the Secretary's analysis or wish it were more detailed. But that does not make out a violation of the RFA. In reviewing a challenge under the RFA, "[t]he proper question . . . is not whether the [agency] reached the 'correct' determination, but whether the agency followed the procedural steps set out in the RFA." *Grocery Servs., Inc. v. USDA Food & Nutrition Serv.*, No. CIV.A. H-06-2354, 2007 WL 2872876, at *10 (S.D. Tex. Sept. 27, 2007); *see N.C. Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp. 2d 62, 95 (D.D.C. 2007) ("[A] court reviewing a RFA-based challenge does not evaluate whether the agency got the required analysis right, but instead examines whether the agency has followed the procedural steps laid out in the statute."). Nothing in the RFA requires more than what CMS did, and courts are not authorized to impose additional rulemaking procedures

beyond those that Congress has established. *See Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1207 (2015).

In short, the Secretary followed the steps prescribed by the statute. Accordingly, his Rule should be sustained. Moreover, even if this Court were to find that the Secretary had failed to comply with the RFA, given the strong public interest in favor of her regulation, the correct remedy would be to remand the regulation to the agency for further analysis, not to invalidate it. *See* 5 U.S.C. § 611(a)(4)(A)–(B); *see also Aeronautical Repair Station Ass'n, Inc. v. FAA*, 494 F.3d 161, 178 (D.C. Cir. 2007) (remanding a final rule to agency for further analysis under the RFA without invalidating the rule or deferring the rule's enforcement). This is especially true given that the 2019 Rule contains a number of provisions that Northport does not challenge, and whose propriety is therefore not in dispute.[12]

## CONCLUSION

For these reasons, we respectfully request that the Court deny Northport's motion for summary judgment in its entirety, and enter judgment in favor of the United States.

---

[12] These include the requirements that arbitration agreements provide for a neutral arbitrator and a venue that is convenient for both parties. 84 Fed. Reg. 34,736; *see generally* Am. Compl.; Pl. Br. at 17–19.

Respectfully submitted,

Of Counsel:

ROBERT P. CHARROW
General Counsel

KELLY M. CLEARY
Deputy General Counsel and Chief Legal
Officer, CMS

JANICE L. HOFFMAN
Associate General Counsel

SUSAN MAXSON LYONS
Deputy Associate General Counsel for
Litigation

W. CHARLES BAILEY, JR.
Attorney
United States Department of Health &
Human Services

JOSEPH H. HUNT
Assistant Attorney General

JAMES M. BURNHAM
Deputy Assistant Attorney General

MICHELLE BENNETT
Assistant Branch Director

*/s/ Alexander V. Sverdlov*
ALEXANDER V. SVERDLOV (NY Bar 4918793)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 305-8550
alexander.v.sverdlov@usdoj.gov

October 25, 2019

Attorneys for Defendants

**CERTIFICATE OF SERVICE**

I, Alexander V. Sverdlov, hereby certify that on October 25, 2019, I electronically filed the foregoing "BRIEF IN SUPPORT OF DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION" with the Clerk of Court using the Court's CM/ECF System.  I understand the CM/ECF System will send notification of such filing to all parties of record.


/s/ Alexander V. Sverdlov
Alexander V. Sverdlov