IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

NORTHPORT HEALTH SERVICES
OF ARKANSAS, LLC d/b/a SPRINGDALE
HEALTH AND REHABILITATION
CENTER; NWA NURSING CENTER,
LLC d/b/a THE MAPLES; et al.                                    **PLAINTIFFS**

**V.**                              **CASE NO. 5:19-CV-5168**

UNITED STATES DEPARTMENT OF HEALTH
AND HUMAN SERVICES; ALEX M. AZAR II,
in his official capacity as Secretary of the
United States Department of Health and Human
Services; CENTERS FOR MEDICARE & MEDICAID
SERVICES; and SEEMA VERMA, in her official
capacity as the Administrator of the Centers
for Medicare & Medicaid Services                               **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

Before the Court are the Plaintiffs' Motion for Summary Judgment (Doc. 26) and

Memorandum Brief in Support (Doc. 27) and Defendants' Cross-Motion for Summary

Judgment and Response to Plaintiffs' Motion (Doc. 28) and a Memorandum Brief in

Support (Doc. 29). Plaintiffs filed a Reply to Defendants' Cross-Motion and Response

(Doc. 36), and Defendants filed a Reply brief (Doc. 42), so the matter has now been fully

briefed and is ripe for decision.[1] For the reasons given below, the Plaintiffs' Motion for

Summary Judgment (Doc. 26) is **DENIED** and the Defendants' Cross-Motion for

Summary Judgment (Doc. 28) is **GRANTED**.

---

[1] Defendants also filed the administrative record associated with the rulemaking at issue
here. (Doc. 24). Additionally, the Court received an Amicus Brief in Opposition to Plaintiffs'
Motion for Summary Judgment and In Support of the Government's Motion (Doc. 39) filed
on behalf of National Consumer Voice for Quality Long-term Care, American Association
for Justice, Arkansas Trial Lawyers Association, and Justice in Aging.

## I. BACKGROUND

The federal government subsidizes medical care for eligible individuals, including the elderly, people with disabilities, and families with limited income. These subsidies are distributed through two programs: the federal Medicare program and Medicaid, which is a federal-state partnership. The Secretary of Health and Human Services ("Secretary") administers both programs through the Centers for Medicare & Medicaid Services ("CMS"), an agency within the Department of Health and Human Services ("HHS"). Medicare and Medicaid were created as amendments to the Social Security Act, and the governing statutes for each program are found at 42 U.S.C. § 1395 *et seq.*, and 42 U.S.C. § 1396 *et seq.*, respectively. Medical providers may request to enter into a provider agreement with CMS, in the case of Medicare, and with the state administrator for Medicaid. The provider agreements place myriad requirements on participating providers, including, but not limited to, establishing standards for treatment and setting reimbursement rates for services provided to eligible participants. *See* 42 U.S.C. §§ 1395cc & 1396a. *See also* 42 C.F.R. § 489. Funds are disbursed by CMS or the administering state agency directly to the facility providing care. If a participating provider violates the terms of the provider agreement, the provider can be denied reimbursement, subject to civil penalties, or even excluded from further participation in the Medicare and Medicaid programs. *See* 42 C.F.R. § 488.406.

The Medicare and Medicaid programs both provide coverage for care in long-term care, or "LTC," facilities. Participating LTC facilities must meet the program requirements

laid out at 42 U.S.C. § 1395i-3 (Medicare) and 42 U.S.C. § 1396r (Medicaid).[2] The Plaintiffs in this case are "dually certified" facilities, providing long-term care under both the Medicare and Medicaid programs. In 2015, the federal government spent almost 30 billion dollars on payments to skilled nursing facilities, and payments to nursing facilities under Medicaid topped $50 billion. Reform of Requirements for Long-Term Care Facilities, 81 Fed. Reg. 68688, 68690 (Oct. 4, 2016).

In July 2015, CMS solicited public comments on a comprehensive evaluation and restructuring of the consolidated Medicare and Medicaid requirements for LTC facilities to ensure that the requirements reflect enhanced "knowledge about resident safety, health outcomes, individual choice, and quality assurance and performance improvement." Reform of Requirements for Long-Term Care Facilities, 80 Fed. Reg. 42168, 42169 (proposed July 16, 2015). Among the changes on which CMS sought comment were new restrictions on the use of pre-dispute binding arbitration agreements between facilities and their patients. CMS indicated its concern that "the increasing prevalence of these agreements could be detrimental to residents' health and safety and may create barriers for surveyors and other responsible parties to obtain information related to serious quality of care issues." *Id.* at 42211. Therefore, CMS suggested placing several conditions and requirements on a facility's use of pre-dispute binding arbitration agreements. For example, CMS proposed requiring the facility to "explain the agreement to the resident in a form, manner and language that he or she understands and have the

---

[2] The Medicare statute refers to "skilled nursing facilities," and the Medicaid statute refers to "nursing facilities." Despite this difference in terminology, the requirements placed on these facilities by each statute are materially identical, and the Court will use the term "facility," "LTC facility," or "nursing home" to refer to both skilled nursing facilities under the Medicare statute and nursing facilities under the Medicaid statute.

resident acknowledge that he or she understands the agreement." *Id.* CMS also proposed stipulating that an agreement to arbitrate "will not be considered to have been entered into voluntarily by the resident if the facility makes it a condition of admission, readmission, or the continuation of his or her residence at the facility," and that it therefore "should be a separate agreement" and "should not be contained within any other agreement or paperwork addressing any other issues." *Id.* In addition to proposing these and other conditions, CMS noted that it was "also aware that there are concerns that these agreements should be prohibited in the case of nursing home residents. Therefore, we are also soliciting comments on whether binding arbitration agreements should be prohibited." *Id.*

As the 60-day comment period drew to a close, CMS agreed to extend the comment period by another thirty days in response to requests for more time to respond and in recognition of the "scope and complexity" of the proposals on which the agency had sought comment. Reform of Requirements for Long-Term Care Facilities, 80 Fed. Reg. 55284, 55284–85 (Sept. 15, 2015). The extended comment period closed on October 14, 2015. On October 4, 2016, CMS published notice of the final rule in the Federal Register. The final rule prohibited the use of pre-dispute arbitration agreements by LTC facilities receiving Medicare and Medicaid funding. Residents and facilities could still agree to arbitrate once a dispute arose, but the facility could not enter into a general agreement to arbitrate any dispute with a resident or resident's family before the dispute arose. Reform of Requirements, 81 Fed. Reg. at 68690.

A few weeks later, the American Health Care Association and a number of nursing homes sought a preliminary injunction against the rule in the United States District Court

for the Northern District of Mississippi. On November 7, 2016, the court granted a nationwide preliminary injunction, stopping the rule from going into effect. *See Am. Health Care Ass'n v. Burwell*, 217 F. Supp. 3d 921 (N.D. Miss. 2016).

Rather than appealing the preliminary injunction or pursuing the litigation in the district court, CMS went back to the drawing board. Inviting comments on a revision of the 2016 final rule in June 2017, CMS indicated that "further analysis is warranted before any rule takes effect." Revision of Requirements for Long-Term Care Facilities: Arbitration Agreements, 82 Fed. Reg. 26649, 26650 (proposed June 8, 2017). CMS proposed to withdraw its ban on pre-dispute arbitration agreements and instead place various conditions on their use, similar to the conditions CMS had first proposed in 2015. For example, the agency proposed requiring that any agreement be explained to the resident in language he or she understands and that the resident acknowledge such understanding; that residents not be prohibited or discouraged from communicating with any federal, state, or local official; and that the facility save a copy of the agreement and arbitrator's final decision for five years, subject to inspection by CMS. *Id.* at 26653. CMS suggested that the new proposal "will achieve a better balance between the advantages and disadvantages of pre-dispute arbitration for residents and their providers." *Id.* at 26650.

After another comment period, on July 18, 2019, CMS promulgated the Final Rule that the Plaintiffs challenge here, which went into effect on September 16, 2019. In its final form, the Rule adds the following language regarding binding arbitration agreements to the regulations governing the administration of LTC facilities:

(n) Binding arbitration agreements. If a facility chooses to ask a resident or his or her representative to enter into an agreement for binding arbitration, the facility must comply with all of the requirements in this section.

(1) The facility must not require any resident or his or her representative to sign an agreement for binding arbitration as a condition of admission to, or as a requirement to continue to receive care at, the facility and must explicitly inform the resident or his or her representative of his or her right not to sign the agreement as a condition of admission to, or as a requirement to continue to receive care at, the facility.

(2) The facility must ensure that:

(i) The agreement is explained to the resident and his or her representative in a form and manner that he or she understands, including in a language the resident and his or her representative understands;

(ii) The resident or his or her representative acknowledges that he or she understands the agreement;

(iii) The agreement provides for the selection of a neutral arbitrator agreed upon by both parties; and

(iv) The agreement provides for the selection of a venue that is convenient to both parties.

(3) The agreement must explicitly grant the resident or his or her representative the right to rescind the agreement within 30 calendar days of signing it.

(4) The agreement must explicitly state that neither the resident nor his or her representative is required to sign an agreement for binding arbitration as a condition of admission to, or as a requirement to continue to receive care at, the facility.

(5) The agreement may not contain any language that prohibits or discourages the resident or anyone else from communicating with federal, state, or local officials, including but not limited to, federal and state surveyors, other federal or state health department employees, and representatives of the Office of the State Long–Term Care Ombudsman, in accordance with § 483.10(k).

(6) When the facility and a resident resolve a dispute through arbitration, a copy of the signed agreement for binding arbitration and

> the arbitrator's final decision must be retained by the facility for 5 years after the resolution of that dispute on and be available for inspection upon request by CMS or its designee.

Revision of Requirements for Long-Term Care Facilities: Arbitration Agreements, 84 Fed. Reg. 34718, 34735–36 (July 18, 2019) (codified at 42 C.F.R. § 483.70(n)).

On September 4, 2019, Plaintiffs filed a Complaint and Motion for Preliminary Injunction in this Court. (Docs. 2 & 4). Subsequently, the parties filed a Joint Motion for Scheduling Order in which the Government agreed that it would stay enforcement of the Rule as to Plaintiffs and associated entities to allow the Court to rule on cross-motions for summary judgment the parties would file. (Doc. 16). That motion was granted by the Court. (Doc. 23). Ultimately, the Government agreed to extend the stay of enforcement as to Plaintiffs until April 17, 2020.[3] (Doc. 43).

Plaintiffs claim to be harmed by four elements of the Final Rule in particular: (1) the requirement that an agreement to arbitrate not be made a condition for admission to the facility (42 C.F.R. § 483.70(n)(1)); (2) the requirement that the agreement be explained in language the resident or her representative understands (§ 483.70(n)(2)(i)); (3) the 30-day right of rescission for residents who sign pre-dispute arbitration agreements (§ 483.70(n)(3)); and (4) the 5-year retention requirement (§ 483.70(n)(6)). Plaintiffs challenge these elements of the Final Rule under the Administrative Procedures Act ("APA"), which allows a party harmed by an agency action to seek judicial review of that action. 5 U.S.C. § 702. Upon review, the court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . .

---

[3] While the Government agreed to extend the stay, it did not concede that the public interest or any other factor favored delaying the implementation of the Final Rule.

. in excess of statutory jurisdiction, authority, or limitations; [or] without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C) & (D). The First Amended Complaint raises five claims under the APA. (Doc. 25). First, Plaintiffs assert that the Final Rule is "not in accordance with law" because it violates the Federal Arbitration Act ("FAA"). In Claims Two and Three, Plaintiffs argue that the Rule violates the APA because it exceeds CMS's authority under the Medicare and Medicaid statutes. Claim Four asserts that the Rule is arbitrary and capricious because there is a lack of empirical evidence to support the position taken by the agency and it is an unreasoned departure from CMS's past positions on the issue of binding arbitration. Finally, Plaintiffs assert that CMS has also violated the Regulatory Flexibility Act ("RFA") by failing to acknowledge and analyze fully the economic impact of the Final Rule. Plaintiffs therefore ask the Court to strike down the Rule.

For its part, the Government asserts that the Final Rule is not in conflict with the FAA or that if it is, CMS nevertheless has the authority to promulgate the Rule as a condition on the receipt of federal funding. The Government further argues that the Rule is within the scope of its authority and is adequately supported by the record. Finally, the Government asserts that it complied with the requirements of the RFA. Therefore, the Government asks the Court to uphold CMS's rulemaking on all grounds.

## II. DISCUSSION

### A. The Rule Does Not Violate the Federal Arbitration Act

Plaintiffs' first argument is that the Rule violates the FAA and therefore must be set aside under the APA as "not in accordance with law." 5 U.S.C. § 706(2)(A). The FAA provides, in relevant part, that "[a] written provision . . . to settle by arbitration a

controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Plaintiffs argue that because the Rule imposes special requirements on the formation of enforceable arbitration agreements that do not apply to any other kind of contract, it violates the FAA, which requires the equal treatment of arbitration agreements and any other contract.

The Government also moves for summary judgment on this point, arguing that the Final Rule does not violate the FAA. The Government attempts to distinguish between "legal rules," which are "wielded to preclude or invalidate an agreement to arbitrate," and "procedural rules" that "form no legal barrier to the creation or enforcement of arbitration contracts." (Doc. 29, p. 24). The Government argues that the FAA "has no bearing" on the Final Rule at issue here because the Rule does not prevent nursing homes from forming binding arbitration agreements or undermine the enforceability of any arbitration agreement that is already in place. (Doc. 29, p. 15). Requirements about what a nursing home "must and must not do when attempting to persuade patients to arbitrate," the Government argues, are "no legal impediment to enforcement of any arbitration agreement residents and nursing homes ultimately sign." *Id.*

In its Reply brief, the Government is even more explicit: While "violating the Rule can carry consequences for a nursing home's ability to participate in Medicare and Medicaid, a nursing home can still enforce any agreement it enters into in violation of the procedures that the Rule sets out." (Doc. 42, p. 10). Rather, "any violation of the Rule is an issue between the nursing home and CMS, which conditions its payments to the nursing home on that home following applicable guidelines." *Id.* at 11. In other words, a

participating nursing home may choose to enter into a pre-dispute binding arbitration agreement without complying with the procedural requirements laid out in the Final Rule, and if a resident were to sue the nursing home, the facility could seek to compel arbitration pursuant to the agreement and expect a court to enforce the agreement. At the same time, however, the nursing home would be exposing itself to the possibility of corrective action by CMS for a violation of the facility's participation agreement. But, as the Government points out, a nursing home "could rationally choose to accept a fine as the price for negotiating an agreement the way it wants." *Id.*

CMS also made this argument regarding the Final Rule's validity in the administrative record. In proposing and finalizing the Rule, CMS asserted that the Rule "does not purport to regulate the enforceability of any arbitration agreement, and does not pose any conflict with the language of the FAA." Revision of Requirements, 82 Fed. Reg. at 26651. *See also* Revision of Requirements, 84 Fed. Reg. at 34718. In discussing the conditions on the use of pre-dispute arbitration agreements the agency proposed back in 2015, which are substantially similar to those in the Final Rule challenged here, the agency stated that the "regulations are not meant to limit or provide standards for courts to use in determining if an arbitration agreement should be enforced in, for example, a motion to compel arbitration." Reform of Requirements, 81 Fed. Reg. at 68799.

The Court recognizes that, generally, the distinction that the Government tries to draw between "legal" rules that declare arbitration agreements invalid and "procedural" rules, which simply place requirements on the formation of such agreements, could not save the Final Rule from conflict with the FAA. The cases on which the Plaintiffs rely, particularly *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681 (1996), and *Kindred*

*Nursing Centers Limited Partnership v. Clark*, 137 S. Ct. 1421 (2017), make clear that "[a] rule selectively finding arbitration contracts invalid because improperly formed fares no better under the Act than a rule selectively refusing to enforce those agreements once properly made." *Kindred Nursing*, 137 S. Ct. at 1428.

In *Casarotto*, for example, the Supreme Court considered the following Montana state law: "Notice that a contract is subject to arbitration . . . shall be typed in underlined capital letters on the first page of the contract; and unless such notice is displayed thereon, the contract may not be subject to arbitration." 517 U.S. at 684. The Montana Supreme Court upheld the state law, holding that the first-page requirement was a procedural issue that "did not undermine the goals and policies of the FAA, for the notice requirement did not preclude arbitration agreements altogether; it simply prescribed 'that before arbitration agreements are enforceable, they be entered knowingly.'" *Id.* at 685 (quoting the state supreme court decision, *Casarotto v. Lombardi*, 886 P.2d 931, 939 (Mont. 1994)). The Supreme Court reversed. It held that the FAA preempted the state notice requirement because, in enforcing the procedural rule, a court "would not enforce the arbitration clause in the contract between [the parties]; instead Montana's first-page notice requirement would invalidate the clause." *Id.* at 688.

Similarly, in *Kindred Nursing*, the plaintiffs argued that there is a "distinction between contract formation and contract enforcement," and the Kentucky Supreme Court's "clear-statement rule," requiring that a power-of-attorney expressly include the power to waive the right to a jury trial, should be upheld because it dealt only with formation. 137 S. Ct. at 1428. The Supreme Court rejected this argument, however, holding, as quoted above, that "[a] rule selectively finding arbitration contracts invalid

because improperly formed fares no better under the Act than a rule selectively refusing to enforce those agreements once properly made." *Id.*

Thus, if the failure to comply with the procedural requirements in the Final Rule were a basis for holding an agreement to arbitrate invalid and unenforceable, the Rule would indeed conflict with the FAA. Here, in contrast, the Final Rule places requirements on the use of arbitration agreements that do not undermine the validity or enforceability of the agreement when it comes before a court. Instead, the Rule only establishes conditions of the facility's receipt of federal subsidies. Imagine, for example, that a nursing home participating in the Medicare and Medicaid programs had a resident sign an agreement to arbitrate without having "explained [it] in a form and manner that he or she understands" and without having received the resident's "acknowledge[ment] that he or she understands that agreement," in violation of 42 C.F.R. §§ 483.70(n)(2)(i) & (ii). If the nursing home subsequently sought to enforce the agreement in court, the nursing home's violation of the Final Rule would *not* prevent enforcement. Since failure to comply with the Rule's requirements does not prevent the enforcement of arbitration agreements between an LTC facility and a resident, the Court finds no conflict with the FAA.

A district court in the District of Columbia recently reached a similar conclusion in *California Association of Private Postsecondary Schools v. Devos*, 2020 WL 516455 (D.D.C. Jan. 31, 2020) [hereinafter *CAPPS*]. There, the plaintiffs challenged a final rule promulgated by the Department of Education ("DOE") requiring that schools whose students receive funding from the Federal Direct Loan program "not enter into a predispute agreement to arbitrate a borrower defense claim, or rely in any way on a predispute arbitration agreement with respect to any aspect of a borrower defense claim."

*Id.* at *5 (quoting 34 C.F.R. § 685.300(f)(1)(i)). In determining that the rule did not conflict with the FAA, the court noted that "[i]nstitutions of higher education remain free to seek and to invoke predispute . . . arbitration agreements, and, when confronted with any such agreement that is otherwise enforceable, courts must—and will—enforce the agreement." *Id.* at *8. DOE's rule, the court noted, "does not provide a basis for a student to resist a motion to compel arbitration" nor "to stay a judicial proceeding pending arbitration." *Id.* The court concluded that since "the regulations do not purport to invalidate or to render unenforceable any arbitration agreement," the plaintiff's argument invoking *Kindred Nursing* was unpersuasive. *Id.* "[T]o the extent CAPPS suggests that *Kindred Nursing* holds—or even implies—that agencies may not dissuade program participants from entering into arbitration agreements that relate to the federal programs they administer, that contention bears no relation to what the Supreme Court considered or held." *Id.* at *9.

## B. The Rule is a Valid Condition on Federal Funds

Plaintiffs argue that the mere fact of *disfavoring* arbitration by placing additional requirements on the formation of arbitration agreements that do not apply to other contracts is a violation of the FAA. Pursuant to the Court's ruling in *Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612 (2018), Plaintiffs argue HHS cannot be permitted to promulgate the Final Rule without explicit authorization from Congress, which it lacks.

The Government argues that even if there is a conflict between the FAA and the Final Rule, CMS has the authority to promulgate this regulation as a condition on the receipt of federal funds. The Rule should be upheld because it "imposes conditions only on entities that choose to accept federal funds—not on a universe of unwilling private

parties." (Doc. 29, p. 28). In Reply, Plaintiffs argue that this is a false choice—without Medicare and Medicaid dollars, Plaintiffs and other nursing homes like them would go out of business because LTC facilities "typically serve a patient base that is predominantly part of these federal programs." (Doc. 36, p. 17). For example, Plaintiffs attach affidavits from administrators of two Plaintiff LTC facilities attesting that Medicare and Medicaid funding pay for more than 70 percent of the residents at each facility. *See* Docs. 25-3 & 25-4 at ¶ 3. The "choice" between complying with the Final Rule or withdrawing from Medicare and Medicaid, Plaintiffs argue, therefore exceeds the federal government's authority and constitutes impermissible "'economic dragooning' that leaves participants in a federal program with 'no real option but to acquiesce' to the government's demands." (Doc. 36, p. 17 (quoting *NFIB v. Sebelius*, 567 U.S. 519, 582 (2012))).

*1.* Epic Systems *Is Inapposite in the Context of Federal Spending Power*

First, the Court finds that the facts of this case, which restrict only those parties who voluntarily choose to avail themselves of federal funding through the Medicaid and Medicare programs, are not governed by *Epic Systems*, and CMS did not need explicit authorization from Congress to implement the Final Rule. In *Epic Systems*, the Supreme Court considered an interpretation of the National Labor Relations Act ("NLRA") by the agency charged with administering the NLRA, the National Labor Relations Board ("NLRB") that would have rendered invalid and unenforceable a particular class of arbitration agreements. The Supreme Court held that the NLRB did not have the authority to interpret the NLRA "in a way that limits the work of [the FAA]. And on no account might we agree that Congress implicitly delegated to an agency authority to address the meaning of a second statute it does not administer." 138 S. Ct. at 1629. An agency may

not "seek to diminish the second statute's scope in favor of a more expansive interpretation of its own," *id.*, without Congress having made its intent to empower the agency in this way "clear and manifest." *Id.* at 1624.

Here, in contrast, the Final Rule does not purport to bar the use of arbitration agreements in the heath care industry generally but only to place conditions on the use of such agreements by voluntary participants in a federally funded program. CMS expressly disavows any intent to limit the enforceability of any arbitration agreement. *See, e.g.*, Revision of Requirements, 82 Fed. Reg. at 26651; Revision of Requirements, 84 Fed. Reg. at 34718. The Secretary's exercise of his statutory responsibility does not "limit the work" of the statutory language of the FAA. The FAA allows private parties to agree to arbitrate disputes that might arise between them in the future and to have those agreements enforced according to their terms, on equal footing with any other contract. But there is nothing in the text of the FAA that limits an agency's prerogative to place conditions on the receipt of federal funding in order to achieve the goals of the federal program, nor have the parties cited the Court to any precedent so holding. The Court declines to expand *Epic Systems* in this way.

The court in *CAPPS* reached a similar conclusion. The plaintiffs asserted that "*Epic Systems* stands for the proposition that 'federal Departments and agencies . . . may not, in the absence of explicit congressional authorization, invalidate or otherwise discriminate against arbitration agreements.'" 2020 WL 516455, at *9 (quoting Plaintiff's Motion for Summary Judgment at 16 (No. 17-cv-999), ECF No. 83-1). The court did not disagree with this summary of the holding but pointed out that the plaintiff could identify "no support for its further contention that federal agencies lack authority to disfavor arbitration

agreements in any respect. *Epic Systems* certainly does not support that sweeping proposition." 2020 WL 516455, at *9. Thus, the Court concludes that *Epic Systems* is inapposite and neither finds, nor is directed to, authority indicating that an agency must have explicit authorization from Congress to regulate the use of binding pre-dispute arbitration agreements by voluntary participants in a federal program it administers.

### 2. The Final Rule Does Not Disfavor Arbitration and is Related to the Purposes of Medicare and Medicaid

The federal government has broad authority to place conditions on the use of funds it distributes, even broader than its authority to impose direct restrictions, so long as those conditions are related to the goals of the program. *See, e.g.*, *South Dakota v. Dole*, 483 U.S. 203 (1987) ("[C]onditions on federal grants might be illegitimate if they are unrelated to the federal interest in particular national projects or programs." (internal quotation marks omitted)); *Van Wyhe v. Reisch*, 581 F.3d 639, 650 (8th Cir. 2009) ("[C]onditions on federal funds must be related to the federal interest in particular national projects or programs . . . ."). The Supreme Court has often repeated its conclusion that the FAA is "a congressional declaration of a liberal federal policy favoring arbitration agreements," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983), but the Court has also made clear that the government's refusal to provide funds for a particular activity, even one involving the exercise of a fundamental right, cannot be considered to infringe, interfere with, or penalize that right. *See Rust v. Sullivan*, 500 U.S. 173, 193 (1991). ("'[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right.' . . . 'A refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity.'") (quoting *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 549 (1983) and *Harris v. McRae*, 448 U.S.

297, 317 n.19 (1980)). Thus, though the FAA protects an individual's right to have an arbitration agreement enforced on the same terms as any other contract, the government does not infringe upon that right or "disfavor" arbitration when it limits the use of such agreements to pursue the policy goals of a federally funded program. As the court concluded in *CAPPS*:

> There is, in short, a vast difference between an agency's use of its regulatory authority to impose stricter regulatory requirements on parties that opt to use arbitration in transactions *not* involving public funds and an agency requiring participants in a federal program to eschew predispute arbitration clauses in transactions involving the disbursement . . . of billions of dollars of taxpayer funds as a precondition to participation in that federal program.

*CAPPS*, 2020 WL 516455, at *12 (emphasis added).

The Court finds that the conditions in the Rule are reasonably related to the federal interest in the Medicare and Medicaid programs. The federal government expends tens of billions of dollars annually to subsidize healthcare for eligible participants in order to ensure their access to healthcare services. *See* Reform of Requirements, 81 Fed. Reg. at 68690. CMS describes its substantial interest in the contractual relationship between the LTC facility and the resident as follows:

> Unlike traditional arms-length commercial contracts that are, for the most part, business arrangements between two private individuals, the Medicare and Medicaid programs have a significant interest in both the services being delivered as well as the well-being of the beneficiary. In many cases, Medicare and Medicaid are the sole payors for the services. That's why, for example, Congress has required that the Secretary create a wide assortment of rules and regulations relating to quality of care and the delivery of services in the LTC context.

Reform of Requirements, 81 Fed. Reg. at 68796.[4] The administrative record provides sufficient support for the relationship between the Final Rule and the provision of federally funded care in LTC facilities. The conditions on the use of pre-dispute arbitration agreements were put in place to "ensure that residents will not be forced to sign arbitration agreements to receive the care they need" and that a resident "is not placed in the position of deciding between signing an arbitration agreement or . . . not receiving the care at the facility that he or she needs." Revision of Requirements, 84 Fed. Reg, at 34724. The Final Rule was designed to accomplish the goal of "protecting resident's rights in matters concerning the arbitration process" by decoupling the process of seeking care in a facility that can meet the resident's medical needs from the agreement to arbitrate. *Id.* at 34725. CMS has observed that "many residents or their families usually do not have many LTC facilities to choose from" and determined that "no one should have to choose between receiving care and signing an arbitration agreement." *Id.* at 34728. The dispute requirements in 42 C.F.R. § 483.70(n)(1)–(3) ensure that a pre-dispute agreement to arbitrate is not a barrier for a resident to access care. The provisions allow prospective residents "to choose a LTC facility based upon what is best for the resident's health and safety" without having to forgo access to a judicial forum in exchange. *Id.* at 34735.

---

[4] Similar logic was central to the court's reasoning in upholding the regulation prohibiting reliance on pre-dispute arbitration agreements in *CAPPS*, observing that the DOE "is not acting as a disinterested regulator but as the administrator of a multi-billion-dollar program and as a participant in the transaction between the student borrowers and the schools they attend." 2020 WL 516455, at *10. The Court recognizes that, unlike the DOE in *CAPPS*, CMS does not necessarily face increased financial liability from the unrestricted use of arbitration agreements. But an LTC facility is able to contract with the resident because CMS has approved the facility's participation as a provider and will pay for the care provided to the resident. CMS therefore has an interest in ensuring the LTC facility does not leverage the resident's need for care to deprive her of other rights.

Similarly, the requirement that the facility retain copies of agreements and decisions by arbitrators where disputes were subject to arbitration helps hold facilities accountable for the quality of care they provide. *Id.* at 34726. CMS determined that "concerns about a link between the use of arbitration agreements and quality of care can be alleviated by ensuring that surveyors have access to key documents relating to the arbitration." *Id.* at 34728. The regulations are reasonably related to achieving these goals, and CMS has the authority to impose them.

### 3. The Final Rule Does Not Constitute Economic Dragooning

The Court is not persuaded by Plaintiffs' attempt to invoke *NFIB v. Sebelius* to invalidate the Final Rule as a condition of federal funding. In *NFIB*, the Supreme Court struck down as overly coercive a section of the Affordable Care Act intended to incentivize each state to expand its Medicaid program by withdrawing all of its federal Medicaid funding if the state did not comply. The plurality's holding regarding the impermissible coerciveness of the condition, however, was based on the constitutional balance of power between the state and federal governments. A state's acquiescence to the federal government's conditions must be *voluntary* to ensure that "Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system." 567 U.S. at 577. Where a state's decision not to comply with conditions placed on federal funding is so significant that it constitutes "economic dragooning that leaves the States with no real option but to acquiesce," *id.* at 582, the conditions must be struck down because the state's participation is no longer voluntary.

No part of the Court's decision in *NFIB* touched on the government's power to place conditions on private entities. In fact, Courts of Appeals have held time and time

again that the participation of private entities in Medicare and Medicaid is always voluntary, and providers can avoid regulations to which they object by choosing not to participate in Medicare or Medicaid. "Nursing homes, unlike public utilities, have freedom to decide whether to remain in business and thus subject themselves voluntarily to the limits imposed" by the Medicaid program. *Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Pub. Health*, 742 F.2d 442, 446 (8th Cir. 1984) [hereinafter, *MAHCF*]. "It is, of course, only through voluntary participation in the state's Medicaid program that a nursing home falls within the purview" of a challenged regulation. *Id. See also Livingston Care Ctr., Inc. v. United States*, 934 F.2d 719, 720 (6th Cir. 1991) ("[P]articipation in the Medicare program is a voluntary undertaking."); *St. Francis Hosp. Ctr. v. Heckler*, 714 F.2d 872, 875 (7th Cir. 1983) (same).

This is true even where providers argued that choosing not to participate in the Medicare and Medicaid programs would cause them to earn less revenue and undermine their viability. "Despite the strong financial inducement to participate in Medicaid, a nursing home's decision to do so is nonetheless voluntary." *MAHCF*, 742 F.2d at 446. *See also Se. Ark. Hospice, Inc. v. Burwell*, 815 F.3d 448 (2016) (holding that hospice provider's voluntary participation in Medicare "forecloses the possibility that the statute could result in an imposed taking of private property which would give rise to the constitutional right of just compensation" (quoting *MAHCF*, 742 F.2d at 446)); *St. Francis*, 714 F.2d at 875 ("Providers who opt not to participate are free to serve persons not covered by Medicare and those potential Medicare recipients who are willing to forego Medicare benefits for the services provided. As a practical matter, perhaps few of those persons eligible for Medicare would choose a non-participating hospital, but the fact that

practicalities may in some cases dictate participation does not make participation involuntary."); *Cf. Livingston Care Ctr.*, 934 F.2d at 720–21 (affirming the dismissal of a nursing home's suit for wrongful termination after it was terminated from Medicare and was forced to declare bankruptcy, noting that "[j]ust as those who choose to serve individuals not covered by Medicare assume the risks of the private market, those who opt to participate in Medicare are not assured of revenues"). Having chosen to structure their private businesses to be heavily dependent on Medicare and Medicaid funding, Plaintiffs cannot now argue that dependence somehow shields them from CMS's efforts to protect the beneficiaries of those programs. Thus, Plaintiff's argument regarding the coercive nature of their "choice" does not undermine CMS's authority to implement the Final Rule.

In summary, the Court concludes that the Rule codified at 42 C.F.R. § 483.70(n) does not conflict with the FAA because it does not interfere with the validity or enforceability of any arbitration agreement. To the extent that the Final Rule places limitations on the use of arbitration agreements by LTC facilities, it cannot be said to disfavor such agreements. Rather, CMS has reasonably imposed these restrictions as conditions by which an LTC facility must abide to receive federal dollars from the Medicare and Medicaid programs. The regulations are reasonably related to the policy goals of the Medicare and Medicaid programs and are therefore a permissible use of the Government's authority to place conditions on the use of federal funds.

## C. The Rule is Within the Secretary's Statutory Authority

The Government cites two sections of the Medicare and Medicaid statutes as the basis for its statutory authority. *See* Revision of Requirements, 84 Fed. Reg. at 34718.

It is the duty and responsibility of the Secretary to assure that requirements which govern the provision of care in [participating LTC facilities], and the enforcement of such requirements, are adequate to protect the health, safety, welfare, and rights of residents and to promote the effective and efficient use of public moneys.

42 U.S.C. §§ 1395i-3(f)(1) & 1396r(f)(1).

A [participating LTC facility] must meet such other requirements relating to the health, safety, and well-being of residents or relating to the physical facilities thereof as the Secretary may find necessary.

42 U.S.C. §§ 1395i-3(d)(4)(B) & 1396r(d)(4)(B).[5]

The Government argues that the Rule falls within the plain language of these authorizing provisions, protecting the health, safety, welfare, and rights of Medicare and Medicaid recipients. If it is ambiguous whether the statute encompasses the new regulations, the Government argues that CMS's interpretation of the extent of its authority is entitled to deference pursuant to *Chevron, U.S.A., Inc. v. Natural Resource Defense Council, Inc.*, 467 U.S. 837 (1984).

The bulk of Plaintiffs' opposition centers on the argument that, pursuant to *Epic Systems*, the Secretary must have explicit authorization from Congress to regulate the use of arbitration. That argument has already been addressed and rejected above. In the alternative, Plaintiffs argue that the statute grants the Secretary narrower authority than the Government believes: "Congress actually confined Defendants' authority to regulate to '*the provision of care'* provided '*in* skilled nursing facilities,' and did not authorize any

---

[5] The Court also notes that while the Government does not rely on this statutory authority in promulgating the Final Rule or in its briefs, the administrative record also refers to 42 U.S.C. §§ 1395i-3(c)(1)(A)(xi) & 1396r(c)(1)(A)(xi), which require that an LTC facility "protect and promote the rights of each resident," including "[a]ny other right established by the Secretary." The Court agrees with CMS that with this statutory provision, "Congress has expressed an [sic] clear interest in protecting the rights of Medicare and Medicaid beneficiaries in LTC facilities." Reform of Requirements, 81 Fed. Reg. at 68796.

regulation that might arguably promote the 'health, safety, welfare, and rights of residents.'" (Doc. 27, p. 30 (quoting 42 U.S.C. § 1395i-3(f)(1) with emphasis added)). Plaintiffs argue that a permissible restriction must be linked to "*how* long-term care providers administer care to residents," not a "condition precedent to the provision of care." *Id.* at pp. 30–31. Regulation of a facility's admissions policies, Plaintiffs argue, does not fall within the statutory language authorizing regulation.

The Supreme Court established the legal standard for judicial review of an agency's construction of the statute it administers in *Chevron.* First a court must consider "whether Congress has directly spoken to the precise question at issue," in which case Congress's command is controlling. *Id.* at 842. But where "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. When Congress, through its silence, implicitly delegates authority to an agency, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* at 844. Therefore, the Court "must decide (1) whether the statute unambiguously forbids the Agency's interpretation, and, if not, (2) whether the interpretation, for other reasons, exceeds the bounds of the permissible." *Barnhart v. Walton*, 535 U.S. 212 (2002).

The Court does not find any statutory language that would forbid CMS from enacting the Final Rule. On the contrary, the statutory language is broad. It does not just empower the Secretary to develop a solution to a particular problem; it is gives the Secretary the responsibility to identify areas where there is inadequate protection for the "health, safety, welfare, and rights" of Medicare and Medicaid recipients and to

promulgate regulations governing the provision of care in LTC facilities to provide needed protection. 42 U.S.C. §§ 1395i-3(f)(1) & 1396r(f)(1). Sections 1395i-3(d)(4)(B) & 1396r(d)(4)(B) contain an even broader mandate to promulgate any regulations necessary for the "health, safety, and well-being" of residents. The Court reads this statutory language as granting discretion to the Secretary to make the regulations he finds necessary based on CMS's experience administering the Medicare and Medicaid programs, and the Court must defer to the agency's judgment so long as it is reasonable.

Plaintiffs do not cite the Court to any language that would forbid CMS's interpretation of the regulation. At most, Plaintiffs point to the fact that Congress has considered, but failed to enact, legislation banning the use of pre-dispute arbitration agreements as evidence that Congress would not wish CMS to regulate such agreements in this way. The Court notes that the regulations in the Final Rule do not rise to the level of the complete prohibition contemplated by proposed legislation. More to the point, however, "[c]ongressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction. . . ." *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) (analyzing agency action under *Chevron* and declining to conclude that Congress had expressed its position by considering, but not enacting, a provision relevant to the agency's rulemaking) (internal quotation marks omitted). Here, for example, the Court could just as easily conclude from Congress's inaction that it believed CMS had the authority to regulate the use of pre-dispute arbitration agreements and would do so if such regulation were necessary, so that there was no need for Congress to act. The ambiguity of congressional inaction is further underscored in this case by the fact that CMS received multiple pieces of correspondence

from members of Congress regarding its rulemaking on arbitration agreements, each taking a different position. *See* Reform of Requirements, 81 Fed. Reg. at 68790. Therefore, the Court concludes that at the first stage of the *Chevron* inquiry, there is no congressional command that forbids the agency's interpretation of its authority.

At the second step of the *Chevron* analysis, the Court finds that it was reasonable for CMS to determine that it had the authority to promulgate the Final Rule. The restrictions on the use of pre-dispute arbitration agreements are intended to protect the resident by preventing the nursing home from leveraging the resident's need to access care to achieve other goals not related to that resident's medical care. CMS observed that when arbitration agreements are included as part of the admissions process, they "are often made when the would-be resident is physically and possibly mentally impaired, and is encountering such a facility for the first time. In many cases, geographic and financial restrictions severely limit the choices available to an LTC resident." *Id.* at 68792. It was reasonable for the agency to conclude that preventing a facility from refusing to serve a resident in need of medical care who declined to enter into a pre-dispute arbitration agreement was necessary to protect the health, safety, welfare, and rights of residents.

Furthermore, the protections CMS has put in place are consistent with other existing statutory and regulatory protections for residents. For example, the administrative record provides several examples of "rules mandating that suppliers of health care items and services forgo contractual and other commercial rights they might otherwise have with respect to Medicare and Medicaid patients," such as restrictions on marketing to program participants, a requirement to give written advance notice to residents of non-

covered services, and a limitation on the right of the facility to pursue payment from a patient who could not have known the service would not be covered by Medicare. *Id.* at 68791. The Court agrees with CMS that these restrictions "evince a Congressional and administrative understanding that business arrangements with Medicare and Medicaid patients are not typical commercial contracts where both parties engage in arms-length bargaining." *Id.*

Additionally, section 483.15 of the Medicare and Medicaid regulations establishes other requirements for an LTC facility's admissions policy, including multiple regulations intended to ensure the facility is not leveraging the resident's need for care to accomplish other goals. Plaintiffs' argument that the language of the statute limits the Secretary's authority to regulate *how* care is provided is particularly unpersuasive in light of the regulations discussed here. For example, the regulations establish that a facility must not "request or require residents or potential residents to waive potential facility liability for losses of personal property" as a condition of admission. 42 C.F.R. § 483.15(a)(2)(iii). Nursing facilities participating in Medicaid also may not "charge, solicit, accept, or receive . . . any gift, money, donation, or other consideration as a precondition of admission, expedited admission or continued stay in the facility." § 438.15(a)(4). LTC facilities participating in Medicaid also cannot "condition the resident's admission or continued stay" at the facility on his or her willingness to purchase "additional services" not covered by the state's Medicaid plan. § 483.15(a)(4)(i). Nursing homes are also required to "disclose and provide to a resident or potential resident prior to time of admission, notice of special characteristics or service limitations of the facility." § 483.15(a)(6).

These regulations establish requirements for the facilities' admissions policies, which are conditions precedent to the resident's admission to the facility. The Final Rule similarly limits a facility's ability to leverage the resident's need for medical care to make other demands on the resident. CMS, recognizing that an agreement to arbitrate can be valuable to both parties if entered into knowingly and voluntarily, has reasonably chosen not to prohibit such agreements altogether, but to use regulations to protect the patient's health, safety, welfare, and rights by decoupling the resident's ability to receive care in a particular LTC facility from her decision whether or not to sign a pre-dispute arbitration agreement. Additionally, given CMS's conclusion that "the secrecy surrounding the arbitration process is a substantial concern" and that because of this secrecy, arbitration "could result in some facilities evading responsibility for substandard care," Reform of Requirements, 81 Fed. Reg. at 68797–98, the retention requirement found at § 483.70(n)(6) is a reasonable exercise of the Secretary's responsibility to ensure that CMS is able to enforce the program requirements.

For these reasons, the Court concludes that the Final Rule is a reasonable exercise of the authority delegated to the Secretary by the Medicare and Medicaid statutes and is entitled to deference under *Chevron*.

### D. The Rulemaking Was Not Arbitrary and Capricious

Plaintiffs challenge the Rule as arbitrary, capricious, and an abuse of discretion on two separate grounds. The Court will address each in turn.

*1. Empirical Data Was Not Necessary*

First, Plaintiffs argue that the Government does not have the empirical data to support the Rule—in fact, one rationale for the Rule's retention requirement is to allow

CMS to *collect* such data. *See* Revision of Requirements, 84 Fed. Reg. at 34728. The Government acknowledges that there is "little solid social science research" indicating the effect of binding pre-dispute arbitration on the quality of care received by residents. *Id.* at 34722. However, the Government argues that it is not obliged to rely on empirical evidence and has provided a sufficiently reasoned basis for the Final Rule.

The standard of review to determine if a change in regulation is arbitrary and capricious is the same as promulgation of a new rule. *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41 (1983). The Supreme Court has described this standard as upholding a rule that is "rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute." *Id.* at 42. The scope of the court's review "is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). The Court must rely only on the rationale that the agency offers without "supply[ing] a reasoned basis for the agency's action that the agency itself has not given." *Id.* (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). However, the Court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* (quoting *Bowman Transp. Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).

To satisfy this standard, "it is highly desirable that the agency: independently amass the raw data; verify the accuracy of that data; apply that data to consider several alternative courses of action; and reach a result confirmed by the comments and

submissions of interested parties." *Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC*, 737 F.2d 1095, 1124 (D.C. Cir. 1984). However, the Courts of Appeals have recognized that it may not be possible for the agency to undertake all of these steps. Instead, the

> [n]otice and comment procedures are partially designed to overcome this problem. They permit parties to bring relevant information quickly to the agency's attention. A degree of agency reliance on these comments is not only permissible but often unavoidable. Thus, although an agency must consider and analyze the factual materials gathered during the informal rulemaking process, we have never held that an agency must conduct this analysis without relying on the comments submitted during the rulemaking.

*Id. See also Peck v. Thomas*, 697 F.3d 767, 775–76 (9th Cir. 2012) (holding that while analysis of statistical evidence would be *sufficient* for APA compliance, it was not *necessary* where the agency reasonably relied on its own experience); *Stilwell v. Office of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009) ("The APA imposes no general obligation on agencies to produce empirical evidence.").

The Court finds that the agency has provided a sufficiently reasoned basis for the Final Rule. While empirical data might have helped the agency form its policy regarding the use of binding pre-dispute arbitration agreements in LTC facilities, CMS was not required to have such data. It was permitted to rely on the numerous comments received from a variety of parties and its review of court decisions and academic literature to guide it in formulating the Final Rule. In responding to the comments received when CMS first proposed the possibility of regulating the use of binding pre-dispute arbitration agreements, the agency noted that it "conducted a literature review and also reviewed court opinions involving arbitration in LTC facilities." Reform of Requirements, 81 Fed. Reg. at 68793. These materials "provided evidence that pre-dispute arbitration agreements were detrimental to the health and safety of LTC facility residents." *Id.* This

"published research"—in conjunction with the public comments reviewed by the agency—led CMS to conclude that it was important to regulate the use of these agreements. Reform of Requirements, 81 Fed. Reg. at 68793.

Furthermore, the fact that evidence was mostly anecdotal rather than statistical influenced the agency's ultimate decision. In determining the appropriate scope of the regulation, the Government tempered its initial decision to bar the use of pre-dispute arbitration entirely precisely because of the "lack of statistical data" and the need to "strike a balance between the stakeholders supporting arbitration and residents having a complete understanding of the consequences of entering into an arbitration agreement." Revision of Requirements, 84 Fed. Reg. at 34722. The agency also finalized a requirement that facilities retain a copy of the arbitration agreement and the arbitrator's final decision in any dispute resolved through arbitration to "allow [CMS] to learn how arbitration is being used by LTC facilities and how this is affecting the residents." *Id.* at 34723 (codified at 42 C.F.R. § 483.70(n)(6)). While Plaintiffs assert that this "puts the cart before the horse," (Doc. 27, p. 33), the Court notes that "agencies can, of course, adopt prophylactic rules to prevent potential problems before they arise. An agency need not suffer the flood before building the levee." *Stilwell*, 569 F.3d at 519. On the basis of the materials it reviewed, including the academic literature and public comments, CMS could reasonably conclude that it was necessary to place some limitations on the use of pre-dispute binding arbitration agreements without prohibiting them completely and establish mechanisms to collect additional information to inform future rulemaking.

*2. The Change in Policy is Adequately Justified*

Second, Plaintiffs assert that the Final Rule is arbitrary and capricious because the agency has left unexplained its departure from prior policy, as laid out in a memorandum from Steven Pelovitz, Director of the Survey and Certification Group in January 2003 (the "Pelovitz Memo") and a letter from Michael Leavitt, Secretary of HHS at the time, to the House Judiciary Committee in 2008 (the "Leavitt Letter"). In response, the Government asserts that the Pelovitz Memo and the Leavitt Letter are general statements that are not in conflict with the Final Rule, which still recognizes that there can be benefits of arbitration and simply eliminates certain negotiating tactics by LTC facilities.

"'When an agency changes its existing position, it 'need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate.' But the agency must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" *Encino Motorcars, LLC v. Narvarro*, 136 S. Ct. 2117, 2125–26 (2016) (quoting *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009)) (internal citation omitted). A more detailed justification of the change may be necessary if the prior policy "has engendered serious reliance interests." *Fox Television Studios*, 556 U.S. at 515.

For the most part, the Court agrees that there is not as much tension between the Final Rule and the Pelovitz Memo and Leavitt Letter as Plaintiffs suggest. The Final Rule does not "deprive patients and providers of the opportunity to agree voluntarily to resolve their disputes through arbitration," which was then-Secretary Leavitt's concern about the Fairness in Nursing Home Arbitration Act. (Doc. 24-26, p. 705). Nor does the Final Rule undercut his observation that "[p]re-dispute arbitration agreements are an excellent way

for patients and providers to control costs, resolve disputes, and speed resolution of conflicts." *Id.* Where both parties agree, subject to the requirements put in place by the Rule, future disputes can still be committed to the arbitrator for resolution. Nor does the Court read the Pelovitz Memo to take a pro-arbitration stance at odds with the Final Rule; rather, it states CMS's decision to leave the choice whether to enter into arbitration agreements to the facility and the resident or to state law and emphasizes that a resident's refusal to enter into such an agreement is not a valid ground for the facility to discharge the resident. *See* Doc. 24-26, pp. 703–04.

However, to the extent that the Court finds that there is more tension between these two policy statements and the Final Rule than the Government is willing to acknowledge, the Court finds that any change in policy is adequately supported by the administrative record. For example, both the Pelovitz Memo and the Leavitt Letter assert that the use of arbitration agreements does not interfere with CMS's ability to enforce its regulations and sanction facilities for inadequate quality of care. *See* Doc. 24-26, pp. 704 & 705. But in promulgating the Final Rule, CMS stated that the retention requirement was being put in place "to ensure that CMS can fully evaluate quality of care complaints that are addressed in arbitration." Revision of Requirements, 84 Fed. Reg. at 34730. To the extent that this suggests CMS now believes that arbitration agreements may in fact impede its enforcement efforts, that change in position is justified by "anecdotal evidence of so-called 'gag-clauses' being common in arbitration agreements and that residents and family members were uncertain if they could talk to surveyors about a quality concern that was arbitrated." *Id.*

Similarly, to the extent that CMS's policy no longer leaves the decision whether to arbitrate *entirely* to the facility and the resident but establishes some additional protections for the resident, the perceived need for those additional protections has been discussed at length above and is sufficient to "show that there are good reasons for the new policy." *Fox Television Stations*, 556 U.S. at 515. Additionally, CMS noted that the use of arbitration by LTC facilities had increased in recent years, citing articles that were published after the Pelovitz Memo and Leavitt Letter were put forward. *See* Reform of Requirements, 81 Fed. Reg. at 68794. Finally, to the Plaintiffs' assertion that CMS has not met the threshold requirement of recognizing that the Final Rule departs from prior policy, (Doc. 36, p. 28), the Court notes CMS's acknowledgment that it "reversed the existing policy through the adoption of the 2016 final rule." Revision of Requirements, 82 Fed. Reg. at 26650. Therefore, the Court can conclude that the agency has sufficiently justified the Final Rule, including providing an adequate basis for changing its policy.

Finally, the Court is unpersuaded by Plaintiffs' claims to have a serious reliance interest in the prior policy that CMS failed to acknowledge. *See* Doc. 27, p. 33. First, the Final Rule has no effect on arbitration agreements that were formed before it went into effect. *See* Revision of Requirements, 84 Fed. Reg. at 34729. Second, Plaintiffs' claim to have "built their economic and pricing models" in reliance on the prior policy, (Doc. 27, p.33), rings hollow in light of their admission that most of their residents are covered by Medicare and Medicaid, *see* Docs. 25-3 & 25-4 at ¶ 3, for whom the rates are set by the agency, not the facility. Ultimately, as discussed at length in Section B.2, *supra*, Plaintiffs are only subject to conditions on their use of pre-dispute arbitration by virtue of their voluntary participation in Medicare and Medicaid. If the regulatory changes made by the

Final Rule truly shift Plaintiffs' economic calculus, they are free to serve fewer residents covered by Medicaid and Medicare, or none at all.

### E. Regulatory Flexibility Act

Finally, Plaintiffs argue that the Rule violates the APA by failing to comply with the Regulatory Flexibility Act ("RFA"). The RFA requires that "[w]hen an agency promulgates a final rule, . . . the agency shall prepare a final regulatory flexibility analysis" containing a variety of descriptions and assessments described in the statute. 5 U.S.C. § 604(a). However, such an analysis is not required where "the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." 5 U.S.C. § 605(b). If the agency head, in this case the Secretary of HHS, makes such a certification, it must be published in the Federal Register when the final rule is promulgated, "along with a statement providing the factual basis for such certification." *Id.*

Judicial review of agency compliance with § 605(b) is governed by the APA. "Thus, if data in the regulatory flexibility analysis—or data anywhere else in the rulemaking record—demonstrates that the rule constitutes such an unreasonable assessment of social costs and benefits as to be arbitrary and capricious, the rule cannot stand." *Nat'l Telephone Co-op Ass'n v. F.C.C.*, 563 F.3d 536, 540–41 (D.C. Cir. 2009) (quoting *Thompson v. Clark*, 741 F.2d 401, 405 (D.C. Cir. 1984)). Under arbitrary-and-capricious review, the court's "review is narrow," and that is "particularly true with regard to an agency's predictive judgments about the likely economic effects of a rule." *Id.* at 541 (internal quotation marks omitted).

It is appropriate for the court to consider the entire administrative record in making this assessment, even if the rulemaking took place over multiple phases. *See Michigan v. Thomas*, 805 F.2d 176, 188 (6th Cir. 1986) (rejecting an RFA challenge where the agency approved a rule, saw the rule challenged in court, and sought voluntary remand to reconsider the rule, because the agency "performed its regulatory flexibility analysis in the context of its overall rulemaking analysis"); *Cal. Farm B. Fed'n v. EPA*, 72 F. App'x 540, 541 (9th Cir. 2003) (rejecting an RFA challenge in part because the Secretary's certification was supported by an "earlier impact analysis"); *Carpenter, Chartered v. Sec'y of Veterans Affairs*, 343 F.3d 1347, 1357 (Fed. Cir. 2003) (upholding the Secretary's certification as complying with the RFA "in view of the record as a whole"). *Cf. Nat'l Mining Ass'n v. Mine Safety & Health Admin.*, 512 F.3d 696, 701 (D.C. Cir. 2008) (holding that since the agency had found that a more widely-applicable requirement did not create a significant economic burden on small business, it was unnecessary for the agency to perform an analysis of a second rule that was simply an alternative to the first).

It is undisputed that the notice of the Final Rule in the Federal Register did contain the Secretary's certification that the Rule would not have a significant economic impact on a substantial number of small entities, *see* Revision of Requirements, 84 Fed. Reg. at 34734, but Plaintiffs assert that the CMS provided no factual basis for the Secretary's certification, that there was no assessment or explanation to support the Secretary's conclusion, and that the Final Rule does in fact have a significant economic impact on a substantial number of small entities. The Government responds that the RFA certification requirement is a purely procedural mandate that requires a reasonable, good faith effort by the agency to comply but does not permit Plaintiffs or the Court to challenge the

outcome of the Secretary's determination. The Government argues that CMS provided an extensive factual basis for the Secretary's certification in promulgating the 2016 version of the rule. Since the Final Rule at issue here imposed fewer requirements on regulated parties, the Secretary could conclude that the analysis under the RFA would be unchanged, and therefore the procedural requirements were met.

The Court agrees with the Government. As discussed above, the Court finds it appropriate to take into account the entire administrative record in evaluating whether the Secretary complied with the requirements of the RFA. In promulgating the first version of the rule in 2016, the Government analyzed the economic impact of the entire rule and determined that "[t]he annual impact on a nursing facility would be around $63,000 in year 1 and $55,000 in year 2 and thereafter . . . so the average impact on the facility is less than 1 percent of revenue" and less than the threshold of 3 to 5 percent that would constitute a significant economic impact. Reform of Requirements, 81 Fed. Reg. at 68846. This was the basis for the Secretary's certification in 2016. The 2016 rule entailed extensive changes to the regulations governing LTC facilities. In addition to the regulation barring the use of pre-dispute binding arbitration, the rule implemented changes to requirements for infection control and nutrition, notification and grievance procedures, and many others. *See id.* at 68847–72.

In promulgating the Final Rule in 2019, the Secretary again certified that the Rule would not have a significant economic impact on a substantial number of small entities. *See* Revision of Requirements, 84 Fed. Reg. at 34734. Though the Secretary did not state the factual basis for this certification in the paragraph where it was made, the Court can conclude from review of the record that the 2019 Final Rule had a much narrower

economic impact on LTC facilities than the 2016 rule, which the Secretary had previously certified. Furthermore, comparing only the portion of the rule related to pre-dispute binding arbitration agreements, CMS made clear that its intention with the Final Rule was to *reduce* the costs to the LTC facilities while still protecting the rights of residents. *See, e.g.*, Revision of Requirements, 82 Fed. Reg. at 26651 ("We believe this revised approach is consistent with the elimination of unnecessary and excessive costs to providers while enabling residents to make informed choices . . . .); Revision of Requirements, 84 Fed. Reg. at 34722 ("[C]ommenters from the LTC industry have argued for the continued use of arbitration agreements for reasons of cost and efficiency. This regulation is designed to strike a balance between those concerns and protecting the needs of LTC residents."); *id.* at 34733 ("LTC facilities assert that . . . arbitration reduces their costs . . . . [W]e are removing the prohibition on pre-dispute binding arbitration agreements . . . .).

Plaintiffs challenge CMS's reliance on the 2016 rulemaking, arguing that the agency should not be able to use its reasoning from 2016 as a factual basis for the RFA certification in 2019. The Court is not persuaded by Plaintiffs' reliance on *North Carolina Fisheries Ass'n v. Daley*, 16 F. Supp. 2d 647 (E.D. Va. 1997). There, the plaintiffs challenged the RFA certification of the Secretary of Commerce in setting the quota for the number of summer flounder that could be caught by the fishing industry in North Carolina in that year. The Secretary certified that there would not be significant economic impact on a substantial number of small entities because the quota was the same as the previous year. The court held that the Secretary did not satisfy § 605(b) and was required to "make some showing that it has at least considered the potential effects of *this* quota, *this* year." *Id.* at 652 (emphasis in original). However, the fisheries management plan being

implemented by the Commerce Department requires the National Marine Fisheries Services to set a quota every year based on a variety of factors. Each year is a new undertaking specific to that year. *See id.* at 649–50. Here, in contrast, the Final Rule is the culmination of a multi-year process that began when a version of the current Rule was initially proposed in 2015. Therefore, the Court concludes that the Secretary complied with the requirements of the RFA.

Further, the Court finds that, as described above, the record provides adequate support for the agency's position. Given the deferential standard of review, the Court is not permitted to "substitute its judgement for that of the agency," even if it disagrees with the agency's conclusion. *Motor Vehicle Mrfs. Ass'n*, 463 U.S. at 43. Plaintiffs have not alleged that the agency has relied on improper factors or "entirely failed to consider an important aspect of the problem." *Id.* The Court cannot conclude that the Secretary's certification is "so implausible that it could not be ascribed to a difference in view," *id.* at 43, and therefore cannot find the agency's RFA certification arbitrary and capricious.

### III. CONCLUSION

For the reasons given above, Plaintiffs' Motion for Summary Judgment (Doc. 26) is **DENIED** and the Defendants' Cross-Motion for Summary Judgment (Doc. 28) is **GRANTED**. Accordingly, Plaintiffs' First Amended Complaint is **DISMISSED WITH PREJUDICE** and this case is terminated.

**IT IS SO ORDERED** on this _____7^TH_____ day of April, 2020.

                                                  _____
                                                  TIMOTHY L. BROOKS
                                                  UNITED STATES DISTRICT JUDGE